## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
THOMAS WILNER, *et al.*,                               )
)
    Plaintiffs,                               )    Hon. Judge Cote
)
    v.                               )    1:07-cv-3883-DLC
)
NATIONAL SECURITY AGENCY, *et al.*,                               )
)
    Defendants.                               )
_____)

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING THE NON-GLOMAR RESPONSE

GREGORY G. KATSAS
Acting Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

ELIZABETH A. SHAPIRO
Assistant Director, Federal Programs Branch

ALEXANDER K. HAAS (CA# 220932)
Trial Attorney
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20044
Tel: (202) 305-9334 — Fax: (202) 305-3138
Email: alexander.haas@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Terrorist Surveillance Program.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Plaintiffs' FOIA Request and Defendants' Responses. . . . . . . . . . . . . . . . . . 3

        1.    OLC's Response. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2.    OIP's Response for OAG and ODAG. . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.    The Criminal Division's Response. . . . . . . . . . . . . . . . . . . . . . . . . . 7

        4.    The Office of Solicitor General's Response. . . . . . . . . . . . . . . . . . . 8

        5.    The FBI's Response. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        6.    The National Security Agency's Response. . . . . . . . . . . . . . . . . . . . 9

    C.    Plaintiffs' Operative Complaint & Documents At Issue. . . . . . . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    DEFENDANTS' SEARCHES FOR RESPONSIVE RECORDS
        WERE ADEQUATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.    The Office of Legal Counsel Conducted a Reasonable Search. . . . . . . . . 16

        B.    The Office of Information and Privacy Conducted a
            Reasonable Search. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.    The Criminal Division Conducted a Reasonable Search. . . . . . . . . . . . . 18

        D.    The Office of Solicitor General Conducted a Reasonable
            Search.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        E.    The Federal Bureau of Investigation Conducted a Reasonable
            Search.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        F.    The National Security Agency Conducted a Reasonable Search. . . . . . . 20

II.  DEFENDANTS PROPERLY WITHHELD RECORDS
     RESPONSIVE TO FOIA REQUEST NO. 3 UNDER FOIA. . . . . . . . . . . . . . . 20

     A.  DOJ And NSA Properly Withheld Records Under Exemption
         One. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         1.  NSA Properly Withheld Records Under Exemption One. . . . . . . 25

         2.  OLC Properly Records Under Exemption One. . . . . . . . . . . . . . 27

         3.  OIPR Properly Withheld Records Referred to it Under
             Exemption One. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

         4.  FBI Properly Withheld Records Under Exemption One. . . . . . . 29

     B.  FBI Properly Withheld Records Under Exemption Two. . . . . . . . . . . . 30

     C.  DOJ And NSA Properly Withheld Records Under Exemption
         Three. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     D.  Defendants Properly Withheld Records under Exemption Five. . . . . . . 42

     E.  DOJ Properly Withheld Records under Exemption Seven. . . . . . . . . . . 51

         1.  The Criminal Division Also Properly Withheld Records
             Under Exemptions 7(A) and 7(D). . . . . . . . . . . . . . . . . . . . . . . . 55

         2.  The FBI Properly Withheld Records Under Exemptions
             7(A), 7(D), and 7(E).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

     F.  DOJ Properly Withheld Information under Exemptions Six and
         Seven(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGES**

ACLU v. DOD, 389 F. Supp. 2d 547 (S.D.N.Y. 2005). ............................................. 14

ACLU v. United States Dep't of Justice, 265 F. Supp. 2d 20
    (D.D.C. 2003). ........................................................................... 21, 22, 26, 27

AFL-CIO v. Fed. Election Comm'n, 177 F. Supp. 2d 48 (D.D.C. 2001),
    *aff'd* 333 F.3d 168 (D.C. Cir. 2003). ................................................. 61

Abbotts v. NRC, 766 F.2d 604 (D.C. Cir. 1985). ........................................ 21

Access Reports v. Dep't of Justice, 926 F.2d 1192 (D.C. Cir. 1991)........................................... 49

Accord Campbell v. U.S. Dep't of Justice, 164 F.3d 20 (D.C. Cir. 1998). ................................ 15

Alyeska Pipeline Serv. v. U.S. Env't Prot. Agency, 856 F.2d 309
    (D.C. Cir. 1988). ........................................................................... 53

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). .................................................. 12

Assoc. of Retired R. R. Workers v. United States R.R. Ritirement Bd,
    830 F.2d 331 (D.C. 1987). ......................................................... 35

Baez v. U.S. Dep't of Justice, 647 F.2d 1328 (D.C. Cir. 1980). .................................. 62

Bassiouni v. CIA, 392 F.3d 244 (7th Cir. 2004). ........................................ 15

Blanton v. Dep't of Justice, 63 F. Supp. 2d 35 (D.D.C. 1999)........................................ 33, 52, 55

Blazy v. Tenet, 979 F. Supp. 10 (D.D.C. 1997), *aff'd*, 1998 WL 315583
    (D.C. Cir. 1998). ........................................................................... 62

Brinton v. Dep't of State, 636 F.2d 600 (D.C. Cir. 1980). ........................................ 50

Brunetti v. Fed. Bureau of Investigation, 357 F. Supp. 2d 97
    (D.D.C. 2004). ........................................................................... 19

Campbell v. U.S. Dep't of Justice, 164 F.3d 20 (D.C. Cir. 1998)................................. 15, 19, 20

Carney v. U.S. Dep't of Justice, 19 F.3d 807 (2d Cir. 1994). ........................................ 15

Carter v. U.S. Dep't of Commerce, 830 F.2d 388 (D.C. Cir. 1987)............................................. 60

Celotex Corp. v. Catrett, 477 U.S. 317 (1986). .......................................... 12

Center for Nat'l Security Studies v. U.S. Dept. of Justice, 331 F.3d 918
    (D.C. Cir. 2003). ............................................................................... passim

Cities Serv. Co. v. Fed. Trade Comm'n, 627 F. Supp. 827 (D.D.C. 1984)................................. 45

City of Virginia Beach v. U.S. Dep't of Commerce, 995 F.2d 1247
    (4th Cir. 1993)................................................................................... 47

Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854 (D.C. Cir. 1980). ...................... 44, 47

Coleman v. Federal Bureau of Investigation, 13 F. Supp. 2d 75 (D.D.C. 1998). ................. 52, 55

Conoco, Inc. v. Dep't of Justice, 687 F.2d 724 (3d Cir. 1982). .................................... 48

Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051
    (D.C. Cir. 1981). ........................................................................ 30, 32, 34

D'Alessandro v. U.S. Dept. of Justice, 1991 WL 35519 (D.D.C. 1991)...................................... 55

Davis v. U.S. Dep't of Justice, 968 F.2d 1276 (D.C. Cir. 1992)................................................. 61

Delta Ltd. v. Customs and Border Prot. Bur., 384 F. Supp. 2d 138
    (D.D.C. 2005). ................................................................................... 32

Dep't of Defense v. FLRA, 510 U.S. 487 (1994). ....................................................... 60

Dept. of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1 (2001). ........................ 43

Dept. of Justice v. Tax Analysts, 492 U.S. 136 (1989)................................................................ 11

Doherty v. DOJ, 775 F.2d 49 (2d Cir. 1985). ............................................................ 13

Dow Jones & Co., Inc. v. Dep't of Justice, 917 F.2d 571 (D.C. Cir. 1990)................................ 54

Dudman Communications Corp. v. Dept. of the Air Force, 815 F.2d 1565
    (D.C. Cir. 1987). ........................................................................... 47, 48

Electronic Privacy Information Center v. Dep't of Justice, 511 F. Supp. 2d 56
    (D.D.C. 2007). .......................................................................... 1, 10-11

Exxon Corp. v. Dep't of Energy, 585 F. Supp. 690 (D.D.C. 1983). ........................................... 47

Ferguson v. FBI, No. 89 Civ 5071, 1995 WL 329307 (S.D.N.Y. June 1, 1995),
    *aff'd*, 83 F.3d 41 (2d Cir. 1996). ......................................................... 2

First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968). ........................................ 12

Fisher v. Dept. of Justice, 772 F. Supp. 7 (D.D.C. 1991), *aff'd*, 968 F.2d 92
(D.C. Cir. 1992). ................................................................................................... 55

Fitzgibbon v. CIA, 911 F.2d 755 (D.C. Cir. 1990). ................................................... 35

Florida Immigrant Advocacy Cir. v. Nat'l Security Agency,
380 F. Supp. 2d 1332 (S.D. Fla 2005). ................................................................. 37

Founding Church of Scientology of Washington, D.C., Inc. v. Smith,
721 F.2d 828 (D.C. Cir. 1983). ............................................................................. 31

Fund for Constitutional Gov't v. Nat'l Archives and Records Serv.,
656 F.2d 856 (D.C. Cir. 1981). ............................................................................. 20

Guillot v. Garrett, 970 F.2d 1320 (4th Cir. 1992). ...................................................... 3

Halperin v. CIA, 629 F.2d 144 (D.C. Cir. 1980). ............................................... 13, 22

Hayden v. NSA/CSS, 608 F.2d 1381 (D.C. Cir. 1979). ..................................... passim

Hickman v. Taylor, 329 U.S. 495 (1947). ................................................................. 45

Hogan v. Huff, 2002 WL 1359722 (S.D.N.Y. 2002). ................................................ 37

Hornbostel v. U.S. Dep't of the Interior, 305 F. Supp. 2d 21 (D.D.C. 2003). ........... 49

Hunt v. FBI, 972 F.2d 286 (9th Cir. 1992). .............................................................. 63

Hunt v. U.S. Marine Corps, 935 F. Supp. 46 (D.D.C. 1996). .................................... 49

Immigrant Advocacy Ctr. v. Nat'l Security Agency, 380 F. Supp. 2d 1332
(S.D. Fla. 2005). ................................................................................................... 37

Int'l Paper Co. v. Fed. Power Comm'n, 438 F.2d 1349 (2d Cir. 1971). .................... 49

Iturralde v. Comptroller of Currency, 315 F.3d 311 (D.C. Cir. 2003). ..................... 16

John Doe Agency v. John Doe Corp., 493 U.S. 146 (1989). ...................................... 12

Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771 (D.C. Cir. 2002). ........... 15

Judicial Watch, Inc. v. Dept. of Justice, 365 F.3d 1108 (D.C. Cir. 2004). ..... 45, 64, 65

Judicial Watch v. Dep't of Justice, 06-cv-00406 (March 20, 2008). .................................. 1, 10-11

Judicial Watch of Florida, Inc. v. Dep't of Justice, 102 F. Supp. 2d 6
    (D.D.C. 2000). ........................................................................................................ 48

Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19 (D.D.C. 2000). .............................. 43

Judicial Watch v. Rossotti, 285 F. Supp. 2d 17 (D.D.C. 2003). ................................................. 15

Kay v. Fed. Communications Comm'n, 976 F. Supp. 23 (D.D.C. 1997),
    *aff'd* 172 F.3d 919 (D.C. Cir. 1998). ............................................................................. 57

Keys v. U.S. Dep't of Justice, 830 F.2d 337 (D.C. Cir. 1987). ................................................... 51

Kidd v. Dep't of Justice, 362 F. Supp. 2d 291 (D.D.C. 2005). .................................................... 19

Klunzinger v. IRS, 27 F. Supp. 2d 1015 (W.D. Mich. 1998). ...................................................... 49

Krikorian v. Dept. of State, 984 F.2d 461 (D.C. Cir. 1993). ....................................................... 22

Lesar v. U.S. Dep't of Justice, 636 F.2d 472 (D.C. Cir. 1980). ................................................... 62

Librach v. FBI, 587 F.2d 372 (8th Cir. 1978). ............................................................................ 59

Linder v. NSA, 94 F.3d 693 (D.C. Cir. 1996). ..................................................................... 36, 42

Mack v. Dept. of Navy, 259 F. Supp. 2d 99 (D.D.C. 2003). ........................................................ 61

Manna v. DOJ, 51 F.3d 1158 (3d Cir. 1995). ............................................................................. 53

Mead Data Central, Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242
    (D.C. Cir. 1977). ........................................................................................................ 44

Meeropol v. Meese, 790 F.2d 942 (D.C. Cir. 1986). ................................................................... 15

Military Audit Project v. Casey, 656 F.2d 724 (D.C. Cir.1981). .............................. 12, 13, 21, 22

Miller v. Casey, 730 F.2d 773 (D.C. Cir. 1984). ........................................................... 13, 21, 22

Minier v. CIA, 88 F.3d 796 (9th Cir. 1996). ........................................................................ 12, 40

Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975). ................................ 43

Nation Magazine, Wash. Bur. v. Customs Serv., 71 F.3d 885
    (D.C. Cir. 1995). ........................................................................................................ 61

National Archives and Records Admin. v. Favish, 541 U.S. 157 (2004). .................................. 64

National Labor Relations Bd. v. Robbins Tire and Rubber Co.,
      437 U.S. 214 (1978). ...................................................................................................... 53

New York Public Interest Research Group v. U.S. Environmental
      Protection Agency, 249 F. Supp. 2d 327 (S.D.N.Y. 2003). ............................................. 48

New York Times Co. v. Nat'l Aeronautics & Space Admin., 920 F.2d 1002
      (D.C. Cir. 1990). ............................................................................................................. 60

Nixon v. Adm'r of Gen. Servs., 433 U.S. 425 (1977). ................................................................ 46

Nixon v. Fitzgerald, 457 U.S. 731 (1982) .................................................................................. 45

Nixon v. Sirica, 487 F.2d 700 (D.C. Cir. 1973) ......................................................................... 46

Ogelsby v. U.S. Dep't of the Army, 920 F.2d 57 (D.C. Cir. 1990). ................................. 15, 19, 20

People for the American Way v. NSA ("PFAW"), 462 F. Supp. 21
      (D.D.C. 2006). ............................................................................................................ 1, 11

Russell v. Dep't of the Air Force, 682 F.2d 1045 (D.C. Cir. 1982). ............................................ 48

SafeCard Services, Inc. v. SEC, 926 F.2d 1197 (D.C. Cir. 1991). ............................................. 63

Salisbury v. United States, 690 F.2d 966 (D.C. Cir. 1982) ......................................................... 21

Schiffer v. FBI, 78 F. 3d 1405 (9th Cir. 1996) ........................................................................... 61

Schiller v. National Labor Relations Bd., 964 F.2d 1205 (D.C. Cir. 1992) .................... 30, 32, 44

Schrecker v. U.S. Dept. of Justice, 349 F.3d 657 (D.C. Cir. 2003). ........................................... 16

Schwarz v. Dep't of the Treasury, 131 F. Supp. 2d 142 (D.D.C. 2000) ...................................... 63

Smith v. Bureau of Alcohol, Tobacco and Firearms, 977 F. Supp. 496
      (D.D.C. 1997). ........................................................................................................... 55, 59

Snepp v. United States, 444 U.S. 507 (1980). ............................................................................ 39

Solar Sources, Inc. v. United States, 142 F.3d 1033 (7th Cir. 1998)
      (quoting Robbins Tires, 437 U.S. at 236). ....................................................................... 54

Southam News v. U.S. Immigration & Naturalization Serv.,
      674 F.Supp. 881 (D.D.C. 1987). ..................................................................................... 50

Spannuaus v. U.S. Dep't of Justice, 813 F.2d 1285 (4th Cir. 1987). .......................................... 54

Spurlock v. Fed. Bureau of Investigation, 69 F.3d 1010 (9th Cir. 1995). .................................. 12

Steinberg v. Dep't of Justice, 23 F.3d 548 (D.C. Cir.1994). ........................................... 15, 19, 20

Tax Analysts v. Internal Revenue Serv., 117 F.3d 607 (D.C. Cir.1997). .................................... 43

The Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l
    Security Agency, 610 F.2d 824 (D.C. Cir. 1979)............................................................. 35

The New York Times v. Dept. of Defense & Dept. of Justice ("NYT"),
    499 F. Supp. 2d 501 (S.D.N.Y. 2007).................................................................... 1, 10-11

Thompson v. Dep't of the Navy, 1995 WL 527344 (D.D.C. 1997). ........................................... 49

Tigue v. U.S. Dep't of Justice, 312 F.3d 70 (2d Cir. 2002). ................................................. 42, 51

Town of Norfolk v. U.S. Army Corps of Engineers, 968 F.2d 1438
    (1st Cir. 1992). ........................................................................................................... 47

U.S. Dep't of Justice v. Landano, 508 U.S. 165 (1993). ........................................................... 54

United States Dep't of State v. Washington Post Co., 456 U.S. 595 (1982)............................... 60

United States v. Nixon, 418 U.S. 683 (1974). ........................................................................... 45

United We Stand American v. IRS, 359 F.3d 595 (D.C. Cir. 2004)........................................... 11

Voinche v. FBI, 46 F. Supp. 2d 26 (D.D.C. 1999). ................................................................... 52

Voinche v. FBI, 940 F. Supp. 323 (D.D.C. 1996). ....................................................... 33, 58, 63

Washington Post Co. v. U.S. Dept. of Health and Human Servs.,
    690 F.2d 252 (D.C. Cir. 1982). ............................................................................... 60, 62

Weissman v. CIA, 565 F.2d 692 (D.C. Cir. 1977)..................................................................... 22

Western Ctr. for Journalism v. Internal Revenue Serv., 116 F.
    Supp. 2d 1 (D.D.C. 2000). ....................................................................................... 15

Whalen v. U.S. Marine Corps, 407 F. Supp. 2d 54 (D.D.C. 2005). .......................................... 40

Wickline v. FBI, 1994 WL 549756 (D.D.C. 1994).................................................................... 55

Wiesenfelder v. Riley, 959 F. Supp. 532 (D.D.C. 1997). .............................................. 31

Williams v. FBI, 69 F.3d 1155 (D.C. Cir. 1995). ........................................................ 54

Winter v. Nat'l Security Agency, 569 F. Supp 545 (S.D. Cal. 1983). ........................... 37

Wolfe v. Department of Health and Human Servs., 839 F.2d 768
    (D.C. Cir. 1988). ..................................................................................................... 44

## STATUTES

5 U.S.C. § 552(b). .............................................................................................. passim

18 U.S.C. § 798. ................................................................................................... 37

50 U.S.C. § 403-l(i). ........................................................................................... passim

50 U.S.C. § 402 note. ....................................................................................... 36, 37

## REGULATIONS

46 Fed. Reg. 59941, § 1.12(b). ............................................................................. 28

60 Fed. Reg. 19825 (Apr. 17, 1995). ....................................................................... 3

68 Fed. Reg. 15315 (Mar. 25, 2003). .................................................................. 3, 21

## MISCELLANEOUS

Executive Order 12958. ...................................................................................... 3, 23

Executive Order 12333. ........................................................................................ 28

Executive Order 13292. .......................................................................................... 3

## INTRODUCTION

Plaintiffs, lawyers who assert that they represent or have represented Guantanamo Bay detainees, *see* 2d Am. Compl. ¶ 3, have requested documents from defendants under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2006), *amended by* OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524, relating to the highly classified Terrorist Surveillance Program ("TSP"), a program the President of the United States authorized after the terrorist attacks of September 11, 2001. The only outstanding issue is plaintiffs' challenge to the withholding of certain records responsive to their request for "policies, procedures, guidelines, or practices for the interception of communications" under the TSP. *See id.* ¶ 8 (FOIA Request No. 3). In light of the grave dangers to the national security that could result if defendants are compelled to disclose information relating to this sensitive method of gathering intelligence critical to the defense of the United States, the defendants have properly refused to disclose certain exempt information responsive to plaintiffs' requests, and have otherwise responded properly under FOIA. Summary judgment under Federal Rule of Civil Procedure 56 should therefore be granted to defendants.

As identified below, many of the records at issue in the instant litigation have been subject to other FOIA litigation both in this Court, before Judge Berman, and in the United States District Court for the District of Columbia. *See People for the American Way v. NSA* ("*PFAW*"), 462 F. Supp. 21 (D.D.C. 2006); *The New York Times v. Dept. of Defense & Dept. of Justice* ("*NYT*"), 499 F. Supp. 2d 501 (S.D.N.Y. 2007); *Electronic Privacy Information Center v. Dep't of Justice*, 511 F. Supp. 2d 56 (D.D.C. 2007); *Judicial Watch v. Dep't of Justice*, 06-cv-00406, slip. op. (March 20, 2008). The withholding of most of the documents at issue here has been upheld by those courts. *See infra* at 10-11 & nn.6-11. And while plaintiffs have the statutory

and legal right to continue to challenge the withholding of the records at issue here, no good reason exists to upset those prior rulings, particularly given the national security interests at stake.  Relitigating broad swaths of documents that are clearly exempt under FOIA does little except expend both this Court's and the parties' limited resources.  For the reasons stated herein, in the accompanying declarations, and in the prior Court orders addressing the same documents, defendants are entitled to summary judgment.

## BACKGROUND[1]

### A.    The Terrorist Surveillance Program.

Following the devastating attacks of September 11, 2001, the President of the United States authorized the National Security Agency ("NSA") to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations (hereinafter, the "Terrorist Surveillance Program," or "TSP").  *See* Supplemental Declaration of Joseph J. Brand ("Brand Decl.") ¶ 11, attached hereto as Exh. A. The TSP was a signals intelligence ("SIGINT") program critical to the national security of the United States.  *Id.*  It was a targeted and focused program intended to help "connect the dots" between known and potential terrorists and their affiliates.  *Id.*  In order to intercept a communication under the TSP, one party to the communication must have been located outside the United States, and there must have been a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda.  *Id.*  Thus, the TSP was an "early warning system"

---

[1]  Defendants are not submitting a Statement pursuant to Local Civil Rule 56.1, in accordance with the general practice in this Circuit.  *See Ferguson v. FBI*, No. 89 Civ. 5071, 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), *aff'd*, 83 F.3d 41 (2d Cir. 1996).  If the Court wishes defendants to submit such a Statement, we will do so promptly.

established to detect and prevent another catastrophic attack on the United States.[2]  *Id.*

The President publicly acknowledged the existence of the TSP on December 17, 2005.
*Id.* ¶ 12.  As the President has made clear, however, details about the TSP remain highly
classified and subject to special access restrictions under the criteria set forth in Executive Order
12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68 Fed. Reg.
15315 (Mar. 25, 2003).  *Id.*  Unauthorized disclosure of information regarding the TSP can be
expected to cause exceptionally grave damage to the national security of the United States, and
thus, pursuant to the criteria outlined in Executive Order 12958, as amended, information related
to the TSP is classified TOP SECRET.  *Id.*; *see also* DNI Decl. ¶ 7.  Moreover, because
information related to the TSP involves or derives from particularly sensitive intelligence sources
and methods, it is subject to the special access and handling procedures reserved for Sensitive
Compartmented Information ("SCI").[3]  Brand Decl.¶ 12; *see also* DNI Decl. ¶ 7.

**B.**    **Plaintiffs' FOIA Request and Defendants' Responses.**

On January 18, 2006, plaintiffs submitted a FOIA request to defendants seeking seven
categories of records regarding the TSP.  *See* 2d Am. Compl. ¶ 8.  Plaintiffs' request went to
several components of the Department of Justice, specifically, the Office of Legal Counsel, the

---

    [2]  On January 17, 2007, the Attorney General announced that any electronic surveillance
that was occurring under the TSP would now be conducted subject to the approval of the Foreign
Intelligence Surveillance Court and that the President's authorization of the TSP had lapsed.  *See*
Supplemental Declaration of J. Michael McConnell, Director of National Intelligence ("DNI
Decl.") ¶ 13, attached hereto as Exh. B.  Congress subsequently clarified and amended the
Foreign Intelligence Surveillance Act through the Protect America Act, which itself lapsed on
February 16, 2008.  *Id.* & n.3.

    [3]  Access to Sensitive Compartmented Information ("SCI") requires specialized clearance
in addition to the Top Secret level.  "SCI is classified information that is required to be handled
exclusively within formal access control systems established by the Director of [National]
Intelligence."  *Guillot v. Garrett*, 970 F.2d 1320, 1322 n. 1 (4th Cir. 1992).

Office of the Attorney General, the Office of the Deputy Attorney General, the Criminal

Division, the Office of the Solicitor General, and the FBI, and NSA.

        1.     OLC's Response

On February 29, 2008, the Office of Legal Counsel ("OLC") made its initial response to

plaintiffs. With respect to unclassified files, OLC indicated that it had located more than 10,000

pages of responsive records. *See* Declaration of Steven G. Bradbury ("Bradbury Decl.") ¶ 20,

attached hereto as Exh. C. OLC released 1,440 pages of the documents, indicated it was

referring 338 pages of the remaining records to other agencies or other components of DOJ for

consultations, and withheld the remaining unclassified documents under FOIA Exemption Five,

because they were protected by the deliberative process privilege, the attorney-client privilege,

the attorney work-product doctrine, and/or the presidential communications privilege and were

not appropriate for discretionary release. *Id.*

On May 5, 2008, OLC responded to plaintiffs on the 338 pages of unclassified records

that it had referred to other agencies or other components of the Department for consultations.

*Id.* ¶ 21. Based on those consultations, OLC released 102 pages, subject to minor redactions to

protect information protected by FOIA Exemptions Two, Five, and Six. OLC also explained that

the Office of Information and Privacy ("OIP") was responding directly on 81 of the 338 pages

and that OLC was withholding the remaining 155 pages under FOIA Exemption Five, because

they are protected by the deliberative process privilege, the attorney-client privilege, and the

attorney work-product doctrine. *Id.* In addition, OLC advised plaintiffs that some of the

withheld pages also contained information protected by FOIA Exemptions Two, Three, and Six.

These unclassified materials are subdivided into 24 unclassified records or categories of records.

*See Id.* ¶ 22 & Exh. C to Bradbury Decl.

With respect to material located in classified files, OLC notified plaintiffs in the February 29 response, that it had located 104 records or categories of records responsive to the request. OLC released one of those records.  Bradbury Decl. ¶ 23.  Of the remaining 103 records or categories of records, OLC referred 42 to other agencies or components of DOJ for consultations. Based on those consultations, OLC withheld 42 records in full under FOIA Exemptions One and Three, 5 U.S.C. § 552(b)(1), (3), because they were properly classified and contain information of the type described in section 6 of the National Security Act of 1959, Pub. L. No. 86-36, § 6, 73 Stat. 63, 64, *codified at* 50 U.S.C. § 402 note, and/or in Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-l(i)(l).  Additionally, those documents are subject to the deliberative process and attorney-client privileges and thus are also withheld under FOIA Exemption Five, 5 U.S.C. § 552(b)(5).

OLC also explained that it was withholding the remaining 61 classified records or categories of records not referred for consultations pursuant to FOIA Exemption One, because they are classified and that many of these documents are exempt from disclosure under Exemption Three, because they contain the type of information described in section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, and/or section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act, 50 U.S.C. § 403-1(i)(l).  Bradbury Decl. ¶ 24.  In addition, most, if not all, of the classified 61 records or categories of records are subject to FOIA Exemption Five, because they are protected by the deliberative process privilege, the attorney-client privilege, the presidential communications privileges, and/or the attorney work-product doctrine.  Only 66 of the 103 classified records or categories of records were responsive to Plaintiffs' FOIA Request No. 3. Bradbury Decl. ¶ 25.  And 22 of the 66 classified records or categories of records were referred to

other components of DOJ or the NSA for a direct response and are addressed by the declarations of other components. *Id.* Other components of DOJ referred 11lassified records or categories of records to OLC for response and these were withheld under Exemptions One and Three. *Id.*

2. OIP's Response for OAG and ODAG

The Office of Information Privacy ("OIP") made a series of responses on behalf of the Office of the Attorney General ("OAG") and Office of the Deputy Attorney General ("ODAG"). *See* Declaration of Melanie Ann Pustay ("Pustay Decl.") ¶¶ 6-12, attached hereto as Exh. D & Exhs. C, F-H to Pustay Decl.

First, on October 16, 2006, OIP provided an interim response to plaintiffs notifying plaintiffs that the search was completed in the OAG and provided plaintiffs with eighty-five pages without excision, as well as two pages with excisions made pursuant to Exemption 6. *Id.* ¶ 6. In addition, eighty-four pages were withheld in full pursuant to the deliberative process, attorney work-product, and presidential communications privileges encompassed within Exemption 5.[4] *Id.* Then on August 1, 2007, OIP provided a second interim response to plaintiffs advising that its records searches were completed in ODAG and in the Departmental Executive Secretariat. OIP also advised plaintiff that classified records had been located. *Id.* ¶ 9. Those records were referred to other components or agencies for handling and certain unclassified records were also referred to other DOJ components. In addition, OIP released forty-seven pages

---

[4] Another one-page e-mail was withheld in full on behalf of the Office of Intelligence Policy and Review ("OIPR") pursuant to Exemption 5. Also on August 17, 2007, the Criminal Division, which received a three-page document by referral from OIP, advised the document was properly released with redactions pursuant to FOIA Exemptions Six and Seven. *See* Declaration of Kathy Hsu ("Hsu Decl."), attached as Exh. E hereto, ¶ 11 n.1 & Ex. 7 thereto. On August 22, 2007, the Civil Division responded concerning a document referred by OIP, *see* Declaration of James M. Kovakas ("Kovakas Decl."), attached as Exh. F hereto, ¶ 2, and advised that the one-page document was withheld in full under Exemption Five.

without excision.  Fifteen pages were withheld in full pursuant to the deliberative process and

attorney work-product privileges of Exemption 5.  On October 31, 2007, OIP provided a

supplemental response releasing thirty-seven pages of records that were previously withheld in

full in the October 16, 2006, and August 1, 2007, responses.  *Id.* ¶ 10.  On December 27, 2007,

OIP made a final response to plaintiffs releasing 297 pages without excision.  *Id.* ¶ 11.  On April

24, 2008, OIP supplemented its final response to plaintiffs.  *Id.* ¶ 12.  In this response, OIP

released one document, which was originally withheld in full pursuant to Exemption 5 in the

August 1, 2007, response.  OIP advised plaintiffs that, because three additional pages previously

withheld in the August 1, 2007, response were of primary interest to OLC, those pages had been

referred to OLC.  OIP also processed several referrals made by OLC releasing a number of pages

and also withholding others pursuant to Exemption 5.  *See* Exh. J & K to Pustay Decl.

     In sum, 20 categories of unclassified records responsive to Plaintiffs' FOIA request are

identified by OIP as being at issue in this litigation.  *See* Pustay Decl. ¶ 16 & Vaughn Index

thereto.  Groups 1, 2, 5, and 7 were reviewed *in camera* in *The New York Times v. DOD*, and the

application of Exemption 5 to those documents was upheld.  *Id.*  Plaintiffs have agreed not to

challenge the withholding of those records and they will not be discussed further.  In addition, the

document in Group 6 was released on April 24, 2008, and there is not considered withheld.  Thus,

15 of the 20 categories remain at issue.  As for classified documents, 18 classified records or

categories of records were responsive to plaintiffs' FOIA Request No. 3 and all were referred to

OLC, OIPR, FBI, or NSA for direct response and are addressed in the declarations of those

components.

         3.     The Criminal Division's Response

     The Criminal Division responded directly to plaintiffs' request on November 16, 2006,

indicating that it had copies of the Department's January 19, 2007, "White Paper," entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President," which had been previously released.  Hsu Decl. ¶ 6.  The Criminal Division also indicated that to the extent it had other documents responsive to the request, those documents were compiled solely in connection with an investigation into the unauthorized disclosure of classified information relating to the Terrorist Surveillance Program or in connection with other criminal prosecutions or investigations.  *Id.*

### 4.    The Office of Solicitor General's Response

On February 22, 2008, the Office of Solicitor General ("OSG") responded to plaintiffs' request indicating that "[t]o the extent the Office of the Solicitor General maintains any information related to your request such information would have been compiled solely in connection with, and in anticipation of, litigation concerning the Terrorist Surveillance Program."  Declaration of Kaletus L. McCain ("McCain Decl"), attached as Exh. G hereto, Ex. B to McCain Decl.  OSG further advised plaintiffs that "while the Office of the Solicitor General has identified a number of records or categories of records relating to litigation in the federal courts concerning challenges to the Terrorist Surveillance Program, including legal briefs and supporting materials, drafts of those legal briefs and drafts of supporting materials, appeal recommendations, and other correspondence within and between Executive Branch agencies concerning the litigation, those records or categories of records are exempt from disclosure under FOIA."  McCain Decl. ¶ 7.  In particular, OSG advised that any classified records responsive to plaintiffs' request were withheld under Exemptions One and Three of FOIA and that drafts of legal briefs and supporting materials, internal recommendations, and correspondence within and between Executive Branch agencies were also withheld under Exemption Five of FOIA.  *Id.* ¶ 8.

    5.    The FBI's Response

On April 6, 2006, the FBI made an interim response to the plaintiffs' request. *See* Supplemental Declaration of David M. Hardy, Section Chief, Record/Information Dissemination Section, Records Management Division, FBI ("Hardy Decl."), attached as Exh. H hereto, ¶ 33 (incorporating paragraphs 10-14 of his declaration in support of Defendants' Partial Motion for Summary Judgment on the Glomar response; *see also* Ex. C to first Hardy Decl. On February 8, 2008, FBI made a final response to plaintiffs' request, advising that it had identified and reviewed 2557 pages in full and released 168 pages pursuant to FOIA Exemptions One, 5 U.S.C. § 552(b)(1), Two, *id.* § 552(b)(2), Three, *id.* § 552(b)(3), Five, *id.* § 552(b)(5), Six, *id.* § 552(b)(5), and Seven, *id.* §§ 552(b)(7)(A), (7)(C), (7)(D), 7(E), and (7)(F). *See* Hardy Decl. ¶ 33 & Ex. B (February 8, 2008 Letter). Because plaintiffs only challenge FBI's withholdings as to FOIA Request No. 3, FBI has identified 214 classified records or categories of records that remain at issue in this litigation. *See id.* ¶ 34. Of those, 24 records have been referred to either NSA or other components of DOJ for response. *Id.*

    6.    The National Security Agency's Response

The National Security Agency ("NSA") responded to plaintiffs' FOIA request on February 28, 2006. Brand Decl. ¶ 15. At that time, the NSA released two documents, but determined that a further response with respect to plaintiffs' FOIA Request No. 1 could not be made because the NSA could neither confirm or deny the existence of records relating to targets of surveillance under the TSP without compromising classified information, *see* 5 U.S.C. § 552(b)(1), or information protected by a variety of federal statutes, including Section 6 of the National Security Agency Act of 1959, Pub. L. No. 86-36, § 6, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note. *See* 5 U.S.C. § 552(b)(3). The NSA also determined that documents relating

to plaintiffs' FOIA Request No. 3 could not be released for similar reasons, and withheld these documents under FOIA's Exemptions One and Three.  Finally, NSA concluded that various records referred to it by components of DOJ were properly withheld for similar reasons.

### C.     Plaintiffs' Operative Complaint & Documents At Issue.

Plaintiffs brought suit challenging defendants' responses under FOIA in May 2007.  The operative complaint seeks relief with regard to only two of the eight categories of records plaintiffs sought in their administrative FOIA request.  First, plaintiffs challenge the defendants' refusal to confirm or deny the existence of records that would confirm or deny whether plaintiffs were targeted by the TSP.  *See* 2d Am. Compl. ¶ 8 (FOIA Request No. 1).[5]  Second, plaintiffs challenge the defendants' withholding of records responsive to plaintiffs' request for "policies, procedures, guidelines, or practices for the interception of communications" under the TSP.  *Id.* (FOIA Request No. 3).  Because plaintiffs' complaint challenges the withholdings under FOIA only as to FOIA Request No. 3, withholdings related solely to other of plaintiffs' requests are not discussed further.

Furthermore, by this motion, defendants move for summary judgment with respect to the determinations made to withhold records responsive to FOIA Request No. 3 under the applicable FOIA exemptions.  Separated by component those records are as follows:

•     15 unclassified records or categories of records withheld by OIP or withheld by OIP after a referral for response, *see* Pustay Decl. ¶ 16 & OIP Vaughn Index, and 18 classified records or categories of letters all of which were referred to other components of DOJ or

---

[5]  FOIA Request No. 1 is subject to a separate briefing schedule that began when the defendants moved for partial summary judgment on March 18, 2008, and that request is not further discussed here.  Furthermore, none of the new declarations submitted in support of this motion are intended to bolster the arguments made with regard to defendants' other motion.

the NSA, *see generally* Bradbury Decl., Olsen Decl., Brand Decl;[6]

- 44 classified records or categories of records and an additional 11 classified records or categories or records referred by other components of DOJ and 24 unclassified records or categories of records withheld by OLC, *see* Bradbury Decl. ¶¶ 25 & Ex. D, 22 & Ex. C;[7]

- 12 classified records or categories of records withheld by OIPR that were referred by other DOJ components and one unclassified record referred by OIP, *see* Declaration of Matthew G. Olsen ("Olsen Decl."), ¶ 17, attached hereto as Exh. I;

- Records withheld by the Criminal Division in response to the plaintiffs' request and privacy exemptions to one record referred by OIP, *see* Hsu Decl. ¶ 14-29;[8]

- One record referred by OIP and withheld by the Civil Division, *see* Kovakas Decl. ¶¶ 4-5[9]

- Records withheld by OSG, *see* McCain Decl. ¶¶ 9-20;

- 190 classified records or categories of records withheld by the FBI, and two classified records withheld by FBI that were referred by ODAG, *see* Hardy Decl. ¶ 34;[10]

- Records withheld by NSA and records referred to the NSA by OLC, ODAG, and the FBI, *see* Brand Decl. ¶¶ 19-33.[11]

---

[6] Summary judgment was granted on each of the referred classified records or categories of records by Judge Berman. *NYT*, 499. F. Supp. 2d at 511-13, 553. In addition, either by granting judgment or through an agreement, the Government obtained judgment in *EPIC* on all but five of these records and those five—ODAG 13, 23, 24, 34 & 54—remain pending. *See EPIC*, 511 F. Supp. at 69-70, 72-74. Finally, Judge Berman also upheld withholdings of items 3 and 4 on the OIP *Vaughn* Index without *in camera* review. *NYT*, 499 F. Supp. at 518.

[7] Summary judgment was granted in *EPIC* in all but 11—OLC 7, 46, 76, 80, 82, 107, 113, 114, 139, 144, and 200—of the classified records or categories of records identified on OLC's Vaughn. *See EPIC*, 511 F. Supp. at 69-71.

[8] The *EPIC* plaintiffs disclaimed or withdrew any objection to the withholding of documents by the Criminal Division. *See EPIC*, 511 F. Supp. 2d at 64.

[9] Judge Berman upheld the Civil Division's withholding, *see NYT*, 499 F. Supp. at 515, as did the Court recently in *Judicial Watch*, slip op. at 7 n.12.

[10] As set forth on the FBI's Vaughn index, the withholding of a number of number of FBI documents at issue here were also upheld by the *EPIC* Court. *See* Ex. A to Hardy Decl.

[11] In *PFAW*, the Court upheld the NSA's determinations to withhold information relating to the targets of the TSP and the frequency of surveillance under FOIA Exemption One and

The discussion below and the attached declarations clearly establish that the withheld records fall within the FOIA exemptions invoked by each component.[12]

## ARGUMENT

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT REGARDING THE WITHHOLDING OF RECORDS RESPONSIVE TO FOIA REQUEST NO. 3

The FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). "Congress recognized, however, that public disclosure is not always in the public interest." *Sims*, 471 U.S. at 166-67. The FOIA is thus designed to achieve a "workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *John Doe*, 493 U.S. at 152 (quoting H.R. Rep. No. 1497, 89th Cong., 2 Sess. 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423). To that end, FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exceptions, *see* 5 U.S.C. § 552(b). Despite the "liberal congressional purpose" of

---

Three. *See* 462 F. Supp. 2d at 27-34. In *NYT*, the Court held that the NSA's determinations to withhold information relating to the TSP in documents referred to it from the Department of Defense and components of the Department of Justice under Exemptions One and Three were proper. *See* 499 F. Supp. 2d at 511-13. Similarly, in *EPIC*, the Court determined that the NSA properly withheld information containing operational details of the TSP and TSP-related policies, procedures, checklists and audits. *See* 511 F. Supp. 2d at 73-74.

[12] In addition to the records properly determined to be withheld, both OLC and the FBI identified certain records that did not constitute agency records because they were subject to an express reservation of control by another federal entity. *See* Bradbury Decl. ¶ 82; Hardy Decl. ¶ 378 (describing a duplicate of OLC 56). These documents do not constitute "agency records" under FOIA. *See Dept. of Justice v. Tax Analysts*, 492 U.S. 136, 144 (1989); *United We Stand American v. IRS*, 359 F.3d 595 (D.C. Cir. 2004). Thus, they were properly excluded from processing by these components.

FOIA, the statutory exemptions must be given "meaningful reach and application." *John Doe*,

493 U.S. at 152.  "Requiring an agency to disclose exempt information is not authorized . . . ."

*Minier v. CIA*, 88 F.3d 796, 803 (9th Cir. 1996)  (quoting *Spurlock v. Fed. Bureau of*

*Investigation*, 69 F.3d 1010, 1016 (9th Cir. 1995)).  Indeed, "[a] district court only has

*jurisdiction* to compel an agency to disclose *improperly withheld* agency records," *i.e.*, records

that do "not fall within an exemption."  *Minier*, 88 F.3d at 803 (emphasis in original); *see also* 5

U.S.C. § 552(a)(4)(B) (providing jurisdiction only to "enjoin the agency from withholding

agency records and to order the production of any agency records improperly withheld . . . .").

    The government bears the burden of proving that the withheld information falls within

the exemptions it invokes.  5 U.S.C. § 552(a)(4)(b).[13]  In a FOIA case, the court may award

summary judgment to an agency on the basis of information provided in affidavits or declarations

that describe "the documents and the justifications for nondisclosure with reasonably specific

detail, demonstrate that the information withheld logically falls within the claimed exemption,

and are not controverted by either contrary evidence in the record nor by evidence of agency bad

faith."  *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir.1981).

    Agency decisions to withhold classified information under FOIA are reviewed de novo by

the courts, and the agency bears the burden of proving its claim for exemption.  *See* 5 U.S.C.

§ 552(a)(4)(B); *Miller*, 730 F.2d at 776.  Nevertheless, in evaluating the applicability of FOIA

---

    [13]  As in any case, summary judgment in a FOIA action should be granted if the movant
has shown, when the facts are viewed in the light most favorable to the nonmovant, that there are
no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A party
opposing a motion for summary judgment "may not rest upon the mere allegations or denials of
his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona
v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

exemptions for purposes of deciding this summary judgment motion, the Court must be mindful

when the information sought by a plaintiff "implicat[es] national security, a uniquely executive

purview." *Center for Nat'l Security Studies v. U.S. Dept. of Justice*, 331 F.3d 918, 926-27 (D.C.

Cir. 2003). Numerous courts have specifically recognized the "propriety of deference to the

executive in the context of FOIA claims which implicate national security." *Id.* at 927-29 (citing,

*inter alia, Sims, supra*; *McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983)). *See also ACLU v.

DOD*, 389 F. Supp. 2d 547, 562-63 (S.D.N.Y. 2005) (citing numerous cases). Thus, the courts

must accord "substantial weight" to an agency's affidavits justifying classification when

reviewing a claim under Exemption 1.[14] *Doherty v. DOJ*, 775 F.2d 49, 52 (2d Cir. 1985);

*Military Audit Project*, 656 F.2d at 738 (noting that agencies' possess "unique insights" into the

adverse effects that might result from public disclosure of classified information); *Earth Pledge

Found.*, 988 F. Supp. at 626. Indeed, courts have routinely and repeatedly emphasized that

"weigh[ing] the variety of complex and subtle factors in determining whether disclosure of

information may lead to an unacceptable risk of compromising the [nation's] intelligence-

gathering process" is a task best left to the Executive Branch and not attempted by the judiciary.

*Sims*, 471 U.S. at 180

---

[14] Indeed, courts have routinely and repeatedly emphasized that "weigh[ing] the variety
of subtle and complex factors in determining whether disclosure of information may lead to an
unacceptable risk of compromising the [nation's] intelligence-gathering process" is a task best
left to the Executive Branch and not attempted by the judiciary. *Sims*, 471 U.S. at 180; *see also
Center for Nat'l Security Studies*, 331 F.3d at 928 ("the judiciary is in an extremely poor position
to second-guess the executive's judgment in [the] area of national security"); *Halperin v. CIA*,
629 F.2d 144, 148 (D.C. Cir. 1980) ("Judges . . . lack the expertise necessary to second-guess []
agency opinions in the typical national security FOIA case"). Thus, although review of an
agency's response to FOIA is *de novo*, courts have "consistently deferred to executive affidavits
predicting harm to national security, and have found it unwise to undertake searching judicial
review." *Center for Nat'l Security Studies*, 331 F.3d at 927.

Moreover, as courts have repeatedly noted, when evaluating the propriety of an agency's FOIA response, it must be remembered that, under FOIA, the Government has no capacity to distinguish between FOIA requesters. *See Bassiouni v. CIA*, 392 F.3d 244, 246 (7th Cir. 2004) (noting that "any member of the public may invoke the FOIA, and the agency must disregard the requester's identity."). Any information determined to be available to plaintiffs here is also available to the next requester to seek it, whether that requester is an individual in Peoria, a political interest group, "North Korea's secret police [or] Iran's counterintelligence service," *id.*, or a member of al Qaeda. Where national security interests of the type identified herein are implicated, the harms to national security that would result from compelling release of the sorts of information sought by plaintiffs in their FOIA requests cannot be underestimated. "Hostile entities," *id.*, including agents of al Qaeda and its affiliates, would no doubt be greatly interested in the opportunity to lay bare the details of the United States' intelligence gathering programs.

Given these legal standards, the discussion below and the accompanying declarations demonstrate that the responsive information at issue was properly withheld by defendants.

# I.    DEFENDANTS' SEARCHES FOR RESPONSIVE RECORDS WERE ADEQUATE.

To obtain summary judgment on the issue of the adequacy of the records search, "the defending agency has the burden of showing that its search was adequate," by submitting "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). This generally requires that the agency "has conducted a search reasonably calculated to uncover relevant documents," *Steinberg v. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir.1994), through a "good faith effort to conduct a search for the requested records, using methods which can be reasonably

expected to produce the information requested." *Ogelsby v. U.S. Dep't of the Army*, 920 F.2d 57,

68 (D.C. Cir. 1990). *Accord Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998).

An agency's search need not be exhaustive, merely reasonable.[15]  *See Western Ctr. for*

*Journalism v. Internal Revenue Serv.*, 116 F. Supp. 2d 1, 8 (D.D.C. 2000); *see also Meeropol v.*

*Meese*, 790 F.2d 942, 952-53 (D.C. Cir. 1986) ("[i]t would be unreasonable to expect even the

most exhaustive search to uncover *every* file") (emphasis in original); *Judicial Watch v. Rossotti*,

285 F. Supp. 2d 17, 26 (D.D.C. 2003) ("Perfection is not the standard by which the

reasonableness of a FOIA search is measured.").  In examining the adequacy of an agency's

search, therefore, the Court must not address "whether there might exist any other documents

possibly responsive to the request, but rather whether the search for those documents was

adequate." *Steinberg*, 23 F.3d at 551 (citing *Weisberg*, 745 F.2d at 1485).  In the absence of

"countervailing evidence" or "substantial doubt," agency affidavits or declarations describing

such a reasonable and adequate search are sufficient to demonstrate an agency's compliance with

FOIA. *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003) (citations

omitted).  By any measure, reasonable searches were conducted here.

### A.    The Office of Legal Counsel Conducted a Reasonable Search.

OLC conducted two separate searches for responsive material: one for unclassified

records and one for classified records.  *See* Bradbury Decl. ¶¶ 26-27.  As to the unclassified

---

[15]  Further, as the D.C. Circuit has recognized, the process of conducting a "reasonable" search requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise" and is "hardly an area in which the courts should attempt to micromanage the executive branch." *Schrecker v. U.S. Dept. of Justice*, 349 F.3d 657, 662 (D.C. Cir. 2003) (quoting *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)). Thus, there is no "bright-line set of steps for an agency to take" in searching in response to a FOIA request. *Schrecker*, 349 F.3d at 662; rather, "the adequacy of an agency's search is measured by a 'standard of reasonableness' and is dependent upon the circumstances." *Id.*

records, OLC searched the files of the acting head of OLC as well as the files of the OLC staff

attorneys and Deputy Assistant Attorney Generals who are principally responsible for all matters

involving the TSP.  *See id*. at ¶ 26.  The files were searched both electronically and in hard copy

and the e-mail of OLC staff relating to the TSP were reviewed either electronically or in hard

copy.  *Id.*  OLC also has a computer database which contains the full text of unclassified

documents authored by the Office since 1945, and a key word search was performed in this

database for documents relating to the plaintiffs' FOIA requests.  *Id.*  As to classified documents,

OLC maintains classified documents relating to the TSP in segregated and locked file cabinets

that are themselves kept in a secured room to which only persons with appropriate security

clearances have access.  *See id.* ¶ 27.  These cabinets were searched in response to plaintiffs'

FOIA requests.  *Id.*  Because responsive classified documents cannot be maintained outside of

these secured cabinets due to their high level of classification, OLC's search was calculated to

identify every responsive record.

### B. The Office of Information and Privacy Conducted a Reasonable Search.

ODAG conducted two separate searches, one to identify unclassified records and one to

identify classified records.  Upon receipt of plaintiffs' FOIA request, OIP initiated records

searches in the Office of the Attorney General, the Office of Deputy Attorney General and in the

Departmental Executive Secretariat, which is the official records repository for the Offices of the

Attorney General and Deputy Attorney General.  Pustay Decl., ¶ 5.  As set forth in detail above,

OIP's search for unclassified records resulted in numerous referrals within DOJ and also releases

to Plaintiffs.  As to the classified documents, due to the substantial national security concerns

associated with any unauthorized disclosure of these documents and their high level of

classification, *all* ODAG documents related to the TSP are kept in a segregated and locked file

cabinet to which only those with appropriate security clearances have access. *See id.* n.1.
Because responsive classified documents cannot be maintained outside of this secured cabinet
due to their classification level, ODAG's search was calculated to identify every responsive
record.

### C.    The Criminal Division Conducted a Reasonable Search.

Upon receipt of plaintiffs' FOIA request, the Criminal Division's FOIA/Privacy Act Unit
searched its components and sections for responsive records. *See* Hsu Decl. ¶ 12. Specifically,
based on its expertise in identifying those offices within the Criminal Division most likely to
have records responsive to any particular FOIA request, the Criminal Division initiated a search
for records responsive to the request in its Office of Enforcement Operations' Title III Unit, and
its Counterterrorism, Domestic Security, and Counterespionage sections. *Id.* Each section
searched their respective files and reported the extent of their possession of potentially
responsive records. *Id.* at ¶¶ 12-13. The Criminal Division's search was tailored to identify
those personnel likely to have responsive records in light of their high level of classification and
the limited personnel with security clearances to access such information. *See id.* ¶ 12.

### D.    The Office of Solicitor General Conducted a Reasonable Search.

Upon receipt of plaintiffs' FOIA request, the Office of Solicitor General requested that
each of the attorneys with responsibility for handling litigation involving the TSP search their
files for responsive materials. *See* McCain Decl., ¶ 6. Because the TSP is a highly classified
program, only a limited number of attorneys within the Office have the necessary clearances for
access to classified information concerning the program and only a limited number of attorneys
have worked on those cases. *See id.* Further, the cases involving the TSP are currently active
and files related to these cases are maintained in the individual attorney's offices and can be

retrieved by case name, docket number, and/or an internal Department file number. *See id.*

Attorneys in the Office of Solicitor General therefore searched their own individual case files and

other files in the Office designated as containing TSP-related materials. *See id.* Attorneys in

OSG specifically searched for documents that would have been created prior to the December 16,

2005, public disclosure of the TSP, and identified none within the custody of the Office. *See id.*

### E. The Federal Bureau of Investigation Conducted a Reasonable Search.

The FBI uses the Central Records System ("CRS"), a system that enables it to maintain

all information which it has acquired in the course of fulfilling its mandated law enforcement

responsibilities, to conduct searches in response to FOIA and Privacy Act requests. *See* Hardy

Decl. ¶¶ 27-32 (describing in detail the CRS). In response to plaintiffs' FOIA request, the FBI

initiated a search of this records system. *Id.* ¶ 33.

The generalized nature of the plaintiffs' request does not lend itself naturally to the

standard CRS searches that defendant typically conducts in response to specific requests for FBI

investigative files. *Id.* As a result, in addition to its standard CRS search, the FBI sent an

internal Electronic Communication ("EC") seeking to identify additional responsive documents.

*See id.* That EC search dated June 23, 2006, sought documents from those offices identified as

likely sources of responsive records given the highly compartmentalized and classified nature of

the TSP, *i.e.*, the Director's Office, the Office of the General Counsel, the Counterterrorism

Division, the Office of Public Affairs, the Office of Congressional Affairs, as well as from the

Counterintelligence Division and the Inspection Division. *Id.* ¶ 33. Through this search, as well

as "an individualized inquiry of those FBIHQ employees most likely to possess potentially

responsive records," the FBI obtained a set of documents deemed to be responsive to plaintiffs'

FOIA request. *Id.* The FBI's system of records and search techniques fully meets the standards

of adequacy and reasonableness established under the FOIA. *See, e.g.*, *Brunetti v. Fed. Bureau of Investigation*, 357 F. Supp. 2d 97, 103 (D.D.C. 2004) (finding adequate search where FBI conducted a CRS search that produced one responsive file).

### F.    The National Security Agency Conducted a Reasonable Search

The NSA searched for records responsive to Plaintiffs' request by forwarding the request to those offices most likely to have such records. *See* Brand Decl., ¶ 18. Because plaintiffs' seek records related to the TSP, a highly compartmented intelligence program, and because only a relatively small number of individuals have been cleared for access, NSA was able to focus this request on a limited number of offices, which are the locations that would possess records responsive to plaintiffs' FOIA request. *See id.* Thus, NSA searched for and located responsive records in offices that managed and operated the TSP. *Id.*

As each of the DOJ components and the NSA have met their burden of demonstrating the reasonableness and therefore the adequacy of their searches in response to plaintiffs' FOIA requests, the Court should enter summary judgment on this issue in favor of the Defendants.

## II.    DEFENDANTS PROPERLY WITHHELD RECORDS RESPONSIVE TO FOIA REQUEST NO. 3 UNDER FOIA.[16]

### A.    DOJ And NSA Properly Withheld Records Under Exemption One.

Exemption 1 protects records that are: (i) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign

---

[16] For ease of reading, we address each applicable FOIA exemption in the order in which they appear in the statute. As the attached declarations amply demonstrate, however, the vast majority of the records or categories of records withheld are exempt from disclosure under more than one Exemption. With respect to any record subject to such overlapping claims of Exemption, this Court need only find any one Exemption applicable in order to grant summary judgment to the Department. *See Fund for Constitutional Gov't v. Nat'l Archives and Records Serv.*, 656 F.2d 856, 864 n.19 (D.C. Cir. 1981).

policy, and (ii) are in fact properly classified pursuant to an Executive Order.[17]  *See* 5 U.S.C. §
552(b)(1).  Exemption 1 thus "establishes a specific exemption for defense and foreign policy
secrets, and delegates to the President the power to establish the scope of that exemption by
executive order."  *Military Audit Project*, 656 F.2d at 737.

In order to properly invoke Exemption 1, the agency must provide "detailed and specific"
information demonstrating both "why the material has been kept secret and why such secrecy is
allowed by the terms of an existing executive order."  *ACLU v. United States Dep't of Justice*,
265 F. Supp. 2d 20, 27 (D.D.C. 2003) ("*ACLU*").  This generally requires an agency to show that
the records at issue logically fall within the exemption, *i.e.*, that the Executive Order authorizes
the classification of the information.  *See Salisbury v. United States*, 690 F.2d 966, 970-73 (D.C.
Cir. 1982); *Military Audit Project*, 656 F.2d at 737-38.  An agency satisfying these standards is
then entitled to summary judgment.  *See, e.g.*, *Abbotts v. NRC*, 766 F.2d 604, 606-08 (D.C. Cir.
1985); *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984).

Thus, to carry its burden of demonstrating the propriety of its decisions supporting its
Exemption One position, DOJ must simply demonstrate a "logical connection between the
information and the claimed exemption . . . ."  *ACLU*, 265 F. Supp. 2d at 29-30.  In reviewing the
claims made by DOJ, the Court "is not to conduct a detailed inquiry to decide whether it agrees
with the agency's opinions . . . ."  *Halperin*, 629 F.2d at 148; *see Weissman v. CIA*, 565 F.2d 692,
697 (D.C. Cir. 1977) (recognizing that "[f]ew judges have the skill or experience to weigh the

---

[17]  Section 1.2(a)(4) of Executive Order 12958, as amended, states that an agency may
classify information that fits into one or more of the Executive Order's categories for
classification when the appropriate classification authority "determines that the unauthorized
disclosure of the information reasonably could be expected to result in damage to the national
security." 68 Fed. Reg. 15315, 15315 (Mar. 25, 2003).

repercussions of disclosure of intelligence information"). To do so would not accord substantial

weight due the expert opinion of the agency. *See Miller*, 730 F.2d at 776; *Military Audit Project*,

656 F.2d at 738. Rather, the Court should "take seriously the government's predictions about the

security implications of releasing particular information to the public . . . ," *ACLU*, 265 F. Supp.

2d at 28, and "recognize that the executive branch departments responsible for national security

and national defense have unique insights and special expertise concerning the kind of

disclosures that may be harmful." *Id.* at 27 (citing *Krikorian v. Dept. of State*, 984 F.2d 461, 464

(D.C. Cir. 1993); *Salisbury*, 690 F.2d at 970).

The Exemption One claims at issue in this case are supported by the Director of National

Intelligence. The DNI is the head of the United States' Intelligence Community and the principal

adviser to the President, the National Security Council, and the Homeland Security Council on

national security matters. DNI Decl., ¶ 10. As such, the DNI has "access to all intelligence

related to the national security that is collected by any department, agency, or other entity of the

United States," *id.* ¶ 14, and so, is fully cognizant of the strategies and priorities of the

Intelligence Community as reflected by the entirety of the U.S. intelligence operation. The DNI

is also the Executive Branch official charged with safeguarding classified information and for

establishing the procedures under which classified information is handled and stored so as to

avoid any unauthorized disclosure, *id.* ¶ 13, and is specifically authorized by Congress to protect

intelligence sources and methods. *See* 50 U.S.C. § 403-1(i)(1). Relying upon his expertise and

exercising his responsibilities to the Intelligence Community, the DNI has identified with

particularity the exceptionally grave harms to national security that are reasonably expected to

occur if information regarding the TSP is compelled to be disclosed. *See* DNI Decl. ¶¶ 23-39.

In particular, DNI McConnell identifies seven categories of information that cannot be

-22-

disclosed without causing grave harms to national security, including "(1) any classified intelligence information concerning the continuing threat to the United States posed by al Qaeda and its affiliates that forms the basis for the President's authorization and reauthorization of the TSP;" *id.* ¶ 26; *see also id.* ¶ 30; "(2) any operational details concerning the technical methods by which the NSA intercepts communications under the TSP"; *id.* ¶ 26; *see also id.* ¶¶ 31-32; and "(7) any information that would reveal or tend to reveal whether someone is a target of surveillance under the TSP." *Id.* ¶ 26; *see also id.* ¶ 39. In the classified portions of his declaration, DNI McConnell also discusses certain additional categories of information relating to the TSP that cannot be disclosed without exceptionally grave consequences for national security. *See* DNI Decl. ¶¶ 26-27, 32-38. For each of these categories, the DNI explains "from the perspective of the Intelligence Community, the significant harms that would be done to United States intelligence gathering in the war against terror" if documents that contain information falling within these categories are compelled to be disclosed. *Id.* ¶ 4. As the DNI attests, information in the seven categories he identifies is specifically authorized to be classified by the express terms of Executive Order 12958, as amended.[18] *Id.* ¶ 7.

Relying upon the express finding by the President contained in Executive Order 12958, as amended, that such information is properly classified and upon his own expertise in identifying

---

[18] In particular, *see* DNI Decl., ¶ 7, information about the TSP relates to "intelligence activities (including special activities), intelligence sources or methods, or cryptology," Exec. Order 12958, as amended, § 1.4(c); "foreign relations or foreign activities of the United States, including confidential sources," *id.* § 1.4(d); "scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism," *id.* § 1.4(e); and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism," *id.* § 1.4(g), the disclosure of which "reasonably could be expected to cause exceptionally grave damage to the national security of the United States." *Id.* § 1.2(a)(1)

those categories of information that cannot be disclosed without jeopardizing the national

security of the United States, the DNI concludes that the disclosure of classified information

falling within any the seven categories he identifies "would cause exceptionally grave harm to

the national security of the United States and render the nation more vulnerable to another

terrorist attack." *Id.* ¶ 29. Thus, under Executive Order 12958, as amended, information related

to the TSP is classified TOP SECRET, DNI Decl. ¶ 7, and moreover, is subject to the special

access and handling requirements reserved for Sensitive Compartmented Information or "SCI."

*Id.* In light of these classification levels, and the exceptionally grave harms to the national

security that would result from their disclosure, the DNI "fully support[s] and defend[s] any

determination made to withhold information responsive to FOIA requests that seek disclosure of

classified information related to the TSP." *Id.*

     As discussed below, and in greater detail in the declarations filed in support of this

motion, the NSA and each of the DOJ components that maintains classified records relating to

the TSP withheld information that falls within one or more of the seven categories of information

identified by the DNI as information that cannot be disclosed without causing exceptionally

grave harm to national security. Because the DNI's description of the harms that would result

from the compelled disclosure of this information is more than sufficient to establish its proper

classification, the defendants' Exemption One claims must be upheld.[19]

---

    [19] Because all of the classified records or categories of records withheld by ODAG were
referred to the NSA or other components of DOJ, *see* Pustay Decl., ¶ 5 n.1, those withholdings
are discussed in the context of withholdings made by those other entities.

1.    NSA Properly Withheld Records Under Exemption One.

As explained in the Declaration of Joseph Brand, NSA properly withheld and cannot be compelled to disclose either responsive records discovered in its own search or the documents referred to NSA by OLC, ODAG, and FBI, because the disclosure of any details regarding the TSP can reasonably be expected to cause exceptionally grave harm to the national security of the United States.

One of NSA's primary functions is the collection of signals intelligence ("SIGINT"). Brand Decl. ¶ 5; Executive Order 12333, 46 Fed. Reg. 59941, § 1.12(b) (setting forth the responsibilities of the NSA).  NSA's SIGINT mission includes obtaining information from foreign electromagnetic signals and intercepting communications necessary to the national defense, national security, or the conduct of foreign affairs of the United States.  *Id.*  Information produced by SIGINT is relevant to a wide range of issues, including military order of battle; threat warnings and readiness; arms proliferation; terrorism; and foreign aspects of international narcotics trafficking.  Brand Decl. ¶ 7.

The SIGINT collection mission of NSA provides national policy makers and the intelligence community with highly reliable foreign intelligence information.  *Id.* ¶ 5.  This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world.  *Id.* ¶ 7.  Foreign intelligence information produced by NSA as a result of its SIGINT mission is often unobtainable by other means.  *Id.*

NSA's ability to produce foreign intelligence information depends upon its access to foreign and international electronic communications.  *Id.* ¶ 9.  Thus, NSA has developed a sophisticated worldwide SIGINT collection network to acquire these communications.  *Id.* ¶ 8. The technological infrastructure that supports NSA's foreign intelligence information collection

has taken years to develop at a substantial cost and untold human effort. *Id.* It relies on sophisticated collection and processing technology that is designed to keep pace with challenging new technological developments. *Id.* ¶ 6.

A fundamental tenet of NSA's communications collection process is that the identity of specific communications (referred to as "targets"), the degree of success in exploiting these targets, the vulnerability of particular foreign communications, and the extent of any cryptologic successes are matters that must be maintained in the strictest secrecy. *Id.* ¶ 9. This is because NSA's SIGINT technology is both expensive and fragile. *Id.* Disclosure of the identities of targets, the degree of success or weakness in exploiting those targets, the vulnerabilities of particular foreign communications, and the extent of any cryptologic success would encourage countermeasures by the targets of NSA's efforts. *Id.* ¶ 10. Public disclosure of either the capability to collect specific communications or the substance of the information itself can easily alert targets to the vulnerability of their communications. *Id.* ¶ 9. Thus, disclosure of even a single communication has the potential to reveal the intelligence collection techniques that are applied against targets around the world. *Id*.

Once alerted that NSA is targeting their communications, a target can easily frustrate SIGINT collection by taking steps to evade detection, to manipulate the information that NSA receives, or to implement other countermeasures aimed at undermining NSA's operations, such as, for example, using different communications techniques or utilizing a different communications link. *Id.* ¶ 9. If a target is successful in defeating an intercept operation, all of the intelligence from that source is lost until and unless NSA can establish a new and equivalent exploitation of the target's signals. *Id.* ¶ 10. If a source becomes unavailable, the military, national policymakers, and the intelligence community must operate without the information

such signals provided.  *Id*.  These intelligence losses are extremely harmful to the national security of the United States.  *Id*.  The description of the fragility of NSA's signals intelligence process fully supports NSA's need to protect any document that contains details regarding the operation of the TSP.  As courts have long recognized, it is "inherently logical," *see Hayden*, 608 F.2d at 1388, that disclosure of such information related to signals intelligence be ordered.

Indeed, courts have long recognized that sensitive information of this nature, if disclosed, when coupled with other available or unconfirmed information could provide further insight into the United States' intelligence strategies.  *See Sims*, 471 U.S. at 178 ("What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context"); *Center for Nat'l Security Studies*, 331 F.3d at 928 ("things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence gathering capabilities from what these documents revealed about sources and methods"); *Fitzgibbon*, 911 F.2d at 763 ("each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance itself").

Because NSA has determined that all responsive referred records were currently and properly classified, *see* Brand Decl. ¶ 21, and has specifically articulated the grave harms to national security that would result from their disclosure, NSA is entitled to summary judgment as to those referrals.  *Id.* ¶¶ 22-24.

### 2.   OLC Properly Withheld Records Under Exemption One.

As described by OLC, *see* Bradbury Decl, ¶¶ 25, 30-81, the 44 classified records or categories of records found in OLC (and not referred to other DOJ components or the NSA) and

11 classified records or categories of records referred to OLC by other DOJ components that

OLC withheld are currently and properly classified because they contain information that falls

into the categories described by the DNI.  OLC withheld information that "would reveal or tend

to reveal operational details concerning the technical methods by which NSA intercepts

communications under the TSP," DNI Decl. ¶ 26; *see also id.* ¶¶ 31-32.  *See, e.g.*, Bradbury

Decl. ¶¶ 30-37 (withholding documents that contain classified information regarding the terms of

the President's authorization of the TSP), 66 (withholding informal communications "to and

from OLC and other federal government agencies containing attorney-client communications

regarding very specific questions about the TSP").  OLC also withheld "information that would

reveal or tend to reveal whether a particular person is a target of surveillance," DNI Decl. ¶ 26;

*see also id.* ¶ 39.  *See* Bradbury Decl. ¶¶ 43-55.  For example, OLC withheld "records or

categories of records relating to the criteria used for targeting and the appropriateness of targeting

certain groups or individuals under the TSP," *id.* ¶ 43; *see also id.* ¶ 49.  For the reasons

described above and detailed more fully in the supporting declarations, this sort of information

cannot be disclosed without causing exceptionally grave harm to the national security of the

United States.  As such, it is properly withheld under Exemption One.

        Similarly, OLC withheld information in additional categories identified by the DNI as

material that cannot be disclosed without causing exceptionally grave harm to the national

security of the United States.  *See* DNI Decl. ¶¶ 26, 32-38; Bradbury Decl. ¶¶ 38-42; 56-60.  The

DNI has described, with particularity the harms that would arise from the disclosure of the types

of information withheld by OLC, *see* DNI Decl. ¶¶ 26, 30-40; *see also* Bradbury Decl. ¶¶ 38-42;

56-60.  Although that description cannot be provided on the public record without itself

disclosing classified information, the information contained in these declarations is "detailed and

specific," and demonstrates clearly "why the material has been kept secret and why such secrecy is allowed by the terms of an existing executive order." *ACLU*, 265 F. Supp. 2d at 27. Accordingly, OLC properly withheld all of its classified records or categories of records and those records referred to it under Exemption One, and is entitled to summary judgment.

### 3.    OIPR Properly Withheld Records Referred to it Under Exemption One.

As described in the Declaration of Matthew G. Olsen, 12 records or categories of records were referred to the former OIPR and were withheld because they are currently and properly classified and thus exempt from disclosure by FOIA Exemption One.  The "vast majority of documents withheld by OIPR concern its dealings with the Foreign Intelligence Surveillance Court ('FISC')."  Olsen Decl. ¶ 14; *see id.* ¶¶ 16-24.  Proceedings before the FISC must be conducted "in such a manner as will protect its secrecy."  *See id.* ¶ 15.  Moreover, as Mr. Olsen describes, the withheld documents contain information concerning the operation of the TSP and other information which falls squarely into the categories of information identified by the DNI. *See* Olsen Decl. ¶¶ 16-24.  As the DNI attests, information that falls within the categories he describes cannot be disclosed without causing exceptionally grave harm to the national security of the United States.  DNI Decl. ¶¶ 26-40.  As a result, OIPR properly withheld the 12 records or categories of records referred to it under Exemption One, and it is entitled to summary judgment.

### 4.    FBI Properly Withheld Records Under Exemption One.

As described in the Declaration of David M. Hardy, the FBI withheld records relating to several categories of information because they were classified.  *See* Hardy Decl. ¶¶ 40-45; *see also* ¶¶ 46-55 (identifying several categories of withheld information including information concerning "intelligence activities and methods utilized by the FBI for gathering intelligence data," *id.* ¶ 49).  As further attested to by Mr. Hardy, the FBI specifically reviewed each of the

documents it identified as responsive, and in consultation with the NSA, as well as based on the

classification determinations reflected in the DNI Declaration, determined that the information at

issue remains classified pursuant to the provisions of Executive Order 12958, as amended, §§ 1.4

(c), (e), and (g).  Hardy Decl. ¶¶ 43-44.

Specifically, as Mr. Hardy describes, "United States intelligence-gathering efforts in the

ongoing war against terror would be significantly harmed if documents that contain classified

information about the TSP are compelled to be disclosed." *Id.* ¶ 56.  The classified portions of

Mr. Hardy's declaration identify the classified records or categories of records withheld by the

FBI, and demonstrate that these records directly implicate the categories of information identified

by the DNI as information that cannot be disclosed without causing exceptionally grave harm to

the national security of the United States.  *See* Hardy Decl. ¶¶ 44-58.  In light of these

determinations, and the "substantial weight" owed to them by this Court, *see ACLU*, 265 F.

Supp. 2d at 27, it is plain that, as with each of the other DOJ components[20] described above, the

FBI has properly withheld responsive records or categories of records under Exemption One, and

is entitled to summary judgment.

### B.    FBI Properly Withheld Records Under Exemption Two.

Information that is "related solely to the internal personnel rules and practices of an

agency" is exempt from disclosure pursuant to Exemption 2.  5 U.S.C. § 552(b)(2).  Exemption 2

applies to materials "'used for predominantly internal purposes.'"  *Schiller v. National Labor*

*Relations Bd.*, 964 F.2d 1205, 1207 (D.C. Cir. 1992) (quoting *Crooker v. Bureau of Alcohol,*

---

[20]  Although the Criminal Division withheld its records principally under Exemptions 5,
6, and 7, to the extent that any of its records are classified, Exemption One provides further
protection for any such records.  *See* Hsu Decl., at n.4.

*Tobacco & Firearms*, 670 F.2d 1051, 1073 (D.C. Cir. 1981) (*en banc*)).  This exemption has been held to protect two types of information:  (1) information the release of which would risk circumvention of agency regulations or statutes, *see Crooker*, 670 F.2d at 1074, and (2) "routine matters of merely internal interest," *id.* at 1069 (citation omitted).  *See also Founding Church of Scientology of Washington, D.C., Inc. v. Smith*, 721 F.2d 828, 831 n.4 (D.C. Cir. 1983) (material is exempt if it "relates to trivial administrative matters of no genuine public interest").  The former application of the exemption is known as "high 2," while the latter is known as "low 2." *See Wiesenfelder v. Riley*, 959 F. Supp. 532, 535 (D.D.C. 1997).

The FBI has invoked this Exemption and has demonstrated that it did so properly. Specifically, the FBI has asserted the applicability of Exemption Two with respect to two categories of information.

First, the FBI has claimed the "high 2" protection of Exemption Two with respect to specific "internal operational and law enforcement support procedures," and its practices relating to "its intelligence information-gathering and cooperation with the NSA."  Hardy Decl. ¶ 59; *see generally id.* ¶¶ 59-64.  As the classified portions of Mr. Hardy's declaration explain, the withheld information meets the criteria for protection under Exemption 2.[21]  First, the information meets Exemption 2's threshold requirement because it is "used for predominantly internal purposes."  *Schiller*, 964 F.2d at 1207; *see* Hardy Decl. ¶ 56.  The information is "predominantly internal" because these techniques and procedures relate to internal law enforcement information used by the FBI.  *See, e.g.*, *Crooker*, 670 F.2d at 1073-74 (finding

---

[21]  Many of these same records are also protected under Exemption 7(E), which protects "techniques and procedures of law enforcement investigations or prosecutions."  5 U.S.C. § 552(b)(7)(E).  *See infra* at 58.

exempt from disclosure ATF training manual on surveillance techniques); *Delta Ltd. v. Customs and Border Prot. Bur.*, 384 F. Supp. 2d 138, 147-48 (D.D.C. 2005) (finding "procedures, guidelines and techniques utilized by the agency in an operational environment" were predominantly internal and exempt as "high 2" information), *vacated in part on other grounds*, 393 F. Supp. 2d 15 (D.D.C. 2005).

This first category of information relating to these techniques and procedures qualifies for the "high 2" exemption because the FBI has reasonably determined that disclosure of its law enforcement techniques would "impede the effectiveness of the internal law enforcement procedures of the FBI and the intelligence-gathering procedures of the FBI's fellow intelligence agencies as it engages in counterterrorism activities." Hardy Decl. ¶ 59; *see id.* ¶¶ 62-64; *see also, e.g., Gordon*, 388 F. Supp. 2d at 1036-37 (Exemptions 2 and 7(E) properly invoked over materials created in course of maintenance of terrorist watch lists because terrorists could educate themselves about watch list procedures and devise ways to circumvent watch lists); *Delta Ltd.*, 384 F. Supp. 2d at 147-48 (withholding proper under Exemption 2 because disclosure would "reveal procedures, guidelines, and techniques used by the [agency] in an operational environment, thereby benefitting those attempting to violate the law and detection" and "would 'aid those who seek to circumvent [agency] operations and thus [harm] the agency's effective conduct of its mission.'") (quoting declaration); *Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35, 43 (D.D.C. 1999) (upholding FBI's assertion of Exemption 2 over "information about administrative practices and procedures pertaining to internal functions and policies of the FBI as they relate to the 'use of specialized technical equipment,' the release of which might provide the public 'with insight into the internal handling' of investigations involving race crimes") (internal quotations refer to FBI's *Vaughn* declaration); *Voinche v. FBI*, 940 F. Supp. 323, 332 (D.D.C.

-32-

1996) (upholding FBI's Exemptions 2 and 7(E) withholding over, among other things,

information relating to the "safety procedures afforded to the Supreme Court and its Justices").

As in the Exemption One context, an agency's predictive judgments about the risks of

disclosure are entitled to particular deference because disclosure implicates national security

concerns. These determinations are peculiarly within the FBI's expertise and, thus, requires that

the FBI's predictive judgment be afforded heightened deference, as the D.C. Circuit emphasized

in a similar case involving counterterrorism law enforcement efforts:

> The need for deference in this case is just as strong as in earlier cases. America
> faces an enemy just as real as its former Cold War foes, with capabilities beyond
> the capacity of the judiciary to explore. Exemption 7(A) explicitly requires a
> predictive judgment of the harm that will result from disclosure of information. . .
> . It is abundantly clear that the government's top counterterrorism officials are
> well-suited to make this predictive judgment. Conversely, the judiciary is in an
> extremely poor position to second-guess the executive's judgment in this area of
> national security.

*Center for Nat'l Security Studies*, 331 F.3d at 928. Just as deference must be afforded under

Exemption 7(A), it is appropriate where the predictive judgment over national security risks

relate to Exemptions 2 and 7(E). *See id.* ("Judicial deference depends on the substance of the

danger posed by disclosure—that is, harm to national security—not the FOIA exemption

invoked."). Taken together the case law and Mr. Hardy's declaration establish that the FBI's

withholding of responsive information is entirely proper under Exemption Two because

disclosure would compromise the continued effective use of the law enforcement techniques and

methods that Mr. Hardy discusses.

Second, the FBI has also withheld under Exemption Two (low), in conjunction with

Exemptions Six, 5 U.S.C. § 552(b)(6), and 7(C), *id.* § 552(b)(7)(C), business telephone, fax and

pager numbers of FBI Special Agents, FBI support employees, and other federal government

personnel.  As Mr. Hardy describes, this sort of information relates "to the internal practices [of

the federal government], in that they are tools utilized by personnel in the performance of their

jobs."  Hardy Decl. ¶ 60.  Disclosure of such information "could subject these individuals to

harassing contacts (via telephone, fax or pager) which could disrupt official business, including

impeding government personnel from conducting and concluding intelligence and law

enforcement matters in a timely manner."  *Id.*  In particular, to disclose the names of federal,

state, or local law enforcement officials or supporting staff who work on sensitive terrorism

investigations could subject them to harassment and disrupt the performance of duties that, of

necessity, often require a low profile.  *See* Hardy Decl. ¶¶ 60-61.  Because internal contact

information such as this constitutes a "routine matter[] of merely internal interest," *Crooker*, 670

F.2d at 1069; *see also* Hardy Decl. ¶¶ 60-61, Exemption Two authorizes withholding of these

records.  In addition, there is no public interest in such information.  Accordingly, the FBI is

entitled to summary judgment on its Exemption Two claims.

### C.    DOJ And NSA Properly Withheld Records Under Exemption Three.

Much of the information responsive to Plaintiffs' FOIA Request No. 3 was properly

withheld, independent of other exemptions that may apply, under Exemption Three.  Exemption

3 applies when a statute other than FOIA protects information from disclosure.  5 U.S.C. §

552(b)(3).  "A court evaluating an agency's refusal to comply with a FOIA request under section

552(b)(3) must ask two questions:  First, is the statute in question a statute of exemption as

contemplated by section 552(b)(3), and second, does the withheld information satisfy the criteria

of the exemption statute."  *See Earth Pledge Found.*, 988 F. Supp. at 627 (citing *Fitzgibbon v.

CIA*, 911 F.2d 755, 761 (D.C. Cir. 1990)).  Because the threshold issue for the application of

Exemption 3 is based on the statute invoked by the agency, the analysis is distinct from that

-34-

employed to analyze other FOIA exemptions.  As the D.C. Circuit has explained, "'Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.'"  *Fitzgibbon*, 911 F.2d at 761-62 (quoting *Assoc. of Retired R.R. Workers v. United States R.R. Retirement Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987)).  Here, several protective statutes encompass the information sought by plaintiffs concerning policies, procedures, guidelines or practices related to the interception of communications under the TSP, and these statutes therefore authorize the Government to withhold these records under FOIA Exemption 3.

Foremost among them is Section 6 of the National Security Agency Act of 1959, Pub. L. No. 86-36, § 6, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, which provides:

> [N]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of the names, titles, salaries, or number of persons employed by such agency.

It is well-established that Section 6 "is a statute qualifying under Exemption 3."  *The Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Security Agency*, 610 F.2d 824, 828 (D.C. Cir. 1979).  Section 6 reflects a "congressional judgment that in order to preserve national security, information elucidating the subjects specified ought to be safe from forced exposure."  *Church of Scientology*, 610 F.2d at 828.  In enacting Section 6, Congress was "fully aware of the 'unique and sensitive' activities of the [NSA] which require 'extreme security measures.'"  *Hayden v. NSA/CSS*, 608 F.2d 1381, 1390 (D.C. Cir. 1979) (citing legislative history).  Thus, as the D.C. Circuit has held, "[t]he protection afforded by section 6 is, by its very terms, absolute.

If a document is covered by section 6, NSA is entitled to withhold it . . . ." *Linder v. NSA*, 94

F.3d 693, 698 (D.C. Cir. 1996).

The second applicable statute is Section 102A(i)(1) of the Intelligence Reform and

Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), codified

at 50 U.S.C. § 403-1(i)(1). This statute requires the Director of National Intelligence to "protect

intelligence sources and methods from unauthorized disclosure." It is "settled" that this statute

falls within Exemption 3. *Gardels*, 689 F.2d at 1103 (discussing predecessor statute applicable

to CIA, which provided that "the Director of Central Intelligence shall be responsible for

protecting intelligence sources and methods from unauthorized disclosure"); *accord Sims*, 471

U.S. at 167-68, 193; *Earth Pledge Found.*, 988 F. Supp. at 627 (holding that the predecessor

statute to the current statute giving the DNI the authority to protect sources and methods is

"clearly [an] exemption statute[] for the purpose of section 552(b)(3)").[22] *See NYT*, 499 F. Supp.

2d at 512 (addressing current statute).

The third applicable statute is 18 U.S.C. § 798. This statute prohibits, on pain of criminal

penalty, the disclosure of various kinds of classified information, including information

"concerning the communications intelligence activities of the United States." 18 U.S.C. § 798

Specifically, 18 U.S.C. § 798(a) provides, in pertinent part, that:

> Whoever knowingly and willfully communicates, furnishes, transmits or
> otherwise makes available to an unauthorized person, or publishes, or uses in any
> manner prejudicial to the safety or interest of the United States . . . any classified
> information . . . (3) concerning the communications intelligence activities of the

---

[22] The predecessor statute was superceded by enactment of the Intelligence Reform and
Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), which
shifted the responsibility for protecting intelligence sources and methods from the Director of
Central Intelligence to the Director of National Intelligence.

> United States . . . shall be fined under this title or imprisoned for not more than
> ten years, or both.

The term "communications intelligence" means "all procedures and methods used in the

interception of communications and the obtaining of information from such communications by

other than the intended recipients." *Id.* § 798(b). This statute clearly identifies matters to be

withheld from the public and refers to particular types of matters to be withheld. *See* 5 U.S.C.

§ 552(b)(3). Thus, this statute qualifies as an Exemption 3 statute under FOIA. *See Florida*

*Immigrant Advocacy Ctr. v. Nat'l Security Agency*, 380 F. Supp. 2d 1332, 1340 (S.D. Fla. 2005)

("Other exempting statutes include . . . 18 U.S.C. § 798"); *Winter v. Nat'l Security Agency*, 569

F. Supp. 545 (S.D. Cal. 1983) (18 U.S.C. § 798 is a "statute[] within Exemption 3").

Because these statutes unquestionably meet the first prong of the exemption 3 inquiry, the

sole question is whether the information sought "satisf[ies] the criteria of the exemption statute."

*Earth Pledge Found.*, 988 F. Supp. at 627.

As with the Exemption One claims, the Exemption Three claims made by the Defendants

here are supported by the Declaration of J. Michael McConnell, Director of National Intelligence.

The DNI is the Executive Branch official that Congress has expressly authorized to protect

intelligence sources and methods, *see* DNI Decl., ¶ 14; *see* 50 U.S.C. § 403-1(i)(1), authority that

he has fully exercised here; his determinations, accordingly, are entitled to substantial deference.

Relying upon his expertise and exercising his responsibilities to the Intelligence

Community, the DNI has identified with particularity seven categories of  information which, if

compelled to be disclosed, would compromise United States intelligence sources and methods.[23]

---

[23] As described above with regard to records withheld under Exemption One, DNI
McConnell identifies seven categories of information that cannot be disclosed without causing
grave harms to national security, including "(1) any classified intelligence information

*See* DNI Decl. ¶ 26. Although, as described above, *see supra* at 22-24, the DNI has also

specifically described the multitude of harms to the national security that would result from any

compelled disclosure of information falling within each of these seven categories, a showing of

harm is "irrelevant" to the successful assertion of Exemption Three. *See Hayden*, 608 F.2d at

1390. It is similarly irrelevant whether information for which the protection of Exemption Three

is sought is classified pursuant to Executive Order. *See Gardels*, 689 F.2d at 1107 (noting that

"Exemption 3 is independent of Exemption 1 and may be invoked independently" and finding

that classification under Executive Order is "not a prerequisite for application of [an] Exemption

3 statute"). All that is necessary is that the information withheld "logically" falls within the

categories outlined by the statutes. *Hayden*, 608 F.2d at 1387. The declarations filed by the DNI

and on behalf of each component that withheld documents under this exemption meet this test.

As DNI McConnell explains, the TSP was "itself a method of intelligence gathering."

DNI Decl. ¶ 3. As such, disclosure of any information describing the program in more detail

including information that relates to its operation or that more specifically identifies its targets

falls "logically" within the category of information that the DNI is authorized by statute to

protect. Such information relates to a "method" of collecting intelligence, and Congress and the

Courts have long recognized the necessity for preventing the disclosure of such information. The

─────────────────

concerning the continuing threat to the United States posed by al Qaeda and its affiliates that
forms the basis for the President's authorization and reauthorization of the TSP;" *id.* ¶ 26;
*see also id.* ¶ 30; "(2) any operational details concerning the technical methods by which the
NSA intercepts communications under the TSP"; *id.* ¶ 26; *see also id.* ¶¶ 31-32; and "(7) any
information that would reveal or tend to reveal whether someone is a target of surveillance under
the TSP." *Id.* ¶ 26; *see also id.* ¶ 39. In the classified portions of his declaration, DNI
McConnell also discusses certain additional categories of information relating to the TSP that
cannot be disclosed without exceptionally grave consequences for national security. *See* DNI
Decl. ¶¶ 26-27, 32-38.

authority to protect intelligence sources and methods from disclosure is rooted in the "practical necessities of modern intelligence gathering," *Fitzgibbon*, 911 F.2d at 761, and has been described by the Supreme Court as both "sweeping," *Sims*, 471 U.S. at 169, and "wide-ranging." *Snepp v. United States*, 444 U.S. 507, 509 (1980). Sources and methods constitute "the heart of all intelligence operations," *Sims*, 471 U.S. at 167, and "[i]t is the responsibility of the [intelligence community], not that of the judiciary to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process." *Id.* at 180. As courts have noted, the "sources and methods" exemption provided to the U.S. Intelligence Community is a "near blanket FOIA exemption," and is "only a short step [from] exempting all [intelligence agency] records from FOIA." *Whalen v. U.S. Marine Corps*, 407 F. Supp. 2d 54, 59 n.5 (D.D.C. 2005) (quoting *Minier*, 88 F.3d at 801) (both discussing predecessor statute applicable to the CIA).

As described in the declarations of OLC, OIPR, FBI, and NSA, documents identified as responsive to plaintiffs' FOIA request No. 3 seek exactly the information that constitutes "the heart of all intelligence operations." *Sims*, 471 U.S. at 167. At issue in this suit, is Plaintiffs' request for records concerning "policies, procedures, guidelines, or practices for the interception of communications" under the TSP. All of the information that would be responsive to this kind of request is specifically identified by the DNI as information relating to intelligence sources and methods of the United States and thus subject to both strict and "sweeping," *Sims*, 471 U.S. at 169, statutory protection. The policies, procedures, guidelines or practices sought are operational details that cannot be disclosed without compromising this method of intelligence collection. *See* DNI Decl. ¶ 26-28; Bradbury Decl. ¶¶ 30-37, 38-42, 56-60, 64-65, 67; Brand Decl. ¶ 22-24, 29; Olsen Decl. ¶¶ 19-24. Similarly, to the extent that such policies, procedures, guidelines or

practices relate to the targeting of the TSP, such information cannot be disclosed without compromising both the sources of U.S. intelligence information and, more broadly, the method by which intelligence is collected from those sources. *See* DNI Decl. ¶ 39; Bradbury Decl. ¶¶ 43-55. Facts that implicate both the operation of the TSP and its targets and thus, documents responsive to plaintiffs' requests, as more specifically identified in the supporting declarations, and the exhibits filed in support thereof, *see* Ex. D to Bradbury Decl., contain information that is strictly protected by the DNI's assertion of his statutory authority to protect intelligence sources and methods. *See also* DNI Decl. ¶¶ 26, 33-38 (describing additional categories of information that must be withheld under the DNI's statutory authority). Defendants' assertion of Exemption Three as a basis for withholding responsive information that falls into the categories identified by the DNI, accordingly, must be upheld.[24]

In addition to the DNI's statutory authority, the NSA has its own independent authority to protect a wide range of information relating to its activities. Specifically, Section 6 of the National Security Agency Act of 1959 provides that "nothing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof . . . ." As the D.C. Circuit has noted, "[n]owhere in the legislative history of [Section 6] does Congress express any intent to limit the effect of the clear statutory language." *Hayden*, 608 F.2d at 1390. Thus, NSA's protections under Section 6 are "broader" than the sweeping exemption afforded to the other intelligence agencies. *See id.* ("In light of the peculiar NSA security needs . . ., Congress

---

[24] The FBI also withheld additional information under Exemption Three, which is discussed in the classified portions of Mr. Hardy's declaration. *See* Hardy Decl. ¶¶ 65-67.

certainly had rational grounds to enact for the NSA a protective statute broader than the CIA's."). That broad protection clearly applies here with respect to a host of the withheld records.

The TSP was a signals intelligence activity conducted by the NSA. *See* Brand Decl. ¶ 12; *see also* DNI Decl. ¶¶ 2, 16, 18. As such, information relating to the TSP falls squarely within the protection of Section 6, which specifically authorizes the withholding of "any information with respect to the activities" of the NSA. *See* Brand Decl. ¶ 3 ("all of the records responsive to plaintiffs' FOIA requests describe the NSA's operation of the TSP"). As explained in the declarations offered in support of the NSA's decision to withhold records it located or information that was referred to it by various components of DOJ, information relating to the TSP cannot be disclosed without violating the intent behind this explicit and plainly-worded statutory command. *See id.* ¶¶ 25-29. As courts have recognized, "[t]he protection afforded by Section 6 is, by its very terms, absolute. If a document is covered by Section 6, NSA is entitled to withhold it." *Linder*, 94 F.3d at 698. The reason for such broad withholding, of course, is that information of the kind sought by plaintiffs concerning "NSA's Signals Intelligence efforts directly relates to the [NSA's] core functions and activities" that Congress sought to protect from disclosure because of "the fragile nature" of such efforts, the "vulnerability of signals intelligence to countermeasures by targets and the significance of the loss of valuable foreign intelligence information to national policymakers and the intelligence community." Brand Decl., ¶ 25. NSA, accordingly, properly withheld information to plaintiffs' request under this broad authority. By the same token, each of the DOJ components that maintain other documents that were derived from or contain information related to NSA activities should be entitled to the benefit of this broad protection. Thus, under Section 6 of the National Security Act, 50 U.S.C. § 402 note, as well as under Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of

-41-

2004, 50 U.S.C. § 403-1(i)(1), the defendants' Exemption Three claims must be upheld in their entirety.

### D.    Defendants Properly Withheld Records under Exemption Five.

Exemption Five allows the agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "'Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5.'"  *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76-77 (2d Cir. 2002) (quoting *Grand Cent. P'ship*, 166 F.3d at 481).  Of the ordinary litigation privileges available to DOJ, the deliberative process privilege, the attorney-client privilege, the attorney-work-product doctrine, and the presidential communications privilege are applicable here.

*The Deliberative Process Privilege.*  Documents covered by the deliberative process privilege include those "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental; decisions and policies are formulated." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (citation omitted). As the Supreme Court has explained:

> The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

*Dept. of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (internal quotation marks and citations omitted).  FOIA's inclusion of the deliberative process privilege among its exemptions "reflect[s] the legislative judgment that the quality of administrative

-42-

decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible." *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 617 (D.C. Cir. 1997).

An agency record must satisfy three conditions to qualify for the deliberative process privilege. It must be "inter-agency or intra-agency," 5 U.S.C. § 552(b)(5), that is, "its source must be a Government agency," *Klamath*, 532 U.S. at 8; and it must be both "predecisional" and "deliberative." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citations omitted). "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citation omitted). A record is "deliberative" when "it reflects the give-and-take of the consultative process." *Wolfe v. Department of Health and Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (citation and internal quotation marks omitted) (en banc).

***The Attorney-Client Privilege.*** In general, the attorney-client privilege applies when a client communicates something to his or her lawyer with the intent that it remain confidential and for the purposes of securing "either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceedings." *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (citing *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984)). The privilege also encompasses any opinions given by an attorney to his client based upon facts communicated by the client. *See, e.g.*, *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 254 n.25 (D.C. Cir. 1977). In the FOIA context, the requirement that the attorney-client privilege involve confidential communications is satisfied if the communications suggest that "the government is dealing with

-43-

its attorneys as would any private party seeking advice to protect personal interests . . . ."

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).

      ***The Attorney Work-product Doctrine.***  The attorney-work-product doctrine prevents the

disclosure of "documents prepared in anticipation of foreseeable litigation, even if no specific

claim is contemplated." *Schiller*, 964 F.2d at 1208.  It applies so long as "some articulable claim,

likely to lead to litigation" has arisen.  *Coastal States*, 617 F.2d at 865.  The doctrine, thus,

protects information generated by legal counsel where "the document can fairly be said to have

been prepared or obtained because of the prospect of litigation."  *In re Sealed Case*, 146 F.3d

881, 884 (D.C. Cir. 1998)

      The work-product doctrine also shields activities designed to forestall or prevent

litigation.  Thus, the D.C. Circuit has noted:

> [i]t is often prior to the emergence of specific claims that lawyers are best
> equipped either to help clients avoid litigation or to strengthen available defenses
> should litigation occur. . . . If lawyers had to wait for specific claims to arise
> before their writings could enjoy work-product protection, they would not likely
> risk taking notes about such matters or communicating in writing with colleagues,
> thus severely limiting their ability to advise clients effectively. . . . Discouraging
> lawyers from engaging in the writing, note-taking, and communications so critical
> to effective legal thinking would . . . "demoraliz[e]" the legal profession, and "the
> interests of the clients and the cause of justice would be poorly served."

*In re Sealed Case*, 146 F.3d at 886 (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)); *see

also Cities Serv. Co. v. Fed. Trade Comm'n*, 627 F. Supp. 827, 832 (D.D.C. 1984) (documents

which relate to "possible settlement discussions pertaining to foreseeable litigation are protected

under the attorney work-product privilege").

      ***The Presidential Communications Privilege.***  The Supreme Court has recognized a

"presumptive privilege for Presidential communications" founded on the "President's

generalized interest in confidentiality."  *United States v. Nixon*, 418 U.S. 683, 708 (1974), and

the Court of Appeals has specifically identified that privilege as one falling within the ambit of

those covered by Exemption Five of FOIA.  *See Judicial Watch, Inc. v. Dept. of Justice*, 365 F.3d

1108, 1113 (D.C. Cir. 2004).  The Supreme Court found the presidential communications

privilege "necessary to guarantee the candor of presidential advisers and to provide '[a] President

and those who assist him . . . [with] free[dom] to explore alternatives in the process of shaping

policies and making decisions and to do so in a way many would be unwilling to express except

privately."  *In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir. 1997) (quoting *Nixon*, 418 U.S. at

708).  The President "occupies a unique position in the constitutional scheme," *Nixon v.

Fitzgerald*, 457 U.S. 731, 749 (1982), and thus, the D.C. Circuit has recognized a "great public

interest" in preserving "the confidentiality of conversations that take place in the President's

performance of his official duties" because such confidentiality is necessary in order to protect

"the effectiveness of the executive decision-making process."  *Nixon v. Sirica*, 487 F.2d 700, 717

(D.C. Cir. 1973); *In re Sealed Case*, 121 F.3d at 742.

The presidential communications privilege protects "communications 'in performance of

[a President's] responsibilities,' 'of his office,' and made 'in the process of shaping policies and

making decisions.' ' ' *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977). The privilege is

"closely affiliated" with the deliberative process privilege, but, unlike that privilege, it "applies to

documents in their entirety, and covers final and post-decisional materials as well as pre-

deliberative ones." *In re Sealed Case*, 121 F.3d at 745; *see also id.* at 744 ("Even though the

presidential privilege is based on the need to preserve the President's access to candid advice,

none of the cases suggests that it encompasses only the deliberative or advice portions of

documents").

As is clear from a review of the declarations filed in support of defendants' motion for summary judgment and the exhibits filed in support thereof, the vast majority of documents withheld under Exemption 5 are drafts, related deliberative exchanges, and attorney notes, or memoranda and legal analysis conducted for and at the request of individuals or entities with whom the various components of the Department have an attorney-client relationship, or which contain information communicated by those individuals or agencies for review by the Department. *See* Bradbury Decl. ¶¶ 37, 49-50, 52, 55, 64, 66-68, 70, 72-73, 80, 87-101 & Exs. C & D thereto; Olsen Decl. ¶¶ 19, 22, 25-29; Hsu Decl. ¶¶ 25-28; Kovakas Decl. ¶¶ 4-5; Pustay Decl. ¶¶ 18-31; Hardy Decl. ¶ 71, ¶ 72(a)-(c); *see also* Brand Decl. ¶¶ 31-33. As Mr. Hardy describes, "as a whole, the [withholdings under] Exemption 5 . . . reflect an internal, on-going dialogue among and between FBI personnel, DOJ personnel, and other federal agency personnel, including NSA and other Intelligence Community personnel, with regard to the operation of the TSP. . . . All of the material withheld pursuant to Exemption (b)(5) reflects a fluid, continuous and on-going deliberative set of discussions among decision makers and contributors to the TSP dialogue, and the role . . . federal agencies play in this significant national security initiative." Hardy Decl. ¶ 72(a). *See also* Pustay Decl. ¶ 22 ("These "discussions," which get memorialized online, are part of the exchange of ideas and suggestions that accompanies all decision-making and typically reflect staff members' very preliminary assessments about issues on which they may be asked to make recommendations. Indeed, such online discussions most resemble conversations between staff members which are part of the give and take of agency deliberations."). The presence of that internal, ongoing dialogue is reflected in each of the other declarations, *see, e.g.*, Olsen Decl. ¶¶ 24, 26; Bradbury Decl. ¶¶ 49-50, 66-68, 93-94; Hsu Decl. ¶¶ 25-28, Kovakas Decl. ¶¶ 4-5, and, as a result, all of the materials identified by these

components as falling within the scope of the Exemption are protected from disclosure. *See, e.g., City of Virginia Beach v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1253 (4th Cir. 1993) (deliberative process "protects 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency'") (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

As explained in a more comprehensive and particularized manner in the accompanying declarations "[d]raft documents by their very nature, are typically predecisional and deliberative." *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D.D.C. 1983); *see, e.g.*, Bradbury Decl. ¶¶ 88-90; Olsen Decl. ¶¶ 22, 27-28; Pustay Decl. ¶¶ 20-22; Hardy Decl. ¶ 71, 72(a)-(c); *see also Dudman Communications Corp. v. Dept. of the Air Force*, 815 F.2d 1565, 1568-69 (D.C. Cir. 1987); *City of Virginia Beach*, 995 F.2d at 1253; *Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1458 (1st Cir. 1992). Disclosure of such documents would fundamentally compromise the manner in which personnel throughout the Department fulfill their responsibilities to review, advise, and consult with respect to the ongoing operations of the Executive Branch. *See* Bradbury Decl. ¶¶ 92-93; Olsen Decl. ¶¶ 22, 27-28; Pustay Decl. ¶¶ 20-22; Hardy Decl. ¶¶ 72(b), 72(c); *see also Dudman*, 815 F.2d at 1569 (disclosure of "decisions to insert or delete material or to change a draft's focus or emphasis—would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work"); *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (recognizing that disclosure of draft manuscript "could lead to confusion of the public").

Similarly, the disclosure of attorney notes and inter- and intra-agency deliberative exchanges relating to the resolution of issues raised by any matter being actively considered by

DOJ either internally or with client agencies, would inhibit the full and fair exchange of ideas and recommendations that is necessary to the formulation of Executive Branch policy and would markedly alter the process by which such policies are made. *See* Pustay Decl. ¶¶ 22-23, 25-26; Bradbury Decl. ¶¶ 95-96; Olsen Decl. ¶¶ 27-28; Hsu Decl. ¶ 28; Hardy Decl. ¶¶74-76; *see also Judicial Watch of Florida, Inc. v. Dep't of Justice*, 102 F. Supp. 2d 6, 12-15 & n.7 (D.D.C. 2000) (handwritten notes appropriately withheld because notes are related to decision-making process) (citing cases); *Conoco, Inc. v. Dep't of Justice*, 687 F.2d 724, 727-28 (3d Cir. 1982) (handwritten notes constitute intra-agency memoranda for purposes of Exemption 5); *New York Public Interest Research Group v. U.S. Envi'tl Prot. Agency*, 249 F. Supp. 2d 327, 338-39 (S.D.N.Y. 2003). Moreover, disclosure of such documents would severely compromise the confidentiality of attorney client communications both in the Department and among the federal agencies. *See, e.g.*, Hardy Decl. ¶ 76 ("[d]isclosure of these communications would breach the confidential relationships between [FBI attorneys, DOJ attorneys, and FBI Special Agents and support personnel] and would repress and stifle such critical communication in the future."); *see also* Bradbury Decl. ¶¶ 99-100.

Similarly, talking points, plans, proposals and briefing papers generally constitute privileged deliberative material. Such papers are typically prepared to assist decisionmakers in making decisions or in communicating those decisions to the public and the press. *See, e.g.*, Pustay Decl. ¶¶ 20, 23-24, 26; Bradbury Decl. ¶¶ 70-81, 90. Disclosure of "work plans, status reports, briefings, opinion papers, and proposals" would "stifle the candor necessary in an agency's policy making process." *Hornbostel v. U.S. Dep't of the Interior*, 305 F. Supp. 2d 21, 31 (D.D.C. 2003); *see also Thompson v. Dep't of the Navy*, 1995 WL 527344, at *4 (D.D.C. 1997); *see also Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196-97 (D.C. Cir. 1991)

-48-

(memorandum regarding "study of how to shepherd the FOIA bill through Congress" protected, as are "communications . . . contributing to deliberations about whether to introduce legislation"); *Hunt v. U.S. Marine Corps*, 935 F. Supp. 46, 52 (D.D.C. 1996) ("point papers" prepared in the "midst of [agency's] deliberative process to assist officers in their formulation of a final decision" exempt from disclosure); *Klunzinger v. IRS*, 27 F. Supp. 2d 1015, 1026-27 (W.D. Mich. 1998) (briefing paper for Commissioner exempt).

Disclosure of memoranda and other legal advice prepared internally for DOJ use or in the course of providing legal advice and assistance to client federal agencies and to the President of the United States are also subject to protection. *See* Bradbury Decl. ¶¶ 70-81, 88-91. These documents constitute or reflect confidential attorney-client communications, as well as deliberative advice provided to support the formulation of Executive Branch policies. *See Int'l Paper Co. v. Fed. Power Comm'n*, 438 F.2d 1349, 1358-59 & n. 3 (2d Cir. 1971) (memoranda from the Federal Power Commission's general counsel containing "legal analysis and recommendations, legal conclusions, and policy recommendations" were protected from disclosure under Exemption 5 because these items were part of the agency's deliberative process and not final orders); *Brinton v. Dep't of State*, 636 F.2d 600, 604-05 (D.C. Cir. 1980) (legal opinions prepared by the State Department's Office of the Legal Adviser were not "final opinions" and therefore were protected by the deliberative process privilege: "There can be no doubt that such legal advice, given in the form of intra-agency memoranda prior to any agency decision on the issues involved, fits exactly within the deliberative process rationale for Exemption 5"). *Southam News v. U.S. Immigration & Naturalization Serv.*, 674 F.Supp. 881, 886 (D.D.C. 1987) (opinion letter on legal questions regarding the criteria used to evaluate

certain applicants for visas was protected because it was generated in the course of a deliberative process).

Finally, documents prepared for purposes of litigation cannot be disclosed without compromising the process by which attorneys make decisions in the context of the adversarial trial process and would fundamentally disrupt the manner in which attorneys prepare to litigate cases through the court system.  Documents identified as falling within the terms of this protection, accordingly, are properly withheld under Exemption Five.  *See* Hsu Decl. ¶¶ 26-27; Hardy Decl. ¶¶ 78-81; *see also* Bradbury Decl. ¶¶ 99-100; Olsen Decl. ¶¶ 14-21 (withholding documents concerning OIPR's dealings with the FISC).  Relatedly, the files of the Office of Solicitor General ("OSG") are clearly exempt under Exemption 5.  The OSG has identified categories of core attorney-work-product created in litigation such as drafts of briefs and declarations, emails relating to the TSP litigation or offering OSG's comments on drafts of TSP-related materials where the Office's advice was sought by other components or agencies because of pending or anticipated litigation and attorney notes on cases or briefs.  *See* McCain Decl. ¶¶ 8-13, 15-18.  Similarly, OSG is the final arbiter of whether and when to take appeals in DOJ and several of the TSP-related cases required such consideration.  *See id.* ¶¶ 4, 8.  The internal memoranda considering the merits of taking such appeals would clearly be deliberative and otherwise is subject to withholding as attorney-work-product.  *Id.* ¶ 14.  Indeed, as a litigating component of DOJ, the categories of records identified by OSG fall within that category of records "'which would not be obtainable by a private litigant in an action against the agency under normal discovery rules,'" *Tigue*, 312 F.3d at 76-77, and are therefore exempt from disclosure under FOIA.

### E.    DOJ Properly Withheld Records under Exemption Seven.

Records compiled for law enforcement purposes are exempt from disclosure if the disclosure could reasonably be expected to cause one of the harms enumerated in any of the six subparts of Exemption Seven. *See* 5 U.S.C. § 552(b)(7).  The applicable subparts invoked by DOJ components in response the plaintiffs' FOIA request are 7(A), 7(D), and 7(E), each of which is discussed in detail herein.[25]

Documents are compiled for law enforcement purposes within the meaning of Exemption Seven's threshold requirement if:  (1) the activity that gives rise to the documents is related to the enforcement of federal laws or the maintenance of national security; and (2) the nexus between the activity and one of the agency's law enforcement duties is based on information sufficient to support at least a "colorable claim" of its rationality.  *See Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 340 (D.C. Cir. 1987).  Essentially, this threshold showing requires "that the defendant show a nexus between the agency's activities and a legitimate law enforcement purpose."  *Coleman v. Federal Bureau of Investigation*, 13 F. Supp. 2d 75, 83-84 (D.D.C. 1998).

Here, the DOJ's Criminal Division and the FBI, components specializing in and with core functions concerning law enforcement, invoked Exemption Seven and each has explained why the documents at issue meet the threshold requirement that they be compiled for law enforcement purposes.  *See* Hsu Decl. ¶¶ 15-17; Hardy Decl. ¶¶ 101-03.  These claims of law enforcement purpose are entitled to deference.  *Center for Nat'l Security Studies*, 331 F.3d at 926; *see also Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 44 (D.D.C. 1999) ("Law enforcement

---

[25]  Various DOJ components also withheld records implicating privacy concerns under Exemption 7(C).  But because those concerns and the law concerning those exemptions parallel Exemption 6, they are discussed together in Part II.F, *infra*.

agencies such as the FBI face a lesser burden with regard to showing a legitimate law enforcement purpose behind the compilation of such records than do other agencies."). Moreover, as exhaustively discussed above and in the supporting declarations, the TSP was a program particularly and specifically geared towards the maintenance of the national security; as such, the documents identified by these components as subject to a claim of Exemption Seven easily meet FOIA's threshold requirement.

    *Exemption 7(A).*  Exemption 7(A) authorizes the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  To justify the applicability of this Exemption, the Government need only demonstrate that (1) a law enforcement proceeding is pending or prospective, and (2) release of the information could reasonably be expected to cause some articulable harm to the proceeding.  *Voinche v. FBI*, 46 F. Supp. 2d 26, 31 (D.D.C. 1999).

    With respect to the showing of harm to a law enforcement proceeding required to invoke Exemption 7(A), courts have long accepted that Congress intended the Exemption to apply whenever the government's case could be harmed by the premature release of evidence or information, or when disclosure could impede any necessary investigation prior to the enforcement proceeding.  *See, e.g.*, *National Labor Relations Bd. v. Robbins Tire and Rubber Co.*, 437 U.S. 214, 232 (1978) ("[T]he release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against.").  Further, Congress has significantly relaxed the Government's burden in establishing interference with law enforcement proceedings under Exemption 7(A).  Section 552(b)(7)(A) originally provided for the

withholding of information that "would interfere with enforcement proceedings," but the Freedom of Information Reform Act of 1986 amended that language and replaced it with the phrase "could reasonably be expected to interfere with" enforcement proceedings.  *See* Pub. L. No. 99-570, § 1802, 100 Stat. 3207, 3207-48.  Courts recognize that this change in the statutory language substantially broadens the exemption's scope.  *See, e.g.*, *Manna v. DOJ*, 51 F.3d 1158, 1164, n.5 (3d Cir. 1995) (purpose of amendment was "to relax significantly the standard for demonstrating interference with enforcement proceedings"); *Alyeska Pipeline Serv. v. U.S. Env't Prot. Agency*, 856 F.2d 309, 311 n.18 (D.C. Cir. 1988) (district court improperly relied on pre-amendment version of exemption that "required EPA to meet a higher standard than FOIA now demands").

Finally, it is well-established that the applicability of Exemption 7(A) may be shown generically, based on the category of records involved, rather than on a document-by-document basis.  *See Robbins Tire*, 437 U.S. at 236.  Thus, courts have routinely accepted affidavits in Exemption 7(A) cases that specify the distinct, generic categories of documents at issue and the harm that could result from their release, rather than requiring extensive, detailed itemizations of each document.  *See, e.g.*, *Spannuaus v. U.S. Dep't of Justice*, 813 F.2d 1285, 1288 (4th Cir. 1987) ("The Supreme Court has rejected the argument that [Exemption 7(A)] requires particularized showings of interference, holding instead that the Government may justify nondisclosure in a generic fashion."); *see also Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1037 (7th Cir. 1998) ("The Government need not establish that release of a particular document would actually interfere with an enforcement proceeding," but rather that "with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory

records while a case is pending would generally interfere with enforcement proceedings.") (first

emphasis in original and subsequent emphases added) (*quoting Robbins Tires*, 437 U.S. at 236).

   ***Exemption 7(D).***  Informants are entitled to the protection of 5 U.S.C. § 552(b)(7)(D),

which permits the withholding or redacting of law enforcement records the release of which

"could reasonably be expected to disclose the identity of a confidential source . . . and, in the case

of a record or information compiled by a criminal law enforcement authority in the course of a

criminal investigation . . . information furnished by a confidential source."  Exemption 7(D)

requires no balancing of public and private interests.  *See Dow Jones & Co., Inc. v. Dep't of*

*Justice*, 917 F.2d 571, 575-76 (D.C. Cir. 1990).  The exemption applies if the agency establishes

that a source has provided information under either an express or implied promise of

confidentiality.  *See Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995).  A confidential source

is one who "provided information under an express assurance of confidentiality or in

circumstances from which such an assurance could be reasonably inferred."  *U.S. Dep't of Justice*

*v. Landano*, 508 U.S. 165, 172 (1993) (internal quotation and citation omitted).

   ***Exemption 7(E).***  Finally, records compiled for law enforcement purposes may be

withheld under Exemption 7(E) if release of the information "would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would disclose guidelines for

law enforcement investigations or prosecutions if such disclosure could reasonably be expected

to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The protection afforded by

Exemption 7(E) is categorical for information related to law enforcement techniques.  *See Smith*

*v. Bureau of Alcohol, Tobacco and Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997); *Fisher v.*

*Dept. of Justice*, 772 F. Supp. 7, 12 n. 9 (D.D.C. 1991), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992).

Even if a law enforcement technique itself has been disclosed, but the public is not

generally aware of the manner and circumstances in which the technique is employed, or the

specific methods used by the particular agency, Exemption 7(E) still applies.  *See, e.g.*, *Blanton*,

63 F. Supp. 2d at 49-50; *Coleman v. FBI*, 13 F. Supp. 2d 75, 83-84 (D.D.C. 1998).  In some

cases, even commonly known procedures have been protected from disclosure when

"circumstances of their usefulness . . . may not be widely known," *Wickline v. FBI*, 1994 WL

549756, *5 (D.D.C. 1994), or when their use "in concert with other elements of an investigation

and in their totality directed toward a specific investigative goal [] constitute a 'technique' which

merits protection to ensure it future effectiveness."  *D'Alessandro v. U.S. Dept. of Justice*, 1991

WL 35519, *4 (D.D.C. 1991).  It is sometimes not possible to describe a technique, even in very

general terms, without disclosing the very information being withheld.  *See, e.g.*, *Smith*, 977 F.

Supp. at 501.

        1.    The Criminal Division Properly Withheld Records Under
                   Exemptions 7(A) and 7(D).

The records identified by the Criminal Division as responsive to plaintiffs' requests

consist of records compiled in the course of an ongoing criminal investigation into the

unauthorized disclosure, or "leak," of classified information concerning the TSP and involving

related allegations of violation of federal law.  *See* Hsu Decl. ¶ 15  These records accordingly,

meet the threshold requirement of Exemption Seven that they be compiled for law enforcement

purposes.  These records fall into three categories: "classified copies of [FBI] '302' reports

(specifically, reports and summaries of witness interviews, as well as related attorney notes;"

unclassified documents relating to "attorney work-product and case development matters," and a

"classified chronology of events related to the leak investigation."  *Id.* ¶ 19.  These documents

contain information related to "potential subjects of the investigation"; "prospective and

investigative theories" concerning the investigation; "facts relevant to the investigation," and

"the initial and developing focus of the investigation." *Id.*

Information of this sort is clearly protected under Exemption 7(A) due to the fact that its

disclosure "could reasonably be expected to result in interference with the on-going [law

enforcement] proceedings. Hsu Decl. ¶ 20. Thus, as cogently explained in the Criminal

Division's Declaration:

> [f]or example, prematurely disclosing documents relating to witnesses in ongoing
> inquiries and investigations could result in witness tampering or intimidation;
> could lead to alteration, tailoring, or construction of testimony; and could
> discourage the continued cooperation of these witnesses as well as of other
> knowledgeable individuals. Likewise, disclosure of attorney work-product and
> other documents related either to the government's initial inquiries or to the
> development of the government's cases could prematurely reveal the direction,
> focus and scope of the inquiries; the evidence developed to date and the reliance
> placed by the government on that evidence; the government's strategies; and the
> strengths and weaknesses of the government's cases. Prematurely revealing such
> information could also provide the targets and subjects with undue insight into the
> development of the government's cases, could enable them to devise strategies to
> counter prosecutorial efforts, and could impair the government's ability to present
> its most effective case. Finally, disclosure of evidentiary material obtained by the
> government could likewise provide targets and subjects with insight into the
> government's case against them; could enable such individuals to alter, tailor or
> destroy evidence, as well as to fabricate alibis, or could otherwise assist such
> individuals in circumventing the investigation.

*Id.* This detailed and specific description of the harms to an ongoing criminal proceeding likely

to result from disclosure of the documents maintain by the Criminal Division fully justifies its

withholding under FOIA Exemption 7(A). *See, e.g.*, *Kay v. Fed. Communications Comm'n*, 976

F. Supp. 23, 38 (D.D.C. 1997) (records exempt under 7(A) because disclosure could "reveal the

scope, direction, and nature" of the investigation, and could thereby allow the target to potentially

circumvent the proceeding), *aff'd* 172 F.3d 919 (D.C. Cir. 1998).

So too, as Ms. Hsu describes, certain of the records compiled in the course of the leak investigation contain information relating to confidential sources which is categorically protected from disclosure under Exemption 7(D).  *See* Hsu Decl. ¶¶ 36-38.  Any sources providing information to that investigation must be protected as "[t]here can be no doubt that . . . the nature of the crime is such consequence that anyone with relevant knowledge would expect that their statements would not be publicly divulged unless and until such disclosure is absolutely essential for law enforcement purposes."  *Id.* ¶ 38.  Because premature disclosure of a source could result in the loss of sources "through retaliation against the sources for past disclosure or because of the source's fear of future disclosure," FOIA expressly provides "comprehensive" protection against disclosure of source information.  *Id.* ¶ 37.  Withholding information relating to confidential sources, accordingly, is proper under Exemption 7(D).

> 2.    The FBI Properly Withheld Records Under Exemptions 7(A), 7(D), and 7(E).

Like the Criminal Division, the FBI also withheld a variety of records related to the ongoing criminal leak investigation under FOIA Exemption 7(A), *see* Hardy Decl. ¶¶ 104-115, including evidentiary or investigative materials, *see id.* ¶ 113; and administrative materials, *see id.* ¶ 114, which take a variety of forms, such as Electronic Communications ("ECs"), FD 302 Forms, and Investigative Notes, *see id.* ¶¶ 111-12.  Because the release of any of this information would interfere with the ongoing leak investigation for many of the same reasons identified in detail in the Declaration of Ms. Hsu, *see* Hsu Decl. ¶¶ 19-20, and for the additional

reasons set forth in the Declaration of Mr. Hardy, *see* Hardy Decl. ¶¶ 105-10, the FBI's

invocation of Exemption 7(A) should be upheld.[26]

The FBI also specifically invoked Exemption 7(D) to protect information where

disclosure could "reasonably be expected to disclose the identity of a confidential source . . . [or]

information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). As Mr. Hardy

explains, information relating to confidential sources must be protected because:

> [t]he release of a source's identity would forever eliminate that source as a future
> means of obtaining information. In addition, when the identity of one source is
> revealed, that revelation has a chilling effect on the activities and cooperation of
> other sources. It is only with the understanding of complete confidentiality
> (whether express or implied), that the aid of such sources can be enlisted, and only
> through this confidence that these sources can be persuaded to continue providing
> valuable assistance in the future.

Hardy Decl. ¶ 117. For these and the other reasons explained in Mr. Hardy's declaration, *see id.*

¶¶ 116-22, the FBI's assertion of Exemption 7(D) must be sustained.

Finally, the FBI properly withheld information under Exemption 7(E) because, as

demonstrated in the section on Exemption 2 and the Declaration of Mr. Hardy, disclosure would

risk circumvention of the law, *see supra* at 31-33; *see also* Hardy Decl. ¶¶ 123-25; *see Voinche*,

940 F. Supp. at 332 (information relating to protection of Supreme Court and Justices protected

under Exemption 7(E), as well as "high 2" exemption); *Gordon*, 388 F. Supp. 2d at 1035-37

(materials created in course of maintenance of terrorist watch lists protected under Exemption

7(E), as well as Exemption 2, because terrorists could educate themselves about watch list

procedures and devise ways to circumvent watch lists). Information such as that identified by

---

[26] The FBI also withheld additional documents pursuant to FOIA Exemption 7(A), which
are discussed in more detail in the classified portions of Mr. Hardy's declaration. *See* Hardy
Decl. ¶ 111.

Mr. Hardy is entitled to categorical protection under Exemption 7(E).  *See Smith*, 977 F. Supp. at

501; *see also Librach v. FBI*, 587 F.2d 372, 373 (8th Cir. 1978) (proper to withhold under

Exemption 7(E) documents pertaining to relocation of a witness because disclosure "would

jeopardize the effectiveness of the Witness Security Program").  Accordingly, because this

information was properly withheld under Exemption 7(E), as well as under Exemption 2, the FBI

should be granted summary judgment as to its invocation of these Exemptions.

### F.    DOJ Properly Withheld Information under Exemptions Six and Seven(C).

Many DOJ components withheld,[27] under Exemption 6 and/or Exemption 7(C), the

names of private individuals and Department and other government agency staff, as well as those

individuals' personal information such as addresses (including email addresses), telephone

numbers, and cellular phone numbers, which occasionally appear in the responsive documents.

*Exemption 6.*  Exemption Six authorizes an agency to withhold "personnel and medical

files and similar files the disclosure of which would constitute a clearly unwarranted invasion of

personal privacy."  5 U.S.C. § 552(b)(6).  Review of any agency's withholding under Exemption

Six proceeds in "two stages."  First, the Court must decide whether the information is subject to

protection under the Exemption; and second, the Court must determine whether disclosure would

constitute a "clearly unwarranted invasion of personal privacy."  *Washington Post Co. v. U.S.*

*Dept. of Health and Human Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982).  With respect to the first

stage, the threshold for the application of Exemption Six is "minimal."  *Id.*  The requirement of

---

[27] As a matter of general practice, DOJ does not withhold the names of certain high-level
Department officials, but does withhold their personal information such as home addresses,
personal telephone numbers and personal email addresses.  The disclosure of this sort of
information compromises the personal privacy of these individuals, but sheds no light on the
inner workings of the Department.

files "similar" to personnel or medical files has been read broadly to encompass any "information which applies to a particular individual." *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982); *accord New York Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) ("the threshold for application of Exemption 6 is crossed if the information merely 'applies to a particular individual'") (citation omitted).

Second, the public's interest in disclosure must be balanced against the interest in privacy that would be furthered by nondisclosure. *See Dep't of Defense v. FLRA*, 510 U.S. 487, 495 (1994). The "only relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government." *Id.* at 495-96 (internal citation and quotation marks omitted) (emphasis added); *see Hopkins*, 929 F.2d at 88. Establishing that disclosure of personal information would serve a cognizable public interest is the plaintiff's burden. *See Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 392 n.13 (D.C. Cir. 1987).

*Exemption 7(C).* Like Exemption (6), Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes" to the extent that the disclosure of law enforcement records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy."[28] 5 U.S.C. § 552(b)(7)(C). In applying Exemption 7(C), a court should "balance the privacy interests that would be compromised by disclosure against the public

---

[28] As the Supreme Court explained in *Reporters Comm.*, however, "Exemption 7(C)'s privacy language is broader than [that of] Exemption 6 in two respects. First, whereas Exemption 6 requires that the invasion of privacy be 'clearly unwarranted,' the adverb 'clearly' is omitted from Exemption 7(C). . . . Second, whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion." 489 U.S. 749, 756 (1989) (quoting 5 U.S.C. § 552(b)(6), (7)(C)).

interest in release of the requested information."  *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276,

1281 (D.C. Cir. 1992).  Courts have also construed the public interest component narrowly,

noting that the public interest "must be assessed in light of FOIA's central purpose," which, as

under Exemption 6, "is not fostered by disclosure about private citizens that is accumulated in

various governmental files but that reveals little or nothing about an agency's own conduct."

*Nation Magazine, Wash. Bur. v. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995) (citation

omitted).

        In weighing this balance, "an agency must exempt from disclosure the names of and

identifying information about private individuals appearing in an agency's law enforcement files

unless that information is necessary to confirm or refute compelling evidence that the agency is

engaged in illegal activity."  *AFL-CIO v. Fed. Election Comm'n*, 177 F. Supp. 2d 48, 61 (D.D.C.

2001) (emphasis in original), *aff'd* 333 F.3d 168 (D.C. Cir. 2003); *see also Mack v. Dept. of

Navy*, 259 F. Supp. 2d 99, 106 (D.D.C. 2003) ("our court of appeals has categorically held that

the names and addresses of private individuals appearing in law enforcement files are exempt

from disclosure unless they are necessary to confirm or refute compelling evidence of illegal

agency activity"); *Schiffer v. FBI*, 78 F. 3d 1405, 1410 (9th Cir. 1996) (recognizing "little to no"

public interest in disclosure of persons in FBI file where no evidence of FBI wrongdoing).

        Here, the information withheld by the various components was contained in the official

files of these components and consisted of the names of private individuals and Department and

other government agency staff as well as other information relating to these individuals such as

their addresses (including email addresses), telephone numbers, and cellular phone numbers.

*See* Bradbury Decl. ¶¶ 28, 102; Olsen Decl. ¶ 32; Hsu Decl. ¶¶ 30-35; Hardy Decl. ¶¶ 82-100.

This information satisfies the "minimal" threshold necessary to allow its protection under

Exemption Six. *Washington Post Co.*, 690 F.2d at 260. Further, in processing plaintiffs' FOIA

request, the relevant components weighed the personal privacy interests involved and determined

that release of personally identifying information concerning the individuals identified in

Department files was clearly unwarranted. *See* Bradbury Decl. ¶¶ 28, 102; Olsen Decl. ¶ 32; Hsu

Decl. ¶ 35; Hardy Decl. ¶¶ 94, 98, 100. Those determinations are well-founded. *See Hertzberg*,

273 F. Supp. 2d at 87 (disclosing personally identifying information of private individuals is "not

compelled" under FOIA); *Blazy v. Tenet*, 979 F. Supp. 10, 24 (D.D.C. 1997) (affirming CIA

decision to redact names of private individuals contained in responsive documents where the

"names of non-Agency personnel mentioned . . . do not shed light on the workings of the CIA"),

*aff'd*, 1998 WL 315583 (D.C. Cir. 1998). FOIA's purpose "is not fostered by disclosure of

information about private citizens . . . that reveals little or nothing about an agency's own

conduct." *Hertzberg*, 273 F. Supp. 2d at 87; *see also Reporters Comm.*, 489 U.S. at 774

("FOIA's central purpose is to ensure that the Government's activities be opened to the sharp eye

of public scrutiny, not that information about private citizens that happens to be in the warehouse

of the Government be so disclosed.").

Additionally, it is well-established that "government officials have a legitimate interest in

preserving the secrecy of matters that conceivably could subject them to annoyance or

harassment in either their official or private lives." *Baez v. U.S. Dep't of Justice*, 647 F.2d 1328,

1339 (D.C. Cir. 1980); *Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 487 (D.C. Cir. 1980) (same);

*Hunt v. FBI*, 972 F.2d 286, 288 (9th Cir. 1992) (government employees have "legitimate interest

in keeping private matters that could conceivably subject them to annoyance or harassment.").

More specifically, where, as here, government officials are involved in work related to the

national security and classified at high levels, they are likely to be subject to a heightened level of

embarrassing and potentially harassing inquiries.  *See* Olsen Decl. ¶ 32; Hardy Decl. ¶¶ 87-89.

Further, as with information relating to private individuals, no public interest is served by the

disclosure of personal information relating to Department or other federal agency staff, such as

home addresses or personal email addresses or telephone numbers.  *See Voinche*, 940 F. Supp. at

330 ("[T]here is no reason to believe that the public [would] obtain a better understanding of the

workings of various agencies by learning the identities of" the individuals associated with the

documents"); *Schwarz v. Dep't of the Treasury*, 131 F. Supp. 2d 142, 150 (D.D.C. 2000)

(Kennedy, J.) (disclosure of federal employees' names contained in federal records "would not

contribute to the public understanding of government functions").  In light of the foregoing, the

withholdings under Exemption 6 were entirely proper and should be upheld.

Courts have recognized that there is a particularly strong privacy interest implicated with

respect to identities of private individuals mentioned in materials related to law enforcement.

*See SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991) (privacy interests of

third parties mentioned in law enforcement files are "substantial," while "[t]he public interest in

disclosure [of third-party identities] is not just less substantial, it is insubstantial"); *Voinche*, 940

F. Supp. at 329-30 (approving under exemption 6 the withholding of names of individuals

mentioned during the course of routine matters with the FBI); *see also* Hsu Decl. ¶¶ 33-34;

Hardy Decl. ¶¶ 92-100 (describing the specific justifications for withholding the identities of

three categories of private individuals whose names appear in FBI records, third parties of

investigative interest, *id.* ¶¶ 92-94; third parties interviewed by the FBI, *id.* ¶¶ 95-98; and third

parties who are merely mentioned in FBI records, *id.* ¶¶ 99-100).

Turning to Exemption 7(C), the FBI also properly withheld information whose disclosure

would compromise personal privacy.  As discussed above, personally identifying information

-63-

relating to FBI special agents, support personnel, and other government agency staff, was

withheld due to the invasion of privacy that would be occasioned by its disclosure.  When

information that implicates personal privacy appears in the context of records compiled for

purposes of law enforcement, *i.e.*, when those records are subject to protection under Exemption

7(C), as well as under Exemption Six, Courts have emphasized Congress' intent to afford law

enforcement materials significantly more expansive privacy protection than that available under

Exemption 6.  *See National Archives and Records Admin. v. Favish*, 541 U.S. 157, 165-66

(2004); *Judicial Watch, Inc.*, 365 F.3d at 1125.  As a result, all of the personally identifying

information identified by Mr. Hardy, *see* Hardy Decl.    ¶¶ 85-100—including personal

information concerning FBI Special Agents, and FBI support personnel, *id.* ¶¶ 85-89; other

federal government employees, *id.* ¶¶ 90-92; third parties of investigative interest, *id.* ¶¶ 92-94;

third parties interviewed, *id.* ¶¶ 95-98; and third parties who are merely mentioned in FBI

records, *id.* ¶¶ 99-100—is properly exempt under Exemption 7(C).

The Criminal Division records are also properly withheld under Exemption 7(C).  As

described by Ms. Hsu, and as described above, personally identifying information relating to

government agency staff, law enforcement officers, and private individuals is properly withheld

under this Exemption because there is relatively little public interest in its disclosure, and,

particular where such information appears in files compiled for purposes of law enforcement

such as those maintained by the Criminal Division, disclosure is unwarranted.  *See* Hsu Decl. ¶¶

33-35; *see also Favish*, 541 U.S. at 165-66; *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d

1108, 1125 (D.C. Cir. 2004) (noting Congress' intent to afford law enforcement materials

significantly more expansive privacy protection than that available under Exemption 6).

\*          \*          \*

FOIA Request No. 3 seeks specific and detailed information related to one of the most highly classified activities conducted by the federal government.  As the DNI has made clear, the TSP was a program critical to the national security of the United States, *see* DNI Decl. ¶ 20, and while the President has not reauthorized the TSP, information relating to the TSP "must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence efforts of the United States, including efforts by this country to counter international terrorism." *Id.* ¶ 31.

As fully explained in the comprehensive declarations filed in this case, disclosure of the information sought by plaintiffs in these cases would cause a multitude of specific and tangible harms—harms to (i) the national security of the United States, (ii) critical activities of the Intelligence Community, (iii) effective law enforcement and counterterrorism initiatives, (iv) the process by which government decisions are made, (v) intra-Departmental and inter-agency attorney-client confidences, (vi) the decision-making processes of the President of the United States, and (vii) individuals, both government employees and others, whose personal information happens to appear in responsive documents.  In the context of the ongoing war against terror, and with respect to a program whose purpose was to "detect and prevent the next terrorist attack," DNI Decl. ¶ 16, disclosure of information that could give rise to such consequential harms has the potential "to assist foreign intelligence services or hostile entities such as international terrorist organizations, to the detriment of the United States." *Id.* 28-29.  Moreover, as the DNI noted, "even the release of what appears to be the most innocuous information about the TSP poses the substantial risk that our adversaries will be able to piece together sensitive information about how the Program operates." *Id.*  As each component has determined, no portion of any of

the responsive records can be disclosed without risking the same serious consequences.  *See, e.g.*, Bradbury Decl. ¶ 103; Brand Decl. ¶ 34; Hardy Decl. ¶ 23.

For all of the reasons discussed in this motion and in the supporting declarations, the records or categories of records withheld by the defendants' that are responsive to plaintiffs' requests fall squarely within the categories of information that Congress specifically exempted from FOIA on the grounds that "public disclosure is not always in the public interest."  *Sims*, 471 U.S. at 167.  Indeed, this has been expressly recognized in the opinions of the various courts to consider many of the records in dispute, and no reason exists to dispute the conclusions of the other courts to consider these issues.

<u>**CONCLUSION**</u>

For the reasons stated herein and in the supporting declarations, defendants properly responded to the plaintiffs FOIA request and are entitled to summary judgment.

Dated:  May 5, 2008

Respectfully Submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

ELIZABETH A. SHAPIRO
Assistant Director, Federal Programs Branch

_____*/s/ Alexander K. Haas*_____
ALEXANDER K. HAAS (CA# 220932)
Trial Attorney
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20044
Tel: (202) 305-9334 — Fax: (202) 305-3138
Email: alexander.haas@usdoj.gov

-66-