# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS B. WILNER, et al.,     ) | |
|                     ) | |
|       Plaintiffs,        ) | |
|                     ) | |
|          v.             ) | Civil Action No. 07-CIV-3883 (DLC) |

THOMAS B. WILNER, et al.,

     Plaintiffs,

        v.

NATIONAL SECURITY AGENCY and
DEPARTMENT OF JUSTICE,

     Defendants.

Civil Action No. 07-CIV-3883 (DLC)

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT REGARDING THE *GLOMAR* RESPONSE

Kathryn A. Sabbeth (KS 9014)
David C. Vladeck (DV 4836)
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Avenue, NW, Suite 312
Washington, D.C. 20001
(202) 662-9546

*Of Counsel**

Shayana Kadidal (SK-1278)
Emilou MacLean
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6438
Email: skadidal@ccrjustice.org

James R. Rubin
Julie P. Shelton
Karen Borg
Mark A. Schwartz
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street
Suite 1800
Chicago, IL 60602
(312) 242-4112
Email: jshelton@butlerrubin.com

*Attorneys for Plaintiffs*

Dated: May 6, 2008
New York, New York

---

* Counsel gratefully acknowledge the significant contributions of Louise McGauley Betts, a third-year law student at Georgetown University Law Center.

## TABLE OF CONTENT

**Page No**

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

ARGUMENT .........................................................................................................................7

   I.   *GLOMAR* FUNCTIONS TO PROTECT LEGITIMATE
       GOVERNMENT INTERESTS, NOT TO CONCEAL
       UNCONSTITUTIONAL ACTIVITY. .................................................................7

   II.   INTERCEPTION OF PLAINTIFFS' COMMUNICATIONS
       UNDER THE NSA SURVEILLANCE PROGRAM WOULD BE
       UNCONSTITUTIONAL. .......................................................................................10

       A.   Neither FISA Nor the Fourth Amendment Would Permit the
           Government to Conduct Warrantless Surveillance of Plaintiffs'
           Communications in the Course of Representation......................................12

       B.   The Government's Refusal to Disavow Interfering with
           Attorneys' Communications Violates the First and
           Fifth Amendments. ....................................................................................16

   III.   THE GOVERNMENT HAS OFFICIALLY ACKNOWLEDGED
       THE EXISTENCE OF THE WARRANTLESS SURVEILLANCE
       PROGRAM......................................................................................................19

CONCLUSION....................................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACLU v. Department of Defense ("ACLU v. DoD"),*
  389 F. Supp. 2d 547 (S.D.N.Y. 2005)................................................................8, 9, 23

*Al-Haramain Islamic Foundation, Inc. v. Bush,*
  507 F.3d 1190 (9th Cir. 2007) ................................................2, 19, 22, 23

*Al Odah v. United States,*
  346 F. Supp. 2d 1 (D.D.C. 2004) ............................................3, 4, 5, 11, 14

*Albright v. United States,*
  631 F.2d 915 (D.C. Cir. 1980) ........................................................................18

*Bismullah v. Gates*
  501 F.3d 178 (D.C. Cir. 2007)
  *reh'g en banc denied,* 514 F.3d 1291 ....................................5, 11, 15, 18, 19

*Brady v. Maryland,*
  373 U.S. 83 (1963)..........................................................................................18

*California v. Trombetta,*
  467 U.S. 479 (1984)........................................................................................11

*Fitzgibbon v. CIA,*
  911 F.2d 755 (D.C. Cir. 1990) ........................................................................19

*Founding Church of Scientology v. NSA,*
  610 F.2d 824 (D.C. Cir. 1979) ........................................................7, 9, 20

*Greene v. McElroy,*
  360 U.S. 474 (1959)....................................................................................12, 19

*In re Guantnamo Detainee Cases,*
  344 F. Supp. 2d 174 (D.D.C. 2004).......................................3, 5, 11, 14, 15

*Hayden v. NSA / Central Sec. Serv.,*
  608 F.2d 1381 (D.C. Cir. 1979) ........................................................................9

*Hickman v. Taylor,*
  329 U.S. 495 (1947)....................................................................................13, 17

*Hicks v. Bush,*
  452 F. Supp. 2d 88 (D.D.C. 2006).......................................3, 5, 11, 14

i

*Hudson River Sloop Clearwater, Inc. v. Department of Navy*,
    891 F.2d 414 (2d Cir. 1989)........................................................................19

*In re John Doe Corp.*,
    675 F.2d 482 (2d Cir. 1982)........................................................................17

*Krieger v. United States Department of Justice*,
    529 F. Supp. 2d 29 (D.D.C. 2008) ..............................................................18

*Lamont v. Department of Justice*,
    475 F. Supp. 761 (S.D.N.Y. 1979)..............................................................20

*Lawyers Committee for Human Rights v. INS*,
    721 F. Supp. 552 (S.D.N.Y. 1989)..............................................................20

*Legal Services Corp. v. Velazquez*,
    531 U.S. 533 (2001)..................................................................11, 16, 18

*Lisbena v. California*,
    314 U.S. 219 (1941)...................................................................................18

*Lonegan v. Hasty*,
    436 F. Supp. 2d 419 (E.D.N.Y. 2006) ........................................................14

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978).....................................................................................8

*Nagel v. United States Department of Health, Education & Welfare*,
    725 F.2d 1438 (D.C. Cir. 1984)..................................................................18

*National City Trading Corp. v. United States*,
    635 F.2d 1020 (2d Cir. 1980)................................................................11, 14

*National Council of La Raza v. Department of Justice*,
    411 F.3d 350 (2d Cir. 2005)..........................................................................8

*Navasky v. CIA*,
    499 F. Supp. 269 (S.D.N.Y. 1980).........................................................9, 10

*People for the American Way Foundation v. NSA ("PFAWF")*,
    462 F. Supp. 2d 21 (D.D.C. 2006) .........................................................9, 10

*Phillippi v. CIA*,
    546 F.2d 1009 (D.C. Cir. 1976)....................................................................7

*Republic Gear Co. v. Borg-Warner Corp.*,
   381 F.2d 551 (2d Cir. 1967).................................................................17

*Roaden v. Kentucky*,
   413 U.S. 496 (1973)......................................................................13

   *Id.* at 504 ......................................................................................13

*Schlesinger v. CIA*,
   591 F. Supp. 60 (D.D.C. 1984) ....................................................20

*Schware v. Board of Bar Exam. of State of N.M.*,
   353 U.S. 232 (1957)......................................................................19

*Supreme Court of N.H. v. Piper*,
   470 U.S. 274 (1985)......................................................................19

*Terkel v. AT & T Corp.*,
   441 F. Supp. 2d 899 (N.D. Ill. 2006) .......................................9, 10

*Thomas v. Goldsmith*,
   979 F.2d 746 (9th Cir. 1992) ......................................................18

*United States v. Adlman*,
   68 F.3d 1495 (2d Cir. 1995)........................................................17

*United States v. Chuang*,
   696 F. Supp. 910 (S.D.N.Y. 1988)..............................................14

*United States v. Nobles*,
   422 U.S. 225 (1975)......................................................................17

*United States v. Robel*,
   389 U.S. 258 (1967)..........................................................12, 16, 19

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981)......................................................................13

*Wash. Post Co. v. Department of Defense*,
   766 F. Supp. 1 (D.D.C. 1991) .....................................................20

*Wiener v. FBI*,
   943 F.2d 972 (9th Cir. 1991) ......................................................8, 9

*Wilson v. McConnell*,
   501 F. Supp. 2d 545 (S.D.NY. 2007)..........................................20

*Wolf v. CIA,*
    473 F.3d 370 (D.C. Cir. 2007) ..........................................................................20

## STATE CASES

*CR. 396 JGK,*
    2002 WL. 1300059 (S.D.N.Y. June 11, 2002) ...........................................14

*Osborne v. District Attorney's Office,*
    No. 06-35875, 2008 WL. 861890 (9th Cir. Apr. 2, 2008) ..........................18

## DOCKETED CASES

*United States v. Stewart,*
    No. 02 ..........................................................................................................14

## FEDERAL STATUTES

5 U.S.C. § 552(b)(1) (emphasis added) ...................................................................8

5 U.S.C. § 552(b)(3) ...............................................................................................9

50 U.S.C. §§ 1803-1806 .......................................................................................12

50 U.S.C. §§ 1804, 1805 ..................................................................................12, 13

68 Fed. Reg. 15315, 15324 (March 28, 2003) ....................................................7, 8

18 U.S.C. § 2511(2) ..............................................................................................12

Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1801 *et seq* ..........................3

Privacy Act, 5 U.S.C. § 552a(e)(7) .......................................................................18

U.S. Const. amend. IV ...........................................................................................11

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS B. WILNER, et al.,     ) | |
|                     ) | |
|      Plaintiffs,          ) | |
|                     ) | |
|         v.              ) | Civil Action No. 07-CIV-3883 (DLC) |
|                     ) | |
| NATIONAL SECURITY AGENCY and   ) | |
| DEPARTMENT OF JUSTICE,     ) | |
|                     ) | |
|      Defendants.         ) | |
|                     ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' PARTIAL**
**MOTION FOR SUMMARY JUDGMENT REGARDING THE *GLOMAR* RESPONSE**

**INTRODUCTION**

       This Freedom of Information Act ("FOIA") case is brought by Thomas B. Wilner, Esq.,

managing partner at Shearman and Sterling LLP, and twenty-three other lawyers representing

Guantánamo detainees to obtain records showing whether the government has intercepted

communications relating to their representation.  The possibility that the government has been

eavesdropping on their communications has had, and continues to have, a profoundly chilling

effect on the lawyers.

       Plaintiffs' concerns are hardly fanciful.   On the contrary, they are based on the

government's own actions, including: the government's official acknowledgements that the

National Security Agency ("NSA") engaged in warrantless interception of electronic

communications of individuals alleged to have connections to terrorist organizations

("surveillance program" or "TSP") and that the detainees' lawyers may have been targeted; the

government's repeated claims that the zone of privacy that ordinarily safeguards the attorney-

client relationship does not apply to the detainees and their counsel; and the government's refusal

to disavow that it has the legal right to eavesdrop on the plaintiffs.  Lead plaintiff Thomas Wilner

has even been informed by government officials that he is "probably the subject of government surveillance and should be careful in [his] electronic communications." Thomas B. Wilner Decl. ("Wilner Decl.") ¶ 5.

Plaintiffs bring this case to determine whether these warning signs of government surveillance are real or just false alarms. Instead of acknowledging, one way or the other, whether the plaintiffs have been subject to surveillance, the government claims that *Glomar* authorizes it to keep counsel guessing about whether the government is listening to their communications. That is not so.

Never before has *Glomar* been invoked to protect the secrecy of a program that has been officially acknowledged by the President, the Attorney General, and the National Security Advisor. As the Ninth Circuit ruled in *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190, 1198 (9th Cir. 2007), "The subject matter of the litigation—the TSP and the government's warrantless surveillance of persons or entities who, like [the plaintiff], were suspected by the NSA to have connections to terrorists—is simply not a state secret."

But it is not just the existence of the NSA surveillance program that is public; many of the details of the program have also been acknowledged. Most important here, the Department of Justice ("DOJ") has officially acknowledged that lawyers' communications may be monitored under the program. Consequently, the only information at issue that has not been officially acknowledged is whether the government has targeted these particular lawyers and engaged in warrantless eavesdropping on *their* communications. Disclosure of that information would not compromise any lawful national security objective.

*Glomar* functions to protect legitimate government interests, not to conceal illegal or unconstitutional activity. The fatal defect in the government's argument is that there is no

legitimate government interest to protect here. Warrantless surveillance of plaintiffs' communications would be unconstitutional under the Fourth Amendment and would be illegal under the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1801 *et seq.* Regardless of the merits of the government's general defense of the surveillance program, there is no credible claim that without judicial approval the government may lawfully eavesdrop on plaintiffs' communications in the course of representation.

The Constitution and common law accord special protections to the lawyer-client relationship. Courts are wary about authorizing warrants that may intrude on the zone of privacy surrounding communications with attorneys. If they do so, they demand heightened particularity and narrowness of scope to safeguard against unnecessary impairment of the lawyer-client relationship. Indeed, courts have repeatedly rejected the government's attempts to abrogate attorney-client and work product protections for the Guantánamo detainees. *Hicks v. Bush*, 452 F. Supp. 2d 88, 99-100 (D.D.C. 2006); *Al Odah v. United States*, 346 F. Supp. 2d 1, 8-9 (D.D.C. 2004); *In re Guantánamo Detainee Cases*, 344 F. Supp. 2d 174, 186-91 (D.D.C. 2004). The same concerns are implicated here. If the government has engaged in warrantless surveillance of the Guantánamo lawyers, nothing in *Glomar*, FOIA, or any statute authorizes the government to shield that information from disclosure. If the government has not engaged in such activity, then no harm can result from compelling it to tell the plaintiffs that it possesses no records responsive to their request.

## STATEMENT OF FACTS

Plaintiffs are highly respected members of the United States legal community, who represent clients detained by the government in Guantánamo Bay, Cuba. These lawyers are partners and associates at prominent law firms, law professors, and attorneys for established non-profit organizations. Although their detainee clients are held on suspicion of terrorist activity,

they also represent individual and corporate clients with no relation to Guantánamo. The lawyers themselves have been accused of no criminal wrongdoing. On the contrary, the government cleared them for access to Guantánamo after thorough individualized review because they pose no threat to national security.

On December 17, 2005, President George W. Bush officially acknowledged that in the aftermath of September 11, 2001, he had secretly authorized the NSA to engage in a warrantless surveillance program "to intercept the international communications of people with known links to al Qaeda and related terrorist organizations."[1] The President, his National Security Advisor, and the Attorney General have since acknowledged the scope, duration, and contours of the program.[2] Plaintiffs, because of their "links to" and "affiliat[ion] with" the Guantánamo detainees, fit the profile of targeted individuals.[3] DOJ has acknowledged that the detainees' attorneys may be subject to surveillance,[4] and has refused to disavow the right to target them.[5]

The government's insistence that it may properly target the detainees' lawyers for warrantless surveillance is in keeping with the government's broader claim that Guantánamo detainees are not entitled to unfettered access to counsel.[6] *See, e.g.*, *Al Odah*, 346 F. Supp. 2d at 8-9. In fact, the government has consistently taken steps to restrict the ability of counsel to

---

[1] Radio Address (Dec. 17, 2005) ("*Bush Radio Address*") *transcript available at* http://www.whitehouse.gov/news/releases/2005/12/20051217.html (last visited May 4, 2008).

[2] General Michael Hayden, Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, (Dec. 19, 2005) ("*Gonzales/Hayden Press Briefing*"), *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html (last visited May 4, 2008); *see also* U.S. Department of Justice, *Legal Authorities Supporting the Activities of the National Security Agency Described by the President* (Jan. 19, 2006) ("*DOJ White Paper*") *available at* http://www.usdoj.gov/opa/whitepaperonnsalegalauthorities.pdf (last visited May 4, 2008).

[3] *Bush Radio Address*, *supra* note 1; *Gonzales/Hayden Press Briefing*, *supra* note 2.

[4] Assistant Attorney General William E. Moschella, *Responses to Joint Questions from House Judiciary Committee Minority Members* (Mar. 24, 2006), *available at* http://judiciary.house.gov/media/pdfs/responses032406.pdf (last visited May 4, 2008) ("*Mochella Ltr.*") ¶ 45.

[5] Philip Shenon, *Lawyers Fear Monitoring in Cases on Terrorism*, N.Y. TIMES, Apr. 28, 2008, at A14.

[6] *See* David J. Luban, *Lawfare and Legal Ethics in Guantánamo*, 60 Stan. L. Rev. 6, at 2-3 (forthcoming), *available at* http://www.law.georgetown.edu/internationalhrcolloquium/
documents/Luban-Guantanamopaper.doc (last visited May 4, 2008).

consult with the detainees and to obtain evidence on their behalf. *See, e.g.*, *Bismullah v. Gates*, 501 F.3d 178, 187 (D.C. Cir. 2007), *reh'g en banc denied*, 514 F.3d 1291, 1293.  Among other tactics, government officials have misrepresented to attorneys that clients were uninterested in communicating with counsel, punished detainees who sought access to counsel, and sown mistrust between detainees and lawyers by disparaging the attorneys to their clients and suggesting that the attorneys are actually government interrogators.[7]   This campaign even extended to a Defense Department effort to persuade corporate clients to boycott the law firms representing Guantánamo detainees.[8]

The government has also consistently claimed that the Guantánamo detainees and their counsel are *not* entitled to the protections of the attorney-client and work product privileges.  In fact, the government has argued that it is entitled to conduct real-time monitoring of communications between these detainees and their lawyers.  *See Al Odah*, 346 F. Supp. 2d at 8-9.  Courts have repeatedly rejected these efforts. *Id.*; *see Hicks*, 452 F. Supp. 2d at 99-100; *In re Guantánamo Detainee Cases*, 344 F. Supp. 2d at 186-91.  Notwithstanding these adverse rulings, the government continues to argue that it may lawfully monitor attorneys' communications, although it refuses to say whether it has done so.[9]   And yet, government officials on the

---

[7]David J. Luban Decl. ("Luban Decl.") ¶¶ 2-3, 5-10; *e.g.*, J. Wells Dixon Decl. ("Dixon Decl.") ¶ 28 (government officials at Guantánamo "routinely informed my clients that they have 'reservations' – i.e., interrogations – when they are actually scheduled to meet with me . . . . [A] military officer lied to me directly about a client's willingness to meet with me . . . when my client's case was pending before the United States Supreme Court"); Gitanjali S. Gutierrez Decl. ("Gutierrez Decl.") ¶ 35 ("Detainees have been held in solitary confinement for up to 11 days prior to a legal visit . . . ; one detainee reported that he was told the stay in isolation was 'the lawyer's fault' and could have been avoided had no legal visit been scheduled."); Clive A. Stafford Smith Decl. ("Stafford Smith Decl.") ¶¶ 34-35. (All Declarations are contained in the Appendix filed with this memorandum.)
[8]Interview by Jane Norris with Charles Stimson, Deputy Assistant Secretary of Defense for Detainee Affairs, in Washington, D.C. (Jan. 11, 2007), *audio available at* http://www.federalnewsradio.com/index.php?sid=1029698&nid=250 (last visited May 4, 2008), *transcript of relevant portions available at* http://www.democracynow.org/2007/1/17/ top_pentagon_official_calls_for_boycott (last visited May 4, 2008); *see* Luban Decl. ¶ 4.
[9] Excerpt from Transcript of Proceedings, *Al-Haramain Islamic Found, Inc. v. United States Dep't of the Treasury*, CV-07-1155, at 31 (D. Or. Apr. 14, 2008) ("*Al-Haramain* Transcript"), attached hereto as Exhibit A; Shenon, *supra* note 5.

condition of anonymity informed Plaintiff Thomas Wilner that he is "probably the subject of government surveillance." Wilner Decl. ¶ 5.

To find out if they had been subject to monitoring under the NSA surveillance program, plaintiffs submitted FOIA requests to the NSA and DOJ, asking for records reflecting such surveillance. The NSA and DOJ responded that they could neither confirm nor deny the existence of the records. Mem. in Supp. of Defs.' Partial Mot. for Sum. J. Re. the Glomar Resp., at 7. The possibility that the government has conducted and may conduct warrantless surveillance of the plaintiffs' communications, and the government's refusal to deny doing so, has impeded and continues to impede the lawyers' ability to represent their clients in Guantánamo and elsewhere.[10]

Because of the threat of warrantless surveillance by the NSA, the plaintiffs have been unable to guarantee the confidentiality of their electronic communications with clients, potential witnesses, experts, and others with information essential to their clients' representation. This significantly hampers their ability to gather evidence and explore legal theories via telephone, e-mail, and facsimile.[11] Many potential sources of information will no longer engage in candid discussions with the attorneys—others no longer communicate with them at all—because of the looming possibility of surveillance.[12] The lawyers feel restricted from persuading individuals to discuss relevant information with them electronically, because the government may be listening in and could use the information against their clients.[13]

---

[10] *E.g.*, John A. Chandler Decl. ("Chandler Decl.") ¶¶ 5-6; Dixon Decl. ¶¶ 20-21; H. Candace Gorman Decl. ("Gorman Decl.") ¶¶ 16-17; Gutierrez Decl. ¶¶ 22-23; Stafford Smith Decl. ¶ 42; Wilner Decl. ¶¶ 5, 8.
[11] *E.g.*, Chandler Decl. ¶ 5; Dixon Decl. ¶ 20; Gutierrez Decl. ¶¶ 24-25; Wilner Decl. ¶ 8.
[12] *E.g.*, Chandler Decl. ¶ 5; Tina Monshipour Foster Decl. ("Foster Decl.") ¶ 20; Gutierrez Decl. ¶ 24; Brian J. Neff Decl. ("Neff. Decl.") ¶ 26.
[13] *E.g.*, Chandler Decl. ¶ 5; Foster Decl. ¶ 20.

Plaintiffs have therefore had to resort to slower, less efficient, and generally inferior methods of communication. Plaintiffs have attempted to use unreliable foreign mail systems and international travel for in-person interviews, even to conduct relatively brief exchanges with persons on the other side of the globe.[14] The delays in obtaining and relaying information, the inability to engage in multi-party real-time communications, and the sometimes-prohibitive expense, dangers, and legal obstacles to travel, have significantly burdened the attorneys' ability to advocate zealously for their clients.[15]

## **ARGUMENT**

## I.     *GLOMAR* FUNCTIONS TO PROTECT LEGITIMATE GOVERNMENT INTERESTS, NOT TO CONCEAL UNCONSTITUTIONAL ACTIVITY.

A *Glomar* response is permitted only where admitting or denying the existence of records would implicate legitimate national security interests protected by FOIA. *See Phillippi v. CIA*, 546 F.2d 1009, 1014-1015 (D.C. Cir. 1976); *see also* Executive Order 12958 § 3.6(a), as amended, 68 Fed. Reg. 15315, 15324 (March 28, 2003). As we show below in Part II, any warrantless surveillance of the plaintiffs would have been illegal, as it would have contravened FISA, undermined the attorney-client privilege, and violated the First, Fourth and Fifth Amendments of the United States Constitution. When the government responds to a FOIA request, "every effort should be made to segregate for ultimate disclosure aspects of the record that would not implicate *legitimate* intelligence operations." *Founding Church of Scientology v. NSA*, 610 F.2d 824, 830 n.49 (D.C. Cir. 1979) (emphasis added). The government has not shown how admitting or denying possession of records of warrantless surveillance of plaintiffs would implicate legitimate intelligence operations. Indeed, the government cannot show this.

---

[14]*E.g.*, Dixon Decl. ¶ 20; Gorman Decl. ¶ 18; Gutierrez Decl. ¶¶ 24-25.
[15]*E.g.*, Gutierrez Decl. ¶¶ 25, 27, 38; Joseph Margulies Decl. ("Margulies Decl.") ¶ 9; Wilner Decl. ¶ 8.

The FOIA exemptions were not intended to enable concealment of unlawful activity.  On the contrary, "FOIA was enacted in order to 'promote honest and open government and to assure the existence of an informed citizenry [in order] to hold the governors accountable to the governed."  *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355 (2d Cir. 2005) (alteration in original) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999)); *see also NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  The interests behind FOIA Exemptions 1 and 3 are not served by hiding illegal activities.

Exemption 1 shields from disclosure only those documents that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) *are in fact properly classified* pursuant to such Executive order."  5 U.S.C. § 552(b)(1) (emphasis added).  The relevant Executive order, Executive Order 12958, explicitly provides that "*[i]n no case shall information be classified in order to . . . conceal violations of law*. . . ."  Executive Order 12958 § 1.7(a)(1), as amended, 68 Fed. Reg. at 15318 (emphasis added).  Because the government could not lawfully engage in warrantless surveillance of the plaintiffs, records of such activity could not be properly classified, and the government cannot rely on FOIA Exemption 1.

"FOIA places a heavy responsibility on the judge to determine '*de novo*' if documents withheld by an agency are properly withheld . . . ."  *ACLU v. Dep't of Defense* ("*ACLU v. DoD*"), 389 F. Supp. 2d 547, 552 (S.D.N.Y. 2005).  In evaluating a *Glomar* claim under Exemption 1, a court must determine *de novo* whether the documents are improperly classified to "conceal violations of law."  *Id*. at 564 (punctuation omitted).  Where the government has not provided sufficient information for a court to make this *de novo* determination, the court should deny the government summary judgment.  *Id*. at 564, 565; *see Wiener v. FBI*, 943 F.2d 972, 988

(9th Cir. 1991). In *Wiener*, the Ninth Circuit reversed a district court's award of summary judgment to the government and remanded for consideration of, *inter alia*, plaintiff's allegation that the requested information was improperly withheld under Exemption 1 to conceal unlawful government operations. 943 F.2d at 988. Particularly where a FOIA request seeks records on a controversial topic (like the representation of Guantánamo detainees), and that topic has already been addressed in the media, the invocation of *Glomar* can "raise concern" that "the purpose of the [agency's *Glomar* defense] is less to protect intelligence activities, sources or methods than to conceal possible violations of law . . . ." *ACLU v. DoD*, 389 F. Supp. 2d at 564-65 (punctuation altered).

Courts have not approved the invocation of FOIA Exemption 3 and the National Security Act to conceal unconstitutional activities. *See Founding Church of Scientology*, 610 F.2d at 830 n.49; *Hayden v. NSA / Cent. Sec. Serv.*, 608 F.2d 1381, 1389 (D.C. Cir. 1979); *Terkel v. AT & T Corp.*, 441 F. Supp. 2d 899, 905 (N.D. Ill. 2006); *ACLU v. DoD*, 389 F. Supp. 2d at 564-65; *cf. People for the American Way Found. v. NSA* ("*PFAWF*"), 462 F. Supp. 2d 21 (D.D.C. 2006); *Navasky v. CIA*, 499 F. Supp. 269 (S.D.N.Y. 1980). Exemption 3 shields documents "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). "[W]here [an NSA] function or activity is authorized by statute *and not otherwise unlawful*, NSA materials integrally related to that function or activity fall within . . . Exemption 3." *Hayden*, 608 F.2d at 1389 (emphasis added). However, "NSA would have no protectable interest in suppressing information [under Exemption 3] simply because its release might uncloak an illegal operation . . . ." *Founding Church of Scientology*, 610 F. 2d at 830 n.49.

As courts have observed, allowing the government to invoke a blanket *Glomar* response in the face of a FOIA request for records of unlawful government conduct would give the

9

government license "to conceal information regarding blatantly illegal or unconstitutional activities simply by assigning these activities to the NSA or claiming they implicated information about the NSA's functions." *Terkel*, 441 F. Supp. 2d at 905. To the plaintiffs' knowledge, no court has ever approved the use of *Glomar* as a defense to conceal unconstitutional activity.[16] Putting aside the question of whether the NSA surveillance program is wholly unlawful—a question plaintiffs do not raise—the program would certainly be unconstitutional as applied to these plaintiffs.

Finally, the narrowness of the question before the Court bears particular emphasis. As we show in Part III below, the government has publicly disclosed the existence of, and many of the details of, its warrantless surveillance program. The *only* additional information sought by the plaintiffs is whether the government has illegally intercepted *their* communications. Admitting or denying this would not reveal the identities of parties to the communications other than the lawyers. Nor would it reveal sources or methods. The attorneys simply want to know whether the NSA has been eavesdropping on their communications. Nothing in *Glomar*, or the policies behind it, authorizes the government to conceal that information.

## II.    INTERCEPTION OF PLAINTIFFS' COMMUNICATIONS UNDER THE NSA SURVEILLANCE PROGRAM WOULD BE UNCONSTITUTIONAL.

Warrantless surveillance of the plaintiffs would be unconstitutional. The Constitution places a special demand on the government when it engages in surveillance of private communications, especially attorney communications made in the course of client representation. The Fourth Amendment is unique among the Constitution's guarantees; so grave is the act of a

---

[16]*PFAWF*, 462 F. Supp. 2d 21, and *Navasky*, 499 F. Supp. 269, provide no exception: in neither did the court address any constitutional challenge to the government conduct at issue. And while the plaintiffs in *PFAWF* asked the court to find *all* eavesdropping under the NSA surveillance program illegal, the lawyers in this case assert only that the government could not lawfully target *their* communications, made in furtherance of their clients' representation, without complying with FISA or otherwise securing a warrant.

search or seizure that the Fourth Amendment forbids the Executive Branch from proceeding unilaterally; it must first secure judicial approval and obtain a warrant specifically authorizing the search or seizure the Executive Branch proposes.  U.S. CONST. amend. IV.

Here, the Executive Branch has argued that the warrantless surveillance program is justified because of the alleged difficulties in obtaining judicial clearance from the FISA court.[17] Whatever the merits of that argument generally, it fails in this case.  Apart from FISA, courts— including the Second Circuit—have found that attorney communications demand heightened Fourth Amendment protection.  *See, e.g.*, *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1025-26 (2d Cir. 1980).  Recognizing that lawyers must perform their representational functions without government intrusion, even in cases with national security concerns, courts have repeatedly rejected the government's efforts to interfere with the attorney-client relationships of Guantánamo detainees.  *Bismullah*, 501 F.3d at 189; *Hicks*, 452 F. Supp. 2d at 99-100; *Al Odah*, 346 F. Supp. 2d at 8-9; *In re Guantánamo Detainee Cases*, 344 F. Supp. 2d at 186-91.  Nothing could be more destructive of the lawyer-client relationship than warrantless, surreptitious monitoring of attorneys' communications in the course of representation.

The government's refusal to confirm or deny subjecting the plaintiffs to warrantless electronic surveillance exacts a serious toll on these lawyers' ability to represent their clients in a manner consistent with their ethical obligations.    It interferes with the plaintiffs' First Amendment right and duty to raise all reasonable arguments on their clients' behalf, *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 544-45 (2001), it violates their clients' Fifth Amendment due process right to "a meaningful opportunity to present a complete defense," *California v. Trombetta*, 467 U.S. 479, 485 (1984), and it unreasonably interferes with the plaintiffs' Fifth Amendment liberty right to pursue their chosen occupation as attorneys.  *See*

---

[17] *Hayden/Gonzales Press Briefing*, *supra* note 2.

*United States v. Robel*, 389 U.S. 258, 265 n.11 (1967) (citing *Greene v. McElroy*, 360 U.S. 474, 492 (1959)).   For these reasons as well, the government's effort to hide behind *Glomar* should be rejected.

> **A.    Neither FISA Nor the Fourth Amendment Would Permit the Government to Conduct Warrantless Surveillance of Plaintiffs' Communications in the Course of Representation.**

Congress explicitly directed that in the acquisition of "foreign intelligence information" FISA "shall be the *exclusive* means by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted."  18 U.S.C. § 2511(2)(f) (emphasis added).   A special FISA court must supervise surveillance through a designated system of review.  50 U.S.C. §§ 1803-1806.  To conduct electronic surveillance of a "United States person," the government must demonstrate probable cause and obtain a warrant from the FISA court.  50 U.S.C. §§ 1804, 1805.  To establish probable cause, the government must show that the targeted "United States person" is a "foreign power" or an "agent of a foreign power." § 1805(a)(3)(A).

FISA highlights that "no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States."  *Id.*   Rather, the government must show that the targeted person has knowingly engaged in certain categories of wrongdoing, and legally associating with persons suspected of wrongdoing is insufficient.  *See* §§ 1801(b), 1805(a)(3)(A).   Representing Guantánamo detainees is lawful activity clearly protected by the First Amendment and cannot form the basis for surveillance under FISA.

Even if the government had demonstrated an independent basis (sufficient to secure a warrant from a FISA court) to conduct electronic surveillance of the plaintiffs, the government would still have to observe minimization requirements to protect the attorney-client privilege.

12

§§ 1801 (h); 1806(a).  Congress insisted in FISA that the government, even in the most sensitive national security matters, adhere to stringent procedures designed to safeguard the attorney-client privilege.  *Id.*  FISA provides that "[n]o otherwise privileged communication obtained in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character."  § 1806(a).  Despite the clarity with which Congress acted to protect the attorney-client privilege in national security cases, and despite the constitutional basis for these requirements, the Executive has not suggested it respected those limits when engaged in eavesdropping under the NSA surveillance program.[18]  Given that the government claims the authority to bypass FISA's limits, the plaintiffs have reason to believe that, if the government has in fact engaged in warrantless electronic surveillance of their communications, it has done so without taking any of the precautions Congress required under FISA.[19]

The zone of privacy surrounding attorneys' communications in the course of representation deserves heightened protection.  The Supreme Court has repeatedly emphasized that the attorney-client and work product privileges play a crucial role in the American system of legal justice, and policing the zone of privacy in which lawyers work is essential to protecting the integrity of that system.  *See, e.g.*, *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Hickman v. Taylor*, 329 U.S. 495, 510-12 (1947).  Thus, what might constitute a reasonable search under the Fourth Amendment with respect to other members of the public may be unconstitutional as applied to attorneys.  *See Roaden v. Kentucky*, 413 U.S. 496, 501 (1973) (A "seizure reasonable as to one type of materials in one setting may be unreasonable in a different setting or with respect to another type of material.").  The Fourth Amendment requires a "higher hurdle in the evaluation of reasonableness" when a search intrudes on other protected rights.  *Id.*

---

[18] *Gonzales/Hayden Press Briefing*, *supra* note 2.
[19] *See id.*

at 504.  Even where the government demonstrates probable cause that justifies issuance of a search warrant for an attorney's law office, courts require "special care" in executing the search to protect attorney communications and work product.  *Nat'l City Trading Corp.*, 635 F.2d at 1025-26; *United States v. Stewart*, No. 02 CR. 396 JGK, 2002 WL 1300059, at *3 (S.D.N.Y. June 11, 2002); *United States v. Chuang*, 696 F. Supp. 910, 914 (S.D.N.Y. 1988).

National security concerns create no exception to the long-standing protections accorded to attorney communications.  *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 436 (E.D.N.Y. 2006); *Hicks*, 452 F. Supp. 2d at 99-100; *Al Odah*, 346 F. Supp. 2d at 8-9; *In re Guantánamo Detainee Cases*, 344 F. Supp. 2d at 186-91.  In *Lonegan*, attorneys representing suspected terrorists challenged the Bureau of Prisons' policy of eavesdropping on their conversations with clients. 436 F. Supp. 2d at 436.  Upholding the attorneys' Fourth Amendment claim, the court rejected the government's argument that heightened security concerns justified intentional warrantless monitoring of detainees' communications with counsel.  *Id.*

In *Al Odah*, the government sought to engage in audio and video monitoring of in-person meetings between Guantánamo detainees and habeas counsel, as well as to conduct review of both detainees' mail and written materials brought into and out of attorney-client meetings, 346 F. Supp. 2d at 8, but the court found that the government's proposal "flies in the face of the foundational principle of the attorney-client privilege."  *Id.* at 11 (citing *Weatherford v. Bursey*, 429 U.S. 545, 554 (1977)).  "The privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system in the United States." *Id.* at 10. "The Government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."  *Id.* at 5.

14

In still another case where the government asserted a national security need to scrutinize interactions between Guantánamo detainees and their attorneys, the court carefully policed the boundaries of protected communications. In *In re Guantánamo Detainee Cases*, the government petitioned for a protective order to prevent the disclosure of classified national security information by attorneys representing Guantánamo detainees. 344 F. Supp. 2d at 186-91. The court issued an order that placed restrictions on the attorneys' access to detainees and handling of classified information, but took pains to spell out steps for preserving a zone of privacy for attorney-client communications. *Id.* Attorneys were allowed to meet with their clients free of government monitoring, *id.* at 191, and attorney notes were to be "sealed in the presence of counsel" and "mailed [to counsel] in the manner required for classified materials." *Id.* at 188.

Finally, in *Bismullah*, the D.C. Circuit ruled that even with regard to attorneys' written communications with Guantánamo detainees (which raise the possible danger of contraband smuggling), government interference must be restricted to a "procedure [that] protects the confidentiality of communications between counsel and the detainee . . . ." 501 F.3d at 189. The court held that detainees' legal mail must be disclosed only to a Privilege Team walled-off from relevant litigation. *Id.* at 190. And even that intrusion might not have been permitted by the court if it had more than the limited jurisdiction provided for review of enemy combatant status determinations. *Id.* at 182-83, 192.

As is clear, these cases demonstrate that the government does not believe that the Guantánamo detainees and their counsel are entitled to the protection the law accords to attorney-client relationships. Yet in each case, the government's effort to abrogate the sacrosanct privacy interest was rejected. These cases strongly support plaintiffs' view that warrantless interception of plaintiffs' communications made in the course of representation

would be unlawful for precisely the same reasons that the courts in *Lonegan, Al Odah,* and *In re Guantánamo Detainee Cases* found similar efforts unlawful. And indeed this case is even more problematic because here the Executive may have unilaterally obstructed the attorney-client relationship without any judicial oversight.

### B.    The Government's Refusal to Disavow Interfering with Attorneys' Communications Violates the First and Fifth Amendments.

The government's refusal to confirm or deny warrantless monitoring of the lawyers' electronic communications, and its refusal to disavow the position that it has a right to do so, unreasonably interferes with the plaintiffs' ability to represent their clients, in violation of the First and Fifth Amendments. *See Velazquez*, 531 U.S. at 544-45; *Robel*, 389 U.S. at 265 n.11. The First Amendment protects "speech and expression upon which courts must depend for the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545. The plaintiffs' ability to communicate freely with clients and potential witnesses is essential to performing their duties as advocates, and courts depend on unfettered advocacy to resolve the cases before them.

The Supreme Court has rejected government efforts that interfere with attorneys' integral role in the adversary system. *Id*. at 544-45. The right to free speech under the First Amendment encompasses an attorney's ability to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case." *Id*. at 545. "Restricting . . . attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the attorneys' traditional role." *Id.* at 544. The government "may not . . . effect this serious and fundamental restriction on advocacy of attorneys and the functioning of the judiciary." *Id*.

By refusing to confirm or deny whether it is monitoring the plaintiffs' communications, the government is chilling the plaintiffs' ability to engage in factual investigations and other

16

communications essential to advising and presenting arguments and evidence on behalf of their clients—including not only the detainees but also their individual and corporate clients with no relation to Guantánamo.[20]  As Plaintiff Thomas Wilner explains, "No one in good conscience can freely identify or discuss possible plans for a case while the other side may be listening in. Because of the possibility that the government is monitoring my communications, I regularly refrain from discussing in my phone calls and e-mails with my foreign clients issues that should be discussed to protect their interests."  Wilner Decl. ¶ 8

By interfering with plaintiffs' ability to represent their clients, the government is exploiting the very fear that the attorney-client and work product privileges were designed to protect against.[21]  "[T]he purpose of the work product immunity has been to avoid chilling attorneys in developing materials to aid them in giving legal advice and in preparing a case for trial.  The fear of disclosure to adversaries of normal work product would severely affect performance of the lawyer's role . . . ."  *In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir. 1982). Attorney work product doctrine is "designed to encourage effective legal representation by removing counsel's fear that his thoughts and information will be invaded by his adversary if he records them . . . ."  *Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 557 (2d Cir. 1967); *see United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995).

Preserving the privacy of an attorney's work product and communications is "essential to an orderly working of our system of legal procedure."  *Hickman*, 329 U.S. at 512.  "The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case."  *United States v. Nobles*, 422 U.S. 225, 238 (1975).  As the D.C. Circuit

---

[20] *E.g.*, Charles H. Carpenter Decl.¶¶ 11-12; Gorman Decl. ¶ 18; Gutierrez Decl. ¶ 28; Wilner Decl. ¶ 8.
[21] *E.g.*, Chandler Decl. ¶ 5; Dixon Decl. ¶¶20-21; Gorman Decl. ¶ 16; Wilner Decl. ¶ 8.

has held, "Counsel simply cannot argue, nor can the court determine, whether a preponderance of the evidence supports [an enemy combatant] status determination without seeing all the evidence." *Bismullah*, 501 F.3d at 187.  By interfering with the plaintiffs' ability to engage in conversations regarding facts relevant to preparing and presenting their clients' cases, the government infringes on "speech and expression upon which courts must depend." *Velazquez*, 531 U.S. at 545.  Therefore, as applied to the plaintiffs, the government's refusal to disavow warrantless eavesdropping on their communications violates the First Amendment.[22]

The government's refusal to confirm or deny conducting warrantless surveillance of the lawyers' communications in the course of representation also violates the due process rights of their clients.  "[F]undamental fairness essential to the very concept of justice," *Lisbena v. California*, 314 U.S. 219, 236 (1941), requires that the government may not interfere with an individual's access to evidence.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Osborne v. District Attorney's Office*, No. 06-35875, 2008 WL 861890, at *12 (9th Cir. Apr. 2, 2008); *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992).  The possibility that the government is intercepting the plaintiffs' communications hinders the plaintiffs' ability to communicate with potential witnesses who may provide crucial exculpatory evidence, potentially impeding the Guantánamo detainees' ability to challenge their detention.  Gitanjali Gutierrez at the Center for Constitutional Rights was unable for almost a year to obtain evidence—"critical" to the client's challenge to his enemy combatant status—from a "first-hand" witness because of the possibility

---

[22]Government maintenance of records relating to warrantless electronic surveillance of the plaintiffs' communications in the course of their clients' representation would also violate the Privacy Act,  5 U.S.C. § 552a(e)(7), which forbids federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity . . . ."  *Id.*; *see Albright v. United States*, 631 F.2d 915, 921 (D.C. Cir. 1980); *Krieger v. United States Dep't of Justice*, 529 F. Supp. 2d 29, 51-52 (D.D.C. 2008).  "The mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise."  *Nagel v. United States Dep't of Health, Educ. & Welfare*, 725 F.2d 1438, 1441 (D.C. Cir. 1984).

of warrantless surveillance.  Gutierrez Decl. ¶ 24.  Government interference with access to evidence raises particularly acute due process concerns in enemy combatant cases, where the government's evidence has benefitted from a presumption of accuracy.  *See Bismullah*, 501 F.3d at 181−82.

Government interference with the lawyers' communications in the course of representation also unduly burdens their Fifth Amendment right to pursue their chosen occupation.  *See Robel*, 389 U.S. at 264-65; *Greene*, 360 U.S. at 492; *Schware v. Board of Bar Exam. of State of N.M.*, 353 U.S. 232, 247 (1957); *cf. Supreme Court of N.H. v. Piper*, 470 U.S. 274, 281 (1985) (holding that the right to practice law is a "fundamental right").  An attorney has both a right and a professional duty to preserve client confidences.  *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.19.  As legal ethics expert David Luban explains, "By leaving open the possibility of warrantless surveillance of the plaintiffs' communications, the government forces them into an ethical quandary pitting competence and zealous advocacy against confidentiality. This chills their ability to serve their function as advocates in accordance with the most basic principles of the profession."  Luban Decl. ¶ 20.  For these reasons as well, *Glomar* does not permit the government to conceal whether it has targeted plaintiffs for warrantless surveillance.

## III.    THE GOVERNMENT HAS OFFICIALLY ACKNOWLEDGED THE EXISTENCE OF THE WARRANTLESS SURVEILLANCE PROGRAM.

The Ninth Circuit has ruled that the government cannot claim that the warrantless surveillance program is a state secret, because "government officials have made voluntary disclosure after voluntary disclosure about the TSP."  *Al-Haramain*, 507 F. 3d at 1198.   The government waived its right to assert a *Glomar* response when it "officially acknowledged" the information at issue.  *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990); *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 421-22 (2d Cir. 1989).  The rationale

behind the well-settled "official acknowledgement" rule is that there is no national security interest in refusing to disclose information the government itself has already placed in the public domain. *Founding Church of Scientology*, 610 F.2d at 831-32; *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 772 (S.D.N.Y. 1979); *Wash. Post Co. v. Dep't of Def.*, 766 F. Supp. 1, 8 (D.D.C. 1991).

Official acknowledgement occurs when there is "direct acknowledgement[] by an authoritative government source," *Schlesinger v. CIA*, 591 F. Supp. 60, 66 (D.D.C. 1984), and particularly "when the agency responsible for protecting the information discloses it." *Wilson v. McConnell*, 501 F. Supp. 2d 545, 559 (S.D.N.Y 2007). Testimony before a Congressional subcommittee and an "off-the-record" press briefing are just two examples of disclosures found to constitute official acknowledgements. *Wolf v. CIA*, 473 F.3d 370, 379 (D.C. Cir. 2007); *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 569 (S.D.N.Y. 1989).

The NSA Surveillance Program has been officially acknowledged by *all* the key players: President of the United States; then-Attorney General Alberto R. Gonzales; Director of the Central Intelligence Agency Michael V. Hayden, formerly Director of the NSA and Principal Deputy Director for National Intelligence; and William E. Moschella, then-Assistant Attorney General for the Department of Justice Office of Legislative Affairs and currently Principal Associate Deputy Attorney General.

The existence of the NSA surveillance program and many of its specifics are widely known as a result of official acknowledgements. "In the weeks following" September 11, 2001, President Bush authorized the NSA to "intercept the international communications of people with known links to al Qaeda and related terrorist organizations."[23] As noted, the surveillance program was first acknowledged by President Bush on December 16, 2005, and shortly

---

[23]*Bush Radio Address*, *supra* note 1.

thereafter by Gonzales, Hayden, and Moschella.[24]   Director of National Intelligence Mike McConnell, as well as Gonzales and Hayden, officially acknowledged the profile of targeted individuals—any person engaged in international, electronic communications where one party to the communications is suspected to be affiliated with al Qaeda or a related terrorist organization[25]—as well as the process of selecting individuals for surveillance,[26] and the approximate number of people monitored.[27]

Gonzales officially acknowledged that surveillance under the program occurs without a warrant from a FISA court,[28] and Hayden officially acknowledged that this allows interception of communications when the evidentiary basis for the interception is "a bit softer than it is for a FISA warrant."[29]   Hayden also acknowledged that, although the NSA surveillance program targets communications where one party is outside the United States, if a purely domestic call were intercepted, that "incident . . . would be recorded and reported."[30]

DOJ confirmed the details of the NSA surveillance program in a 42-page White Paper, issued on January 19, 2006, which attempted to justify the program's legality.[31]   As the Ninth Circuit explained in *Al-Haramain*, "That the Department of Justice even thought it necessary to explain to the public 'in an unclassified form, the legal basis for the NSA activities described by the President,' . . . suggests that the government both knew that details of the surveillance

---

[24]*Id.*; *Gonzales/Hayden Press Briefing*, *supra* note 2; *Moschella Ltr.*, *supra* note 4.

[25]*Gonzales/Hayden Press Briefing*, *supra* note 2; Attorney General Alberto Gonzales, *Ask the White House* (Jan. 25, 2006), *available at* http://www.whitehouse.gov/ask/20060125.html (last visited May 4, 2008).

[26]*Wartime Executive Power and the NSA's Surveillance Authority Before the Senate Judiciary Committee*, 109th Cong. (Feb. 6, 2006) (statement of Attorney General Alberto Gonzales).

[27]Chris Roberts, *Transcript: Debate on the foreign intelligence surveillance act*, EL PASO TIMES, August 22, 2007, *available at* www.elpasotimes.com/ci_6685679?source=most_viewed ("On the U.S. persons side it's 100 or less.") (last visited May 4, 2008).

[28]*Gonzales/Hayden Press Briefing*, *supra* note 2.

[29]General Michael V. Hayden, *Address to the National Press Club: What American Intelligence and Especially the NSA Have Been Doing to Defend the Nation* (Jan. 23, 2006), *available at* http://www.fas.org/irp/news/2006/01/hayden012306.html (last visited May 4, 2008).

[30]*Id.*

[31]*DOJ White Paper*, *supra* note 2.

program were in the public sphere and recognized that the Surveillance Program was already the subject of significant public discussion and interest."   507 F.3d at 1199-1200 (quoting *DOJ White Paper* at 1).  On January 17, 2007, Attorney General Gonzales announced the suspension of the NSA surveillance program.[32]  But the President has reserved the right to reinstitute it at any time without notice to American citizens.[33]

The Administration has also confirmed its view that lawyers are legitimate targets for warrantless wiretapping.  Moschella acknowledged that attorneys for Guantánamo detainees might be monitored.[34]  Published opinions from federal courts have also adverted to the possibility that attorneys were subject to surveillance.  *See, e.g*, *Al-Haramain*, 507 F. 3d at 1193. And there is no doubt that attorneys like the plaintiffs fit the profile of those subject to monitoring.  The Administration has said that the program targeted people "with known links to al Qaeda and related terrorist organizations,"[35] and the plaintiffs *represent* the Guantánamo detainees who the government describes as suspected "terrorists" and "enemy combatants."[36]

The widespread official acknowledgements that detainees' attorneys are possible targets of surveillance have caused "many prominent criminal defense lawyers [to] say [there] is a well-founded fear that all of their contacts are being monitored by the United States government."[37]

---

[32]*See* Attorney General Gonzales Ltr. to Senate Committee on Judiciary (Jan. 17, 2007), *available at* http://www.fas.org/irp/agency/doj/fisa/ag011707.pdf. (last visited May 4, 2008).

[33] Joseph J. Brand Decl., attached to Mem. in Supp. of Defs.' Partial Mot. for Sum. J. Re. the Glomar Resp., at 2 n.1.

[34]*Moschella Ltr.*, *supra* note 4.

[35]*See Bush Radio Address*, *supra* note 1.

[36]All Guantánamo detainees have been determined by the Department of Defense to be "enemy combatants."  *See* Gordon England, Secretary of the Navy, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants detained at Guantanamo Bay Naval Base, Cuba* (July 29, 2004), *available at* http://www.defenselink.mil/news/Jul2004/
d20040730comb.pdf (last visited May 5, 2008). The Secretary of Defense described all Guantánamo detainees as follows: "They're terrorists, trainers, bomb makers, recruiters, financiers, (Osama bin Laden's) bodyguards, would-be suicide bombers, probably the 20th . . . 9/11 hijacker."  Sgnt. Doug Sample, *Rumsfeld Says Media Show Only 'Negative' Side of Iraq War*, American Forces Press Svcs. (June 28, 2005), *available at* www.defenselink.mil/news/Jun2005/20050628_1889.html (last visited May 4, 2008) (citing Donald Rumsfeld, Radio Address, June 27, 2005) (alteration in original).

[37]Shenon, *supra* note 5.

Instead of quelling attorneys' concerns, the government has strongly suggested that their concerns are grounded in fact.  According to *The New York Times*, "The Justice Department does not deny that the government has monitored phone calls and e-mail exchanges between lawyers and their clients as part of its terrorism investigations in the United States and overseas."[38]  In fact, the *Times* reports that two senior Department of Justice officials admitted that "they knew of . . . a handful of terrorism cases . . . in which the government might have monitored lawyer-client conversations."[39]  And the Ninth Circuit's ruling in *Al-Haramain* suggests that the government will go to great lengths to conceal evidence that monitoring of lawyer communications has occurred.  507 F.3d at 1200.  There, the government succeeded in forcing a lawyer to return a "logbook, which was stamped 'top secret,' [and] appeared to reflect eavesdropping under the [NSA's] warrantless wiretapping program."   Philip Shenon, N.Y. TIMES, April 28, 2008, at A14; *see also Al-Haramain*, 507 F.3d at 1194-95; Patrick Radden Keefe, *Annals of Surveillance: State Secrets*, THE NEW YORKER, April 28, 2008, at 28.

The only information plaintiffs seek that is not in the public domain is whether the government has in fact targeted plaintiffs for surveillance under the NSA program.  Confirming or denying whether the government has conducted warrantless surveillance of these lawyers would not require the government to disclose any legitimate, non-public surveillance sources or methods.  On the contrary, if the answer is no, the government would simply have to deny plaintiffs' FOIA request on the ground that there are no responsive records.  If the answer is yes, then FOIA does not authorize the concealment of that fact; *Glomar* may not be used as a shield to hide unlawful conduct from the public.  *See ACLU v. DoD*, 389 F. Supp. 2d at 564-65.

---

[38]*Id.*; *see Al-Haramain* Transcript, *supra* note 9.
[39]Shenon, *supra* note 5.

## **CONCLUSION**

Because the NSA surveillance program is unconstitutional as applied to the plaintiffs, and because the government has no legitimate interest in concealing illegal government activity or information already in the public domain, the government's *Glomar* response fails and summary judgment must be denied.

Respectfully submitted,

/s/ Julie P. Shelton

Kathryn A. Sabbeth (KS 9014)
David C. Vladeck (DV 4836)
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Avenue, NW, Suite 312
Washington, D.C. 20001
(202) 662-9546

*Of Counsel**

Shayana Kadidal (SK-1278)
Emilou MacLean
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6438
Email:  skadidal@ccrjustice.org

James R. Rubin
Julie P. Shelton
Karen Borg
Mark A. Schwartz
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street
Suite 1800
Chicago, IL 60602
(312) 242-4112
Email:  jshelton@butlerrubin.com

*Attorneys for Plaintiffs*

Dated: May 6, 2008
New York, New York

---

* Counsel gratefully acknowledge the significant contributions of Louise McGauley Betts, a third-year law student at Georgetown University Law Center.

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2008, a copy of the foregoing **Plaintiff's Memorandum in Opposition to Defendants' Partial Motion for Summary Judgment Regarding** *Glomar* **Response and Appendix to Plaintiff's Memorandum in Opposition to Defendants' Partial Motion for Summary Judgment Regarding** *Glomar* **Response** were filed electronically and thereby served to the parties by e-mail through the operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

I also certify that a copy of these materials was served by Federal Express Delivery on:

Alexander K. Haas
Federal Programs Branch, Civil Division
United States Department of Justice
20 Massachusetts Ave., N.W.
Washington, D.C. 20044

/s/ Julie P. Shelton
Attorney for Plaintiffs

W0067264v1

25

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF OREGON

 3   AL-HARAMAIN ISLAMIC              )
     FOUNDATION, INC., ET AL.         )
 4                                    )
               Plaintiffs,            )   CV-07-1155
 5                                    )
         vs.                          )   April 14, 2008
 6                                    )
     UNITED STATES DEPARTMENT         )   Portland, Oregon
 7   OF THE TREASURY, ET AL.,         )
                                      )
 8             Defendants.            )

 9                 TRANSCRIPT OF PROCEEDINGS

10           BEFORE THE HONORABLE GARR M. KING

11           UNITED STATES DISTRICT COURT JUDGE

12                      APPEARANCES

13   FOR THE PLAINTIFFS:   Lynne Bernabei
                           Alan R. Kabat
14                         Thomas Nelson
                           Jessica Ashlee Albies
15                         Attorneys at Law

16   FOR THE DEFENDANTS:   Anthony J. Coppolino
                           Jonathan Eli Zimmerman
17                         Eric J. Beane
                           Attorneys at Law

18

19

20

21

22   COURT REPORTER:      Dennis W. Apodaca, RPR
                          1000 S.W. Third Ave., Room 301
23                        Portland, OR  97204
                          (503) 326-8182
24

25
```



EXHIBIT
A

2

```
 1                    (April 14, 2008)
 2               P R O C E E D I N G S
 3         (Open court:)
 4         THE COURT:  Good afternoon, everyone.
 5         THE CLERK:  Your Honor, this is the time set for
 6  hearing on plaintiffs' motion for preliminary injunction
 7  in Case No. 07-155-KI, Al-Haramain Islamic Foundation,
 8  Inc. et al. versus United States Department of Treasury,
 9  et al.  Counsel, beginning with the plaintiff, would you
10  please identify yourself for the record.
11         MS. BERNABEI:  Yes.  Lynne Bernabei and Albert
12  Kabat for the plaintiff.
13         MR. NELSON:  Thomas Nelson.
14         MS. ALBIES:  Jessica Ashlee Albies for
15  plaintiff.
16         MR. NELSON:  Ms. Bernabei will be arguing for
17  plaintiffs today.
18         THE COURT:  All right.
19         MR. COPPOLINO:  Anthony Coppolino with the
20  Department of Justice, Civil Division, for the
21  United States.  I am joined with my colleagues, Jay
22  Zimmerman and Eric Beane.
23         THE COURT:  All right.  This is the time set for
24  oral argument on plaintiffs' motion for preliminary
25  injunction.  Let me cover a couple of preliminary matters
```

1  hypotheticals without evaluating what the facts are.  In

2  other words, I don't believe it would be appropriate to

3  say, well, look, as a matter of law, something might not

4  be appropriate if it were occurring, so I'll just issue an

5  order that says if it is occurring, it shouldn't be

6  occurring.

7           My view is that you have to have an actual case

8  or controversy.  You don't have Article III jurisdiction

9  to issue an advisory opinion about something that may not

10  be the case.

11          THE COURT:  But you can't have a case of

12  controversy with the Government's position that none of

13  this can be disclosed.

14          MR. COPPOLINO:  Well, that, of course, is the

15  nub of the problem when you challenge alleged

16  surveillance.  But let me just deal with the issue of

17  counsel for one moment, Your Honor.  That issue, unlike

18  the other issues that she has raised about seeking an

19  injunction against the Government for surveillance or the

20  use in the designation record, the attack on counsel is an

21  attack against me and my colleagues personally for alleged

22  ethical violations.

23          The first point I would make to you is that

24  accusation is based wholly on conjecture and speculation

25  and inference that they draw from -- from what?  From the

1  fact that they fear that the Government is conducting or

2  has conducted a surveillance of them, so they then levy an

3  attack on us as counsel, I think as a tactic, to try to

4  somehow force the disclosure as to whether or not there

5  has even been any surveillance.

6       In fact, they say in their reply brief that that

7  issue would trump the state secrets privilege.  Now, I

8  know you are concerned about that issue, because it is an

9  issue that you would obviously want to know, whether the

10  lawyers that are in front of me, in their huddle, are they

11  violating ethical rules and are they obtaining access to

12  information about strategy and work product that we should

13  not have?

14       It is a very serious allegation.  The problem

15  with it, though, in terms of addressing it on a public

16  record is, as we told them -- they first asked us:  Can

17  you confirm or deny whether the Government is surveilling

18  us?  We said, well, we can't.  That is subject to a state

19  secrets privilege.  It was then when they said we are

20  going to come after you lawyers and accuse you of an

21  ethical violation.

22       As we try to deal with their accusation, my

23  first argument is, look, you can't just bring something to

24  court, without any foundation, based solely on conjecture.

25  Because to do that, particularly where there is a state