# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS B. WILNER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Civil Action No. 07-CIV-3883 (DLC) |
| | ) |
| NATIONAL SECURITY AGENCY and | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## APPENDIX TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT REGARDING THE *GLOMAR* RESPONSE

Kathryn A. Sabbeth (KS 9014)
David C. Vladeck (DV 4836)
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Avenue, NW, Suite 312
Washington, D.C. 20001
(202) 662-9546

*Of Counsel*[*]

Shayana Kadidal (SK-1278)
Emilou MacLean
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6438
Email: skadidal@ccrjustice.org

James R. Rubin
Julie P. Shelton
Karen Borg
Mark A. Schwartz
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street
Suite 1800
Chicago, IL 60602
(312) 242-4112
Email: jshelton@butlerrubin.com

*Attorneys for Plaintiffs*

Dated: May 6, 2008
New York, New York

---

[*] Counsel gratefully acknowledge the significant contributions of Louise McGauley Betts, a third-year law student at Georgetown University Law Center.

## APPENDIX

**Tab No.**

Declaration of Scott Barker .................................................................................1

Declaration of Charles H. Carpenter.......................................................................2

Declaration of John A. Chandler ............................................................................3

Declaration of Joshua Colangelo-Bryan ...................................................................4

Declaration of J. Wells Dixon................................................................................5

Declaration of Tina Monshipour Foster....................................................................6

Declaration of H. Candace Gorman .........................................................................7

Declaration of Richard A. Grigg.............................................................................8

Declaration of Gitanjali S. Gutierrez ......................................................................9

Declaration of Jonathan Hafetz.............................................................................10

Declaration of David J. Luban..............................................................................11

Declaration of Joseph Margulies ...........................................................................12

Declaration of George Brent Mickum IV .................................................................12

Declaration of Brian J. Neff.................................................................................14

Declaration of Clive A. Stafford Smith ...................................................................15

Declaration of Michael J. Sternhell ........................................................................16

Declaration of Stephen M. Truitt...........................................................................17

Declaration of Thomas B. Wilner...........................................................................18

W0067343v1

**1**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS B. WILNER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 07-CIV-3883 (DLC) |
| ) | |
| NATIONAL SECURITY AGENCY and ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DECLARATION OF SCOTT S. BARKER

I, Scott S. Barker, declare as follows:

1.    I am a United States Citizen, an Air Force Academy graduate (1970) and an honorably

discharged Air Force Officer who served in Southeast Asia in 1974-1975.  I am a partner

of Holland & Hart, LLP, a civil law firm of approximately 400 lawyers, with its main

office in Denver, Colorado and other offices in Colorado, Utah, Idaho, Wyoming, New

Mexico, Nevada and Washington, D.C.  I was admitted to the Bar of the State of

Colorado in October 1981 and have been practicing continuously since that time.  I am

admitted to practice before all State and Federal Courts in Colorado, as well as the Tenth

Circuit Court of Appeals.  I am also currently admitted *pro hac vice* in habeas petitions

filed on behalf of certain Guantanamo Bay detainees in the United States District Court

for the District of Columbia.  I am in good standing in all instances.  I specialize in civil

litigation/trial work and am a Fellow of the American College of Trial Lawyers.

2.  On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government is engaged in warrantless electronic surveillance of communications involving me or my law office. Alongside 23 other attorneys, including one of my partners, Anne J. Castle, who represent current or former Guantánamo detainees, I am now a Plaintiff in *Wilner et al. v. NSA et al.* Another partner, Trip Mackintosh, while not a plaintiff in this case, also represents current or former Guantanamo detainees.

3.  I understand that in response to my FOIA request, the NSA and DOJ have refused to confirm or deny whether they have records related to whether the NSA is monitoring my electronic communications. I understand that the NSA is the federal agency charged with surveillance under the warrantless surveillance program and that DOJ has had a major role in the continuation of the program. Finally, I understand that the Executive has asserted that it has the right and the duty to carry out warrantless surveillance whenever circumstances demand it.

4.  Because of official assertions about the confines of the warrantless surveillance program, as well as the nature of my international communications and the identities of those with whom I communicate, I am concerned about the possibility of the NSA monitoring or having monitored my communications without a warrant, as well as the communications of my partners, Anne J. Castle and Trip Mackintosh. That concern stems from the fact of our representation of five present and former Guantanamo Bay detainees. In particular, I

2

am concerned that our international telephone and e-mail communications may have been targeted by the NSA, or may be so targeted in the future for warrantless surveillance.

### Knowledge of the Warrantless Surveillance Program

5.    It is my understanding that, under the so-called "Terrorist Surveillance Program" (TSP), as explained by the former Attorney General, Alberto Gonzales, the federal government takes the position that it may target for surveillance not only suspected terrorists but also any person in the United States communicating with any person outside the United States, if it believes that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, a member of an organization affiliated with al Qaeda, or working in support of al Qaeda. I understand that, under this program, government agencies have been engaged in, and may in the future engage in, monitoring telephone calls, reading e-mails and faxes, and otherwise monitoring and recording electronic communications.

6.    While I understood that the federal government was engaged in the surveillance of some international communications prior to the initiation of the warrantless surveillance program, I also understood that such activity was subject to the protections and limitations mandated by the Foreign Intelligence Surveillance Act (FISA). I do not feel that there are, have been or will be similar restrictions governing the surveillance of my international communications with clients. To the contrary, I understand that there have been official assertions that attorney-client communications are not exempted from the program.

## Communication

7.    Ms. Castle, Mr. Mackintosh and I are users of a networked workplace computer system

that gives us access to the internet and the consequent ability to communicate by e-mail

virtually anywhere in the world. The system is equipped with appropriate "firewalls" that

protect the security of the system. We also all have "Blackberries," which have a cell

phone function that can be used to communicate telephonically with international

locations. Mr. Mackintosh has  many clients who do business internationally; he travels

abroad frequently; and communicates internationally by phone and e-mail numerous

times per week. While Ms. Castle and I typically do not travel abroad on business and do

not have international clients, we have traveled and/or communicated internationally on

behalf of our Guantanamo Bay clients. For instance, in November 2006, one of our

Guantanamo Bay detainee clients was transferred to Tirana, Albania, without warning.

This precipitated a period of intense international e-mail and telephonic communications

by myself, Ms. Castle, Mr. Mackintosh and other lawyers in our firm on behalf of our

client, many of which were with our client and/or lawyers in France who were assisting

us in his representation, as well as with representatives of various governmental and non-

governmental organizations in Albania.

8.    The importance of these modes of communication in a global economy is obvious. We

could not effectively represent our clients without the ability to communicate

internationally by e-mail and phone. In the case of the Guantanamo Bay detainee

referenced in Paragraph 7 above, these communication capabilities were essential. Using

the mail  system or other means of "paper" communication would not have sufficed

4

under the circumstances we faced. The confidentiality of these communications is important in order to effectively represent our clients, and to gain the trust of those with whom we communicate.

9.    I am in good standing with the regulatory authorities in the jurisdictions in which I am licensed to practice law or otherwise admitted to practice. I have never been professionally sanctioned or charged with criminal activity. All of my business communications are solely for the furtherance of legitimate representation of our clients.

### Representation

10.   We represent the following five former or current Guantanamo Bay detainees (all Algerians by birth): Motai Saib (Motij Sadiz Hamad Sayad), ISN 288; Fethi Boucetta (Dr. Abu Muhammed), ISN 718; Abbar Sufian al Hawary (Sufian Abar Huwari), ISN 1016; Shafiiq (Sufyian Barhoumi) ISN 694; and Nabil (Nabil Hadjarab), ISN 238. They have been incarcerated at Guantanamo Bay for various periods of time ranging from February 2002 to present. We represent them in their pending habeas petitions in the United States District Court for the District of Columbia. We also represent Motai Saib, Abbar Sufian al Hawary, Sufyian Barhoumi, and Nabil Hadjarab in their petitions under the Detainee Treatment Act before the District of Columbia Circuit Court of Appeals.

11.   Mr. Mackintosh and I have both obtained security clearances in conjunction with our representation of Guantanamo Bay detainees, which featured an extensive FBI background check. In addition, while on active duty with the Air Force I had a Top Secret "Compartmentalized" security clearance. Mr. Mackintosh has made three trips to

Guantanamo Bay and I have made one. In addition, I traveled to Tirana, Albania as part of our representation of the detainee who was released to that country.

12.  High-ranking officials in the U.S. government have repeatedly asserted that the men imprisoned at Guantánamo are "enemy combatants" or "terrorists." Government officials have insisted publicly that many detained there are affiliated with Al Qaeda, or organizations affiliated with Al Qaeda. Though a very small minority have been charged, and little evidence has been released to substantiate these assertions, the U.S. government has alleged that the majority of the men detained at Guantánamo in 2004 were affiliated with Al Qaeda and/or the Taliban. Mark Denbeaux & Joshua Denbeaux, *Report on Guantanamo Detainees: A Profile of 517 Detainees through Analysis of Department of Defense Data*, Seton Hall Public Law Research Paper No. 46, February 2006.

13.  The trip described in Paragraph 7 above to Albania in November 2006 was known to the United States Government and Albanian officials, as was my firm's representation of a just-released Guantanamo Bay detainee. Given the expressed public attitude toward Guantánamo Bay detainees by the United States Government as described above, I believe that my communications, as well as those of Ms. Castle, Mr. Mackintosh and other members of our firm, may have been targeted for warrantless surveillance.

### Concerns about Surveillance and Interference with Representation

14.  I am concerned that the possible past or future surveillance of my communication with my clients or others with whom I communicate in furtherance of my representation of the five Guantanamo Bay detainees identified above may interfere with my legal representation of them. The NSA's possible surveillance of my communications, as well

as those of Ms. Castle, Mr. Mackintosh and our associates, and its refusal to confirm or

deny whether it is engaged in such surveillance, deprives me of the ability to ensure the

confidentiality of my communications with clients, potential witnesses, and others. This

substantially interferes with my ability to participate in candid conversations with people

with knowledge of relevant events and possible witnesses, to engage in factual research,

to explore legal theories, and to otherwise represent my clients' interests. This, in turn,

erodes my ability to zealously represent my clients.

15.    The information I seek in this case is important to me because it will allow me to

confirm that the private and privileged communications of myself, Ms. Castle,

Mr. Mackintosh and other members of our firm have not been compromised. I did not

bring this action as "protest" of the warrantless surveillance program, or simply to learn

more about it. I only seek to know the extent to which my own communications, as well

as those of Ms. Castle, Mr. Mackintosh and other members of our firm, especially our

communications with clients or potential witnesses, are, have been, or will be subject to

warrantless surveillance.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _2nd_ day of May 2008.

Scott S. Barker
Partner
Holland & Hart, LLP

7

**2**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS B. WILNER, et al.,           )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )        Civil Action No. 07-3883 (DLC)
                                    )
NATIONAL SECURITY AGENCY and        )
DEPARTMENT OF JUSTICE,              )
                                    )
        Defendants.                 )

## DECLARATION OF CHARLES H. CARPENTER

I, Charles H. Carpenter, declare as follows:

1.   I am a partner in Pepper Hamilton LLP. I am a member of the bars of Montana,

     Maryland, and the District of Columbia, and have engaged in a national and

     international litigation practice with Pepper for nearly 17 years. I am a citizen of

     the United States.

2.   On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with

     the National Security Agency (NSA) and the Department of Justice (DOJ),

     seeking information regarding the NSA warrantless surveillance program,

     including whether, and to what extent, the federal government is engaged in

     warrantless electronic surveillance of communications involving me or my law

     office. Along with 23 other attorneys who represent current or former

     Guantánamo detainees, I am now a Plaintiff in *Wilner et al. v. NSA et al.*

3.   The purpose of the above-captioned lawsuit is to find out whether the government

     has illegally monitored my professional and personal communications. I

1

understand from various press accounts that the government claims the right to do
so, and that attorney-client communications are not excluded from interception.

4.    I have represented three prisoners held without lawful basis in the prison at
Guantanamo Bay. In connection with that representation, I had spoken by
telephone, both from my house and from my office, with persons in various
Middle Eastern countries, including members of the families of my clients. I have
also spoken with people in the Middle East in connection with other engagements
of my law practice -- most recently with the Iraqi proprietors of a company that
supplies various goods to the United States Army. I have communicated by email
from my office, my home, and using my blackberry.

5.    I understand the government instituted a warrantless eavesdropping program it
calls the "Terrorist Surveillance Program" (TSP). It is the federal government's
position that under this program it may target for surveillance any person in the
United States communicating with any person outside the United States, if the
government believes one party to the communication is "a member of al Qaeda,
affiliated with al Qaeda, a member of an organization affiliated with al Qaeda, or
working in support of al Qaeda." Under this program (and probably others),
government agencies have been engaged in, and may in the future engage in,
surveillance through listening to telephone calls, reading e-mails and faxes, and
otherwise monitoring and recording electronic communications. My belief that
my communication has been monitored is not restricted to the warrantless
surveillance program, but extends to other programs, the existence of which is
clearly implied in the testimony of Mr. Gonzales and others before Congress.

6.      Because of the existence of these programs, both explicitly acknowledged and implicitly suggested, I have had to assume that all communications have been monitored, as have the people in communication with me. This has had a chilling effect on my ability to communicate with my clients as well as others in the process of representing my clients.

7.      My law practice would be impossible without international electronic communication. Telephone and email communication, because they are instantaneous, make it possible to advise clients in the time needed to resolve issues confronting them. It has also been important in this engagement.

8.      Pepper Hamilton is a 500 lawyer firm. I share communications facilities with those in my office; it is quite likely that monitoring of my international communications could include monitoring of other communications by my partners and colleagues.

9.      We represent Hani Saleh Rashid Abdullah, from Yemen, and Maher El Falesteny, a stateless person who was cleared for transfer out of Guantanamo Bay in early 2007. Both have been imprisoned at Guantanamo Bay since 2002. We formerly represented Rami bin Saad al Oteibi, a Saudi who was returned to Saudi Arabia in late 2007. All three were said to have had connections to al Qaeda.

10.     In connection with this representation, I have communicated with other counsel (sometimes abroad), family members, foreign journalists, and officials of foreign governments, all to forward legitimate aspects of the representation.

11.     In addition to my representation of these men unlawfully held in Guantánamo Bay, I also engage in other litigation. The other parts of my practice require me to

engage in international communication with clients and co-counsel in Iraq, Saudi Arabia, Dubai, Yemen, and Israel, to name just a few.

12.    The likely intrusion of the warrantless surveillance program is disturbing, because it compromises the privacy interests of all of my clients–including corporate and other clients wholly unrelated to my Guantánamo representation.  Government interception of my telephone calls, e-mails, faxes, and text messages also violates my privacy during personal communications.

13.    The government's refusal to confirm or deny whether it has engaged in surveillance of my communications infringes on my ability to represent my clients and comply with my ethical obligations to them.  Because I am not certain whether I can discuss factual issues with my clients or witnesses and potential witnesses over the telephone or by email for fear of interception, my ability to represent my clients effectively has been compromised.

14.    As an attorney, with ethical and fiduciary duties to my clients, I believe I am entitled to know if my government has engaged in unlawful and unwarranted intrusion on my communications.  The government may not refuse to respond to my FOIA request in order to protect itself from embarrassment, or criminal or civil liability.

I declare under penalty of perjury that the foregoing is true and correct.


Signed this 5th day of May 2008

Charles H. Carpenter
Partner
Pepper Hamilton LLP

4

**3**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THOMAS B. WILNER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 07-CIV-3883 (DLC) |
| ) | |
| NATIONAL SECURITY AGENCY and ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF JOHN A. CHANDLER

John A. Chandler, a plaintiff in this lawsuit, pursuant to 28 U.S.C. § 1746, declares:

1. I am an attorney practicing as a partner with Sutherland, Asbill & Brennan, LLP in Atlanta, Georgia. I am admitted to practice in Georgia and the District of Columbia and have been licensed for 35 years. I am head of Sutherland's litigation group, where I try business cases. *Chambers* Guide to "America's Leading Lawyers for Business" says I am recommended as "'probably the best lawyer for financial disputes in Georgia.'" I have been recognized in the International Who's Who for Lawyers, a Top 100 super lawyer by *Atlanta Magazine* and have been named to *Georgia Trend* Magazine's Legal Elite since its inception. For the past two years, I have been chosen as one of the top ten lawyers in Georgia. I graduated with a

B.S. from the University of Tennessee in 1966, served just short of two years in the United States Army, and graduated from Vanderbilt University Law School in 1972. I have served as President of the Atlanta Bar Association, the Atlanta Council of Younger Lawyers, the Atlanta Legal Aid Society, Atlanta Volunteer Lawyers Foundation, Travelers Aid of Metropolitan Atlanta, Chair of the Fulton County Ethics Board and Chair of the City of Atlanta Board of Ethics. I was a member of the Board of Governors of the State Bar of Georgia for 20 years. I am also a member of the International Association of Defense Counsel, Past President of the Bleckley American Inn of Court, a Master of the Lumpkin American Inn of Court, a member of the Board of Visitors of the University of Tennessee College of Arts and Sciences, a Trustee of the Lawyers Foundation of Georgia, a Fellow of the American Bar Foundation and a Fellow of the American College of Trial Lawyers. I am citizen and resident of the United States of America. I have never been charged with any crime (apart from traffic citations) and have never been the subject of professional discipline.

2.      On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal

government is engaged in warrantless electronic surveillance of communications involving me or my law office. I represent six current Guantánamo detainees from Yemen and have established attorney client relationships with each of them and with their next friends in Yemen. I filed suit in the District of Columbia seeking the release from Guantánamo of the six men imprisoned there and for their next friends. I am a Plaintiff in the instant case.

3    In response to my FOIA request, the federal government has refused to say whether they have monitored my telephones and e-mail or whether they have any records of their surveillance.

4.    I agreed to be a Plaintiff in this lawsuit because of my conviction that I am subject to warrantless wiretapping by our government. The official explanation by the government for its program is to intercept communications between people in the United States and those "associated with terrorism" in foreign countries. I represent Fahmi Salem Al Assani, Suleiman Awadh Bin Aqil Al-Nahdi, Muhammed Ali Abdullah Bawazir, Zahir Omar Khamis Bin Hamdoon, Muhammad Al-Adahi, and Sharkawi Abda Al-Haag. Each of my clients is from Yemen. The first five named have entered their seventh year of illegal confinement in Guantánamo, despite the fact that two have been officially cleared for release. The sixth,

Sharqwai, was kidnapped by the CIA and Pakistani intelligence services in Karachi and sent to Amman, Jordan where he was tortured for nine months, imprisoned for two years and then sent by CIA chartered aircraft to Afghanistan and then to Guantánamo. The men have been improperly found to be "enemy combatants" in Combatant Status Review Tribunals.

5.　　If the NSA believes my clients are terrorists, they are likely to believe that their families and friends are "associated" with terrorism. If so, my communications with my clients' families fit the description of what the NSA says it is surveilling, despite the imperative for these communications in defending my clients. The next friends and families of my clients in Guantánamo are also clients and authorized the filing of our petition for habeas corpus. I met with those clients in Yemen in September 2005. In that meeting we began to talk about the issues relevant to the defense of my clients held in Guantánamo. A first meeting, however, has inherent limitations. On my return to the United States, I continued to talk on the telephone with my client-families. As they developed a degree of trust in me, I learned that the government may be listening to our calls. It was apparent to me that they too thought their calls were monitored, whether by the government of Yemen or by the government of the United States or both. In fact, on the telephone and by letter, they refused to give even the most

mundane information when I asked about births, deaths, etc. I had the impression they feared personal information being used against the Guantánamo clients. I therefore concluded that I could ask no specific questions—questions of the sort that an attorney would normally ask in preparing a defense. If the government was listening to these calls, I could not ask for frank and candid information of the sort needed. It would be a terrible disservice to the families in Yemen to tell them to trust me and then have them reveal information that might be misconstrued or otherwise used against the Guantánamo clients. Because of government surveillance I also concluded that I could not talk to third party witnesses in Yemen at all. While I understand the NSA has not disavowed listening to privileged communications, I had even more concern about non-privileged communications with potential witnesses. Thus, the concern about the government listening to my conversations has interfered substantially with the representation of the men in Guantánamo.

6.    My concerns about warrantless wiretapping are even broader, however. While my practice is mostly domestic, I do from time to time talk with clients overseas. The idea that the government may be listening to my privileged conversations is unsettling to me and to them. I am a member of a firm with approximately 450 lawyers and other professionals. Many

communicate with their overseas clients regularly. Because I do not know the scope of the NSA program, I do not know whether the NSA is listening to just my calls and the other Sutherland Guantánamo lawyers or whether they are listening to the attorney client privileged calls of all Sutherland lawyers. Indeed, my partner and fellow Guantánamo lawyer Richard G. Murphy has, as one of his principal clients, an entity owned by a company domiciled in a foreign country, but heavily regulated by government. That client has the right to expect confidential communications with its lawyers in the United States, but given the limited information that has been provided about the warrantless surveillance program, and the refusal of the government to disclose whether or not our communications are being surveilled, I do not know whether we can guarantee that.

7.    My understanding of the government's warrantless eavesdropping program is gained from press reports of government officials speaking about the program. The warrantless surveillance program apparently is targeted in part at any person in the United States communicating with any person outside the United States, if the government believes that one party to the communication is "a member of al Qaeda, affiliated with al Qaeda, a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." Presumably, that definition would include what the government

6

erroneously concludes about the men held in Guantánamo. Consequently, as discussed above, if the government is doing or has done what it says it has the right to do, I presume that my phone calls, faxes, e-mails and all other electronic communications are monitored illegally.

8.     If I am being monitored, as I believe I am, this illegal program coupled with my representation of men in Guantánamo exposes me to risks I would not otherwise encounter. I have a regular big firm civil litigation practice. I cannot imagine the government being interested in me apart from this illegal warrantless surveillance program, and its unsubstantiated assertions about my Guantanamo clients. When I was in the Army, I received a Secret security clearance and have been investigated by the FBI and received the necessary security clearances to view classified information in connection with Guantánamo. To gain a security clearance to meet with my clients in Guantánamo, I completed an application, including fingerprints, required by the Department of Defense revealing all information that interested them. I was visited by the FBI as were several of my neighbors and colleagues. The FBI asked for a copy of my "file" at my law firm and presumably saw whatever they wanted.

9.     I understand that there have been official assertions that attorney-client communications are not categorically excluded from the scope of the

7

program. By surveilling my communications, the NSA would violate both
the attorney client privilege of my clients as well as the protections afforded
my work product.

10.     I or other lawyers working with me write, call and e-mail our clients'
families in Yemen thirty or more times a year. We must communicate by
mail, e-mail and telephone because trips to Yemen are inordinately time-
consuming and expensive. I have been to Guantánamo more than twelve
times to visit with my clients.

11.     The NSA's refusal to confirm or deny whether it has engaged in
surveillance of my communications infringes on my ability to function as a
zealous advocate. It is quite important to me that I receive the information
sought about government surveillance of my communications. My belief
that I am a subject of surveillance has caused me to be quite cautious
concerning communications with individuals in Yemen who may have
information helpful to my clients. The defendants in my cases are the
President of the United States, the Secretary of the Department of Defense
and the commander of the base at Guantánamo. I fear that the NSA might
communicate the information obtained to the lawyers for the respondents in
my case. If I learned for certain that I am the subject of surveillance, I
would heighten my caution in developing my case; if I found that I was not,

justice would be better served because I could use all means available to develop the factual basis needed to free my clients from their illegal jailing in Guantánamo.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 24th day of April 2008

John A. Chandler
Partner
Sutherland Asbill & Brennan LLP

9

**4**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS B. WILNER, et al.,

    Plaintiffs,

        v.                         Civil Action No. 07-CIV-3883 (DLC)

NATIONAL SECURITY AGENCY and
DEPARTMENT OF JUSTICE,

    Defendants.

## DECLARATION OF JOSHUA COLANGELO-BRYAN

I, Joshua Colangelo-Bryan, declare as follows:

1.      I am a senior attorney in the New York office of Dorsey & Whitney LLP, an international law firm. I am admitted to practice law in the states of New York and Washington, in the United States District Courts for the Southern District of New York, the Eastern District of New York and the Western District of Washington, and in the United States Courts of Appeal for the Fourth Circuit and the District of Columbia Circuit. I am a citizen of the United States.

2.      On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program referred to as the "Terrorist Surveillance Program" (TSP), including whether, and to what extent, the federal government is engaged in warrantless electronic surveillance of my communications. I first learned of the TSP in December 2005 when it was disclosed in the national media. James Risen & Eric Lichtblau, *Bush Lets US Spy on Callers Without*

*Courts*, N.Y. Times, Dec. 16, 2005. I understand that in response to the above-referenced FOIA requests, the NSA and DOJ refused to confirm or deny whether they possess any responsive records. Presently, I am a Plaintiff with other attorneys in *Wilner et al. v. NSA et al.*, an action that was commenced following the NSA's and DOJ's refusal to provide responsive information.

3.    The FOIA requests were made to the NSA because it is charged with surveillance under the TSP that had been secretly authorized and re-authorized by President Bush prior to January 17, 2007, and which was disclosed publicly by the *New York Times* on December 16, 2005 as addressed above. The FOIA requests were made to the DOJ because it appears to have advised the Executive regarding the TSP and authorized the TSP. *See* Preserving Prosecutorial Independence: Is the Department of Justice Politicizing the Hiring and Firing of U.S. Attorneys? - Part IV: Hearing of the S. Comm. on the Judiciary, 110th Cong. 2 (2007) (statement of James B. Comey, former Deputy U.S. Attorney General); Letter from William E. Moschella, Assistant Attorney General, U.S. Department of Justice, to Senate and Permanent Select Comms. on Intelligence 3 (2005).

4.    Dorsey & Whitney LLP has been counsel to six foreign nationals who were detained in Guantanamo Bay as enemy combatants with alleged links to Al Qaeda. In addition, Dorsey & Whitney LLP has been counsel to certain family members of these detainees who acted as "next friends" and who live outside the United States. I am one of the attorneys responsible for these matters.

5.    Because of official assertions regarding the nature of the warrantless surveillance program, and the nature of my international communications and the identities of those

with whom I communicate, I am concerned that NSA may have monitored and may still be monitoring my communications without a warrant.

### Knowledge of the Warrantless Surveillance Program

6.  Based upon media reports and statements by government officials, I understand the Executive's position to be that, under the TSP, it may conduct surveillance of any person in the United States communicating with any person outside the United States, if it is believed that one party to the communication is "a member of al Qaeda, affiliated with al Qaeda, a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." Attorney General Alberto Gonzales, Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence (December 19, 2005), *available at* http: //www.whitehouse,gov/news/releases/2005/12/20051219-1.html (last visited March 31, 2008).

7.  I understand further that, under the TSP, government agencies have been engaged in, and may in the future engage in, surveillance through listening to telephone calls, reading e-mails and faxes, and otherwise monitoring and recording electronic communications. I also understand that in certain instances, the government has engaged in surveillance of attorney-client privileged communications. Patrick Radden Keefe, *State Secrets: a Government Misstep in a Wiretapping Case*, New Yorker, April 28, 2008.

**Representation**

8.     Since July 2004, Dorsey & Whitney LLP has been counsel to Isa Al Murbati,

Salah Al Bloushi, Salman Al Khalifa, Abdulla Al Noaimi, Adel Hajee, and Jumah

Al Dossari, all of whom were detained in Guantanamo Bay.  Dorsey & Whitney

LLP brought *habeas corpus* proceedings and, in certain instances, Detainee

Treatment Act proceedings on behalf of these individuals.  The United States

government characterized our clients as enemy combatants who were said to have

been associated with Al Qaeda; we vigorously challenged these characterizations.

9.     Mr. Al Dossari has joint Bahraini/Saudi Arabian citizenship and the other

individuals referenced above are citizens of Bahrain.  The family members of

these individuals, some of whom served as "next friends," live in Bahrain and

Saudi Arabia.

10.    Between 2004 and the present, I have had countless attorney-client privileged

communications via the telephone and electronic mail with the "next friends"

referenced above while said individuals were in Bahrain and Saudi Arabia, and I

was in the United States.

11.    In addition, the clients of ours who were detained at Guantanamo Bay as enemy

combatants were released – in small groups and individually – in 2005, 2006 and

2007.  I note that we still represent these individuals in litigation before the

United States Supreme Court.  I have had many attorney-client privileged

communications with these individuals – who were in Bahrain or Saudi Arabia –

via the telephone and electronic mail from the United States since their respective

releases from Guantanamo Bay.

12.    Beyond these attorney-client privileged communications, I have communicated extensively regarding the Guantanamo Bay cases from within the United States via the telephone and electronic mail with individuals located outside the United States in countries such as Bahrain and Saudi Arabia. For example, I have communicated with journalists, politicians, other government officials, and human rights advocates.

13.    In addition to my work with respect to Guantanamo Bay, I communicate from within the United States via the telephone and electronic mail with clients located outside the United States regarding commercial litigation matters.

14.    It is essential that I be able to communicate with foreign nationals outside the United States via the telephone, electronic mail or other media such as facsimile transmissions in order to adequately and vigorously represent clients. Such communications are necessary to prepare for litigation, engage in investigative activities and keep clients informed regarding the status of their matters. The confidentiality of such communications is crucial.

15.    Telephonic or electronic communications are preferable to any other form of communication. The postal service, for example, is slow and does not allow for simultaneous exchanges. In-person communications with individuals who live or work outside the United States, naturally, require international travel.

16.    I note that I also engage in personal communications via the telephone and electronic mail with individuals who are located outside the United States.

**Concerns about Surveillance and Interference with Representation**

17.    My awareness of the possible surveillance of my privileged communications has had a measurable effect on the manner in which I engage in such communications.  Specifically, I have been more cautious and less direct in my communications.  I also have been more reluctant to address certain crucial subjects and ask certain crucial questions.  Further, the potential surveillance of my privileged communications has kept me from being able to assure others of the confidentiality of such communications, which is essential in order to represent clients effectively.  For all of these reasons, the possible surveillance of my communications with clients or others interferes with my representation of clients.

18.    If the United States government is conducting surveillance of my communications it would compromise the privacy interests of my clients, including clients who have no association with the Guantanamo Bay representation.  It would also violate the privacy interests of potential witnesses and others with whom I need to communicate as part of my practice.  Finally, it would violate my privacy rights.

19.    I did not bring this action as a general challenge to the legality of the TSP, nor to

obtain information concerning the sources or methods the government uses under

the TSP.  Rather, I seek only to know whether my own communications,

especially my communications with clients, are, have been, or will in the definite

future be subject to warrantless surveillance.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


Signed this 30th day of April 2008

JOSHUA COLANGELO-BRYAN

**5**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————————————— x
                    :

THOMAS B. WILNER, *et al.*,      :

          Plaintiffs,    :

             v.        :    Civil Action No. 07-CIV-3883 (DLC)

NATIONAL SECURITY AGENCY and  :
DEPARTMENT OF JUSTICE,     :

          Defendants.   :

————————————————————— x

### DECLARATION OF J. WELLS DIXON

I, J. WELLS DIXON, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am an attorney at the Center for Constitutional Rights, 666 Broadway, 7th Floor, New York, New York 10012 ("CCR"). I am licensed to practice law in the State of New York, and have been admitted to practice before this Court and several other federal courts including the United States Supreme Court. I am a plaintiff in the above-captioned action. I respectfully submit this declaration in support of my request, pursuant to the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*, for information regarding the warrantless surveillance program operated by the National Security Agency ("NSA"), including information concerning whether and to what extent the government has engaged or is engaged in warrantless electronic surveillance of communications relating to me.

2.    I graduated from Johns Hopkins University and the University of Colorado School of Law, where I was Editor of the *Law Review*. I clerked for U.S. District Judge Christopher F. Droney in the District of Connecticut for two years. I then worked at the law firm

1

Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 ("Kramer Levin"), where my practice involved complex securities litigation and white collar criminal defense. I joined CCR full-time in the spring of 2007.

3.    I am a United States citizen, and currently hold a national security clearance at the "Top Secret//Sensitive Compartmented Information" level.

4.    I am married to Alison Sclater, who is also a plaintiff in this case. She graduated from George Washington University and New York University School of Law; she clerked for Senior U.S. District Judge I. Leo Glasser in the Eastern District of New York; and she also worked as an attorney at Kramer Levin. She is currently Director of Pro Bono at the New York Legal Assistance Group in New York City. She is a United States citizen, and holds a national security clearance at the "Secret" level.

5.    I currently represent more than a dozen men imprisoned at the United States Naval Station at Guantánamo Bay, Cuba ("Guantánamo"). I represent these men in all matters relating to their imprisonment at Guantánamo, including their federal habeas cases and cases filed under the Detainee Treatment Act of 2005 ("DTA"), as well as in efforts to repatriate these men to their home countries or resettle them safely in third countries where they will not face persecution. Each of my clients has been determined by a Combatant Status Review Tribunal ("CSRT") at Guantánamo to be an "enemy combatant" based on some purported affiliation with the Taliban or al Qaeda. I am also involved in the representation of three detainees who have been charged or may be charged by military commission with alleged acts of terrorism or other purported war crimes.

6.    Among my current clients is Majid Khan, ISN 10020, a citizen of Pakistan. Unlike other Guantánamo prisoners, Khan grew up in the suburbs of Baltimore, Maryland, and

2

has political asylum in the United States. His family still resides legally in the United States; and some of his family members are United States citizens.

7.      As set forth in unclassified, publicly available documents, Khan was captured in Karachi, Pakistan, on March 5, 2003. He was forcibly disappeared by the Central Intelligence Agency ("CIA"), and did not reemerge until September 6, 2006, when he was transferred to Guantánamo. Although Khan has not been charged with any offense, the government has alleged that he was a member or associate of al Qaeda.

8.      Khan was subjected to an aggressive CIA detention and interrogation program notable for its elaborate planning and ruthless application of torture. The CIA program can only be characterized as state-sanctioned torture. However, according to the government, virtually all details about the program are highly classified. As a result, any information that I may learn from Khan is presumptively classified as "Top Secret//Sensitive Compartmented Information," and subject to severe restrictions on its handling, dissemination, storage, and use in court filings.

9.      As indicated above, I represent Khan in his federal habeas case, his DTA case challenging his "enemy combatant" designation, and all other matters relating to his imprisonment. I have also recently been approved by the Department of Defense, Office of the Chief Defense Counsel, to represent Khan before the Military Commissions at Guantánamo, if he is charged before the Commissions.

10.     I am also involved in the representation of Guantánamo prisoner Mohammed al Qahtani, ISN 63, who the government has alleged was a member or associate of al Qaeda. Al Qahtani was the subject of the so-called "First Special Interrogation Plan," personally approved by Defense Secretary Donald Rumsfeld, which resulted in al Qahtani's well-publicized torture at Guantánamo beginning in December 2002.

3

11.     In addition, I have been involved in the representation of Guantánamo prisoner Ahmed al Darbi, ISN 768, who the government has alleged was a member or associate of al Qaeda. Al Darbi was severely tortured by American forces while imprisoned at Bagram Air Base in Afghanistan before his transfer to Guantánamo.

12.     I also represent the following Guantánamo prisoners, among others:

(a)     Djamel Ameziane, ISN 310, a citizen of Algeria, who cannot return safely to his home country for fear of persecution;

(b)     Mohammed Sulaymon Barre, ISN 567, a citizen of Somalia, who is an internationally recognized refugee under the mandate protection of the United Nations High Commissioner for Refugees;

(c)     Mohammed Ahmed Taher, ISN 679, a citizen of Yemen, who is the brother of one of the Guantánamo prisoners who died there in June 2006; and

(d)     Four ethnic Uighurs, who are citizens of China, and each of whom appears to have been cleared for release from Guantánamo as long ago as 2003:

    (i)     Ahmad Turson, ISN 201

    (ii)    Abdur Razakah, ISN 219

    (iii)   Abdulghappar Abdulrahman, ISN 281; and

    (iv)    Adel Noori, ISN 584

As indicated above, each of these men has been determined by a CSRT to be an "enemy combatant" based on some purported affiliation with the Taliban or al Qaeda – even the Uighurs, who the United States has sought to release since before the creation of the CSRT process in 2004.

13.     My wife, plaintiff Alison Sclater, also worked at Kramer Levin. Kramer Levin is co-counsel for my Uighur clients Ahmad Turson, Abdur Razakah, Abdulghappar Abdulrahman, and Adel Noori, who remain in Guantánamo.

4

14.    While at Kramer Levin, my wife and I, along with other Kramer Levin attorneys, represented three Uighur prisoners at Guantánamo who were determined by the CSRTs not to be "enemy combatants." These men were released from Guantánamo in May 2006, and were transferred to a refugee camp outside of Tirana, Albania. They now live in apartments in or near Tirana. The men have political asylum status in Albania, and remain under surveillance by Albanian authorities. The United States Embassy in Tirana also continues to monitor these men.

15.    After their transfer to Albania, the United States government provided our three Uighur clients with cell phones. The men used these cell phones to communicate with me at my Kramer Levin office, as well as at my home which I share with my wife, and to conduct multi-party conference calls with me, my wife, other Kramer Levin attorneys, and their families in Europe, China, and elsewhere throughout Central Asia.

16.    These former prisoners have also communicated with me and other Kramer Levin attorneys occasionally by email.

17.    Notwithstanding their exoneration, their non-"enemy combatant" status, and their ultimate release, the United States government continues to claim publicly that my three Uighur clients who were transferred to Albania are among a group of former Guantánamo prisoners who have "returned to militant activities, participated in anti-US propaganda or other activities through intelligence gathering and media reports." Former Guantanamo Detainees Who Have Returned to the Fight, *available at* http://www.defenselink.mil/news/d20070712formergtmo.pdf.

18.    During the course of my representation of current and former Guantánamo prisoners, I have communicated and continue to communicate with co-counsel located inside and outside the United States; consultants and experts located inside and outside the United States; family members of my clients located inside and outside the United States; news media located

inside and outside the United States; non-governmental organizations located inside and outside the United States; United States government officials located inside and outside the United States; and foreign government officials located inside and outside the United States.

19.    My overseas communications have included telephone calls, faxes, and emails with individuals and organizations in the following countries, among others: Afghanistan, Albania, Algeria, Canada, China, Egypt, Finland, France, Germany, Kazakhstan, Malaysia, Norway, Pakistan, Saudi Arabia, Somalia, Sudan, Sweden, United Kingdom, and Yemen.

20.    As a direct and proximate result of what I know to be true and believe to be true about the warrantless surveillance program, as described below, I have had to limit and censor my communications with individuals and organizations overseas in order to ensure privilege and confidentiality. This has significantly hindered my ability to represent my Guantánamo clients vigorously and effectively, and has increased the costs of these representations to me and to my employer, CCR, a small non-profit organization. For instance, I have had to forego entirely certain substantive discussions with family members of Guantánamo prisoners by telephone, fax or email because of concerns that my communications are monitored. I have instead traveled long distances to meet with these individuals in person, or opted to communicate with them in writing through more costly overnight mail, to ensure privilege and confidentiality. I have also thus far had to refrain from hiring certain overseas investigators because I have not yet been able to communicate with them in person and do not believe that I could do so in a privileged and confidential manner by telephone, fax or email because of the likelihood that my communications are monitored.

21.    In connection with my representation of Khan, in particular, I have communicated and continue to communicate with counsel for other detainees, each of whom is alleged to be

connected to al Qaeda. I have also communicated and continue to communicate with military defense counsel assigned to represent detainees charged before the Military Commissions. Again, because of concerns that my communications may be subject to warrantless surveillance, I have had to limit and censor my communications with these counsel in order to ensure privilege and confidentiality. Indeed, whenever I do communicate with these individuals by telephone, fax or email, I assume that the substance of our discussions is monitored and that information about our defense strategies will be transmitted not only to the NSA but also to our litigation adversaries at the Department of Justice ("DOJ"), CIA and Military Commissions.

22.    My personal privacy and the privacy of my wife have also been directly impacted by the likelihood that our telephone, fax and email communications are subject to warrantless surveillance. Because we have used our personal, home accounts during the course of our representation of Guantánamo prisoners, we have assumed and continue to assume that our communications, particularly communications with each other and with friends and relatives located overseas in countries like Australia, Iraq, Ivory Coast, Nigeria and the United Kingdom, are monitored. We have had to inform our friends and relatives accordingly, thus inevitably restricting our communications. My wife and I have even had to have our home telephone number unlisted in order to limit its use.

23.    In sum, because of the identities of the clients I represent and the nature of my international communications in connection with their representation, I have assumed and continue to assume that all my communications are monitored, especially my overseas communications. I have notified and continue to notify individuals and organizations with whom I communicate that they also must assume that our communications are monitored.

24.    I understand that the President secretly authorized, and later reauthorized, the NSA to conduct a warrantless electronic surveillance program commonly known as the "Terrorist Surveillance Program." I also understand that the government has determined that pursuant to this program it may target for warrantless surveillance not only suspected terrorists and terrorist organizations, but also communications between persons or organizations within the United States and persons or organizations outside of the United States, if the government believes that one party to the communication is "linked," "affiliated with," or "working in support of" al Qaeda, or an organization affiliated with al Qaeda. I understand that the government has engaged in and may continue to engage in such surveillance by listening to telephone calls, reading emails and faxes, and otherwise monitoring electronic communications without warrants.

25.    I understand that the Department of Justice, for its part, has advised the NSA and other government agencies and officials concerning the legality of the warrantless surveillance program, suggested modifications to the program, and authorized or reauthorized the program, and may continue to do so. Moreover, it appears that the Office of Legal Counsel at DOJ has advised the President that he is not bound by the Fourth Amendment to the United States Constitution while engaged in domestic military operations against suspected terrorists or terrorist organizations. *See* Memorandum for William J. Haynes II, General Counsel of the Department of Defense, from Deputy Assistant Attorney General John C. Yoo, U.S. Department of Justice, Office of Legal Counsel, Re: Military Interrogation of Alien Unlawful Enemy Combatants Held Outside the United States at 8 n.10 (March 14, 2003), *available at* http:// www.dod.mil/pubs/foi/detainees/OLCmemo14mar2003.pdf.

26.    I further understand that the President has asserted his purported right as Commander-in-Chief under the United States Constitution to carry out warrantless surveillance whenever he determines it is necessary, regardless of any limitations or restrictions on the warrantless surveillance program, and regardless of whether the program continues to exist and operate in any fashion.

27.    In light of the widespread public disclosures and official government acknowledgements concerning the warrantless surveillance program, as well as the identities of the clients I represent and the nature of my international communications in connection with their representation, I am concerned that the NSA has targeted or may target me for surveillance, and has engaged or may engage in warrantless surveillance of electronic communications relating to me.  I am especially concerned because the NSA and DOJ have refused to confirm or deny such surveillance, and the government has refused to exclude from the warrantless surveillance program attorney-client conversations or other privileged and confidential communications.

28.    My concern about warrantless surveillance is heightened by what I perceive to be an ongoing pattern and practice of government attempts to interfere with my representation of Guantánamo prisoners.  For example, officials at Guantánamo have routinely informed my clients that they have "reservations" – i.e., interrogations – when they are actually scheduled to meet with me, which has sometimes resulted in their refusals to see me.  In one particular instance, a military officer lied to me directly about a client's willingness to meet with me, which was later discovered by me and by other counsel during our meetings with separate Guantánamo prisoners who witnessed that client's purported refusal – all at a time when my client's case was pending before the United States Supreme Court.  I am further informed and believe that

9

government officials record privileged communications between me and my clients during our meetings at Guantánamo, and review our privileged legal mail, without warrants.   Finally, government officials have attempted to threaten and intimidate me in connection with my representation of Majid Khan in a transparent effort to chill my advocacy on his behalf.

29.     Despite my concern about warrantless surveillance, I continue my work on behalf of current and former Guantánamo prisoners because I believe that ensuring basic due process rights for anyone detained by the Executive Branch is consistent with traditional principles of American justice and the highest standards of our legal system.

30.     For all of the foregoing reasons, I am concerned that the government has engaged or is engaged in warrantless electronic surveillance of communications relating to me, including without limitation electronic communications involving: (a) my former Kramer Levin telephone, fax (which I shared with numerous other attorneys), email and Blackberry accounts; (b) my CCR telephone, fax (which I share with numerous other attorneys), email and Blackberry accounts; (c) my home telephone and Skype accounts; and (d) my personal email and cellular phone accounts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:     New York, New York
              May 5, 2008


                          _____
                          J. Wells Dixon (JD-5055)

**6**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS B. WILNER, et al.,                    )
                                             )
        Plaintiffs,                          )
                                             )
            v.                               )    Civil Action No. 07-CIV-3883 (DLC)
                                             )
NATIONAL SECURITY AGENCY and                 )
DEPARTMENT OF JUSTICE,                       )
                                             )
        Defendants.                          )
                                             )

**DECLARATION OF TINA MONSHIPOUR FOSTER**

I, Tina Monshipour Foster, declare as follows:

1.    I am a New York-based human and civil rights attorney. The majority of my clients are

      indigent Arab and Muslims who I represent on a *pro bono* basis. A large number of these

      individuals are current or former prisoners held without charge in US custody overseas, a

      Guantanamo Bay, Cuba ("Guantanamo") or Bagram Airfield, in Afghanistan

      ("Bagram").

2.    I am the founder and Executive Director of the International Justice Network ("IJN"), a

      not-for-profit organization which helps victims of human rights abuses and their

      communities access legal assistance through a global network of leading human rights

      attorneys, academics, advocates, NGOs, and grassroots organizations.

3.    I am frequently asked to speak about my experiences representing Guantanamo and

      Bagram detainees at various university and community events nationwide. My work has

      been featured in major news outlets in the United States and abroad, including the New

York Times, Wall Street Journal, Washington Post, Harper's Magazine, the New

Republic, Al Jazeera, and others.

4.   In addition to my position as Executive Director of IJN, I also hold a part-time position at

Yale Law School, working with the National Litigation Project (NLP) of the Allard K.

Lowenstein International Human Rights Clinic (Lowenstein Clinic) under the leadership

of Harold Hongju Koh, formerly Assistant Secretary of State for Democracy Human

Rights and Labor, and now Dean of the Law School.  Since September 11, 2001, NLP

attorneys have directly represented or served as amicus counsel on dozens of cases on

behalf of current or former detainees held at Guantanamo and other US military prisons.

My role as Litigation Strategy Coordinator is to leverage NLP's expertise in this area,

and provide strategic advice and financial assistance to other attorneys and advocates

collaborating on similar cases around the country.

5.   From approximately October 2004 through April 2006 I worked as an attorney for the

Center for Constitutional Rights ("CCR"). CCR is a non-profit legal and educational

organization committed to the creative use of law as a positive force for social change.

From April 2005 – April 2006, I was Counsel for CCR's Guantanamo Global Justice

Initiative, where I directly represented, assisted with, and coordinated many of the first

cases filed on behalf of detainees at Guantanamo Bay, Cuba.

6.   Over the years, I have represented a number of detainees held at Guantanamo Bay, Cuba,

and served as either as lead or co-counsel in a number of cases as a result of my work at

CCR.  My name is likely to appear on most petitions filed on behalf of Guantanamo

detainees in which CCR was co-counsel from June 2004 through April 2006, and I assisted CCR's co-counsel to varying degrees on other cases filed subsequently.

7.    Prior to joining CCR, I was an associate in the New York office of the law firm Clifford Chance US LLP, where I practiced civil litigation and criminal defense for three years, immediately following a judicial clerkship at the United States Court of International Trade from September 2000 through August 2001. While at Clifford Chance, I represented *pro bono* three French citizens detained at Guantanamo (all of whom have since been released) in *Benchallali v. Bush.*

8.    I have been practicing law for approximately eight years and am a member in good standing of the bars of the states of New York and Massachusetts, as well as the United States District Court for the Southern District of New York.   I have never been charged with criminal activity or sanctioned for professional misconduct in any jurisdiction.

9.    I was born in Iran, and became a naturalized citizen of the United States in 1986.

10.    On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government is engaged in warrantless electronic surveillance of communications involving me. I am now a Plaintiff in *Wilner et al. v. NSA et al.*

11.    In response to my FOIA request, the NSA and DOJ have refused to confirm or deny whether they have records related to whether the NSA is monitoring my electronic communications.

12. I am frequently contacted by, or make contact with, the family members of individuals who are believed to be detained by the United States military at known and secret prisons run by the US military in Afghanistan, Iraq, and other undisclosed locations. I also have telephone or email conversations with witnesses, experts, and cooperating counsel.

13. I believe that my privileged conversations with these clients' and their families, or with witnesses, experts, cooperating counsel or other litigation participants are likely being surveilled by the NSA without a warrant. I have reason to believe that, on the basis of my representation of dozens of detainees from 2004 onward, the NSA may have targeted me for surveillance and engaged in warrantless surveillance of my electronic communications.

14. I believe that this surveillance has included the monitoring of my office, home, work and mobile telephones, and personal and professional email communications.

15. My organization, the IJN, does not have a physical office. Instead, IJN attorneys and staff utilize cutting-edge internet technology to collaborate with one another in a "virtual office," which is a secure password-protected site hosted on our website at www.ijnetwork.org.

16. Thus, my colleagues and I rely primarily on email, live chat, mobile telephones and blackberries to communicate with each other as well as with clients, co-counsel, investigators, journalists, experts, and witnesses or others who may assist with our work in dozens of countries around the world. The central role of telephone and email communication for my organization means that monitoring of my communications would be particularly destructive for my legal work. It also means that monitoring of my

communications may result in the intentional or unintentional monitoring of the communications of my colleagues or others.

17.   As part of my legal representation of current or former Bagram and Guantanamo detainees, I have been most frequently in touch with individuals and legal or human rights organizations in Afghanistan, Yemen, and Bahrain. I have also routinely been in contact with colleagues in several other countries in Europe, Asia and Africa. I primarily rely upon telephone, email, live chat, Google Talk, Skype, and other online collaboration tools to keep in touch with these colleagues, and use one or more of these media for confidential communications almost every day.

18.   Many clients, witnesses, lawyers and advocates with whom I work on the Guantanamo and Bagram cases face very real threats from repressive governments or criminal groups in their own countries. In addition to cultural differences, as an American citizen it is also a challenge to establish a rapport with individuals who have suffered greatly as a result of actions taken by the US government.

19.   In light of the natural mistrust that potential clients and witnesses must overcome in order to collaborate with US lawyers on these cases, it is even more important that these individuals feel that the information they provide be held in strictest confidence. Indeed, confidentiality is essential in order to ensure not only that witnesses and other key individuals are willing to cooperate, but it is also required in order to ensure the safety of all parties, including the clients' families, lawyers, advocates, and others who courageously come forward to expose human rights abuses and other illegal conduct.

5

20.    I have often had to counsel clients of the possibility that our conversations could be surveilled by agencies of the US government.  As a result, clients and witnesses are reluctant to provide private information and sometimes refuse to be contacted directly at all via telephone or internet.  As a result, I have had to spend a great deal of time and money in order to have in-person meetings with clients, witnesses, experts, investigators, and others because of concerns about the confidentiality of our electronic communications.

21.    The availability of low cost internet technology and mobile telephones globally has made it possible for victims of human rights abuses and their advocates in remote areas to access information and assistance from abroad.  Older methods of communications, such as government postal systems, private mail carriers, and traditional telephone land-lines are still not available to many of my clients, either because they live in an area in which such services do not exist, or because such services are prohibitively expensive.  In short, were it not for our internet-based communication, it would not be possible for me to speak with my many of my clients in Afghanistan and Yemen at all unless we scheduled a face-to-face meeting.

22.    In order to protect privileged attorney-client communications and other confidential information, I have had to physically travel as far as Afghanistan, Yemen, United Arab Emirates, Bahrain, and the United Kingdom for the sole purpose of having in person meetings with key witnesses, client representatives, experts, investigators, and co-counsel.

23.  The threat of government surveillance has caused me and my clients a great deal of concern, time, and expense. It has also severely limited my ability to effectively represent my clients because it is impossible to arrange in-person meetings as often as needed to protect privileged and confidential information.

24.  Since 2004, I have spent hundreds of hours traveling, and incurred tens of thousands of dollars of expenses, in order to attend in-person meetings which would not have been necessary if my clients had it not been for the threat of US government surveillance. All topics discussed are all related to my legal representation and counsel of my client, and all communications with such individuals abroad are for the purpose of providing ethical and legally-sound advice to clients.

25.  I believe that if my telephone and internet communications with people outside the United States were targeted by the NSA program, then my other professional and personal communications were likely also intercepted. In addition to my representation of prisoners, I frequently communicate with individuals all over the world regarding unrelated legal work or scholarship in the same places and using the same media as I do in my representation of prisoners.

26.  For example, I have a large number of friends and family in Iran, where I was born, and we are in frequent contact about entirely personal matters. However, I may use the same mobile telephone when contacting friends and family as I use for contacting human rights lawyers and other contacts all over the Middle East.

27.  The NSA's refusal to confirm or deny whether it has engaged in surveillance of my communications infringes on my ability to function as a zealous advocate. I did not bring

this action as a general challenge to the legality of the warrantless surveillance program, nor to obtain information concerning the sources or methods the government uses under the warrantless surveillance program. At this juncture, I seek only to know the extent to which my own communications, especially my communications with clients or potential witnesses, are, have been, or will in the definite future be subject to warrantless surveillance.

28.   Defendants' refusal to provide any information about surveillance of my personal or professional communications has caused a severe drain on the already scarce financial and human resources that exist to support my *pro bono* representation of these indigent clients. By withholding such information, defendants have effectively immunized the conduct of the very same government officials against whom my clients have filed lawsuits alleging unlawful arrest, illegal detention without charge, and abusive treatment.

29.   I declare under penalty of perjury that the foregoing is true and correct.


Signed this _2nd_ day of May 2008


Tina M. Foster
Executive Director
International Justice Network

8

7

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THOMAS B. WILNER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 07-CIV-3883 |
| ) | (DLC) |
| ) | |
| NATIONAL SECURITY AGENCY and ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF H. CANDACE GORMAN

I, H. Candace Gorman, declare as follows:

1.   I am the principal in the law firm of H. Candace Gorman which is located

in Chicago, Illinois. I have been an attorney for twenty-five years. My firm

concentrates in civil rights and human rights. I graduated from the

University of Wisconsin with a BA in Philosophy in 1976 and from John

Marshall Law School with a JD in January 1983. I am a natural born US

citizen and a member in good standing of the bar of the State of Illinois,

the United States District Court for the Northern District of Illinois, the

Seventh Circuit Court of Appeals, the Circuit Court of Appeals for the

District of Columbia and the United States Supreme Court (where I

argued and won a unanimous decision in *Jones vs. R.R. Donnelley*, 541 U.S.

1

369 (2004) changing the Statute of Limitations in § 1981 cases to four years across the country.)

2. I served on the Board of Directors and as President of the Women's Bar Association of Illinois; the Board of Directors for the Federal Bar Association in the Northern District of Illinois; the Merit Selection Panel for United States Magistrates; and the Task Force Planning Committee for the Illinois Supreme Court's Study of Gender Bias in the Courtroom. I was the Legislative Chair and Commissioner on the Chicago Commission on Women, and am a member of the National Employment Lawyers Association where I sat on the Board of Directors for the Illinois Division from approximately 1992-99. I am also a member of the American Trial Lawyers Association and the American Constitution Society. At present, I am on leave from my firm and am a Visiting Professional at the International Criminal Court at The Hague. I have lectured widely on the subject of human rights and civil rights, including about Guantanamo. I am currently representing two detainees who are being held at Guantanamo Bay. I write about the experience of representing Guantanamo prisoners for various publications both online and in print.

3. On January 18, 2006, I filed a Freedom of Information Act (FOIA) request seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government is engaged

in warrantless electronic surveillance of communications involving me or my law office. I am now a Plaintiff in *Wilner et al. v. NSA et al.*

4.    I currently represent two individuals being held prisoner at Guantanamo Bay, Abdul Hamid Al-Ghizzawi and Abdal Razak Ali. Mr. Al-Ghizzawi is a Libyan man who lived many years in Afghanistan, is married to an Afghani woman and has a young child. Mr. Al-Ghizzawi has been held prisoner at Guantanamo since 2002. I represent Mr. Al-Ghizzawi in a habeas petition filed in the District Court for the District of Columbia in 2005, an aspect of that Petition is now on appeal at the Circuit Court of the District of Columbia. I also represent Mr. Al-Ghizzawi in a petition filed under the Detainee Treatment Act (DTA) in the D.C. Circuit Court of Appeals, pending since 2007. Additionally, I represent Mr. Al-Ghizzawi in an original habeas petition that has been pending in the Supreme Court since July 2007. Mr. Razak Ali, an Algerian who was visiting Pakistan in 2002, when he was taken into U.S. custody, has been held prisoner at Guantanamo since 2002. I have represented him since early 2006 in a habeas petition that was filed in the District Court of the District of Columbia in 2005 an aspect of that Petition is now on appeal in the Circuit Court of the District of Columbia. To date I have been to Guantanamo approximately thirteen times.

5.    Neither of my clients has ever been charged with any crime or caught anywhere near a battlefield. In fact, Mr. Al-Ghizzawi was affirmatively

found to *not be an enemy combatant* when the government in 2004 first

conducted a cursory review of the detention of Guantanamo detainees, a

procedure (called the combat status review tribunal "CSRT") that the

government established in order to avoid the habeas hearings that had

been ordered by the Supreme Court in *Rasul v. Bush* (U.S. 2004).[1]

Extremely ill at Guantanamo, Mr. Al-Ghizzawi was subjected to a *second*

(CSRT) within weeks of being found not to be an enemy combatant, so

that the government could secure an enemy combatant determination and

justify his unwarranted detention. Al-Ghizzawi was never informed of

that second CSRT until I received the documents in 2006 and informed

him during one of our visits.

6.    Despite never having been charged with a crime or tried, my clients – like

all of the other men at Guantanamo – have been labeled "enemy

combatants" and have been declared by high-ranking government

officials, including Vice President Dick Cheney and former Secretary of

Defense Donald Rumsfeld, to be "the worst of the worst" and affiliated

with Al Qaeda or organizations affiliated with Al Qaeda.

7.    As soon as I learned of the NSA surveillance program and of the

government's refusal to state the extent of its surveillance of U.S. citizens,

I became concerned I might be a target because of the nature of my law

---

[1] Lt. Col. Stephen Abraham, a member of Mr. Al-Ghizzawi's first Combatant Status Review Tribunal (CSRT) panel which found him to *not* be an enemy combatant, provided an affidavit to the U.S. Supreme Court describing in detail the paucity of evidence against Mr. Al-Ghizzawi and the failed CSRT process.

practice, and in particular because of my representation of my two Guantanamo clients. In response to my FOIA request, the NSA and DOJ have refused to confirm or deny whether they have records related to monitoring of my electronic communications without judicial review.

8.    Because of official statements about the warrantless surveillance program, and my legal work, including the representation of two Guantanamo prisoners, I have reason to believe the NSA may have intercepted or is intercepting my communications without a warrant. I also have reason to believe that the surveillance might include my law office, home and cellular telephones. I believe I may also be a target of surveillance because I have spoken and written publicly about the gross and unfair litigation techniques and processes utilized by the government to try to maintain the upper hand in the Guantanamo litigation.

9.    In my legal practice, for both domestic and international communications, my primary modes of communication are email, fax and telephone (cell and landlines). I share and have shared space with several other independent attorneys. We share a fax machine and an internet system. These other attorneys have expressed concern about our shared resources especially after it became public knowledge that the current administration has undertaken warrantless surveillance of US citizens.

10.    Because of the international scope of my practice, telephonic and/or electronic communication is preferable and necessary in relation to any

other form of communication. Telephone and email allow a two way dialogue which is not possible with postal mail. Meeting face-to-face is very time consuming and prohibitively expensive to be used for all communication and postal mail is also too slow and does not allow more than two people to participate. Although I have on occasion used postal mail and courier services to try to obtain confidentiality for my communications I learned in a speech by President Bush that he believes those communications can also be intercepted without court order so I no longer rely on those communications as private either. I have visited and/or attempted to visit many of the individuals in international countries that I communicate with in order to avoid the limitations of telephonic or written communications, but travel to some of these countries is particularly difficult due to the high cost of travel and security or access situations in those countries.

11.     The international communications related to my Guantanamo representation include, but are not limited to, family members of my Guantanamo clients, witnesses or potential witnesses, foreign government officials, attorneys, non governmental organizations, translators and investigators, media outlets, and others relevant to my practice. I also engage in international communications related to other clients and for personal matters. The countries I have communicated with include, but are not limited to, Germany, Spain, Libya, Great Britain, Afghanistan,

Denmark, Pakistan, Netherlands, Switzerland, Algeria, France and Italy. The regularity of these communications varies depending on the issues at the time.

12. In my legal practice, it is an essential for me to communicate with foreign nationals in various countries in order to adequately and vigorously represent my clients and the legal issues I am pursuing. This communication is necessary in order to investigate facts, learn information that may help my clients, pursue investigative leads, develop legal strategy, keep litigation participants apprised of case developments, and engage with the foreign media. It is vital that the people I talk to understand our communications are confidential so I can gain their trust.

13. In addition to international communications related to my representation of my two Guantanamo clients, I am currently engaged in international communications for my work in the area of victim's participation and reparations with the International Criminal Court. The nature of my communications while in this position is extremely sensitive and involves several African nations. I also communicate internationally for personal matters.

14. The U.S. government has introduced numerous barriers to the effective representation of my clients at Guantanamo. Before being allowed to visit or communicate with my clients through the legal mail system, I had to obtain government security clearance – a process which took months

during which time my neighbors, colleagues, former classmates and unknown others were contacted by the US government regarding my character and fitness. When I obtained my clearance in early 2006, the government fought to keep me from communicating or visiting with my clients by not agreeing to the entry of the requisite Protective Order allowing attorneys to travel to the military base and communicate through the legal mail system. Even after entry of the Protective Order, my clients often do not receive legal mail that I have sent them.[2]

15.     I was finally allowed to visit Mr. Al-Ghizzawi in July 2006. Despite the fact that I had also obtained a court order to visit my second client, Mr. Razak Ali, during that same visit, I was prevented from seeing Mr. Ali and I was forced to obtain a second court order later that summer. During that July 2006 visit I was told by an official at the base that "judges' orders don't work here, we consider those only *advisory.*" During that same first visit to the base, one of my military escorts referred in conversation to personal information about my family that I had not disclosed to him leaving me to wonder what kind of file the military had on me and who was privy to the information. Since the highly contentious hearing with the government regarding my inability to visit with Mr. Razak Ali in July 2006 despite having a court order I have been subjected to extraordinary

---

[2] For several months in the summer and fall of 2007, Mr. Al-Ghizzawi received no letters from me, even though I sent more than six letters. Mr. Al-Ghizzawi sent me desperate letters wondering if I had decided not to represent him any further and begging me to help him find another attorney if indeed I was no longer representing him.

procedures while visiting the base including, but not limited to, being separated from the other habeas counsel and individually escorted at the base, most times by a JAG officer. I was finally allowed to visit with my second client Mr. Razak Ali in November 2006.

16.     There was a definite change in my legal practice after it became clear that the US government felt free to eavesdrop on anyone it felt was a "threat," with neither a transparent process nor a court order. I remain very concerned that possible past or future surveillance of my communications in the course of representing Mr. Al-Ghizzawi and Mr. Razak Ali may interfere with my legal representation of these and other clients. NSA's possible surveillance of my communications, and its refusal to confirm or deny whether it is engaged in such surveillance, makes it impossible for me to ensure my communications with clients, potential witnesses, and others are confidential. This substantially interferes with my ability to zealously represent my clients. If it is learned that these communications are not confidential, I will never gain or retain the trust of those with whom I communicate.

17.     By refusing to confirm or deny whether it has intercepted or is intercepting my communications, the NSA is interfering with my ability to represent my clients in accordance with my practice and the most basic ethical duties of the legal profession. This possible intrusion compromises the privacy interests of all of my clients – not only Guantánamo detainees.

It also violates the privacy interests of potential witnesses and others with whom I communicate as part of my practice. Warrantless surveillance of my telephone calls, e-mails, faxes, and text messages also violates my own privacy during personal communications.

18.    Once it became clear to me that the government may be intercepting my communications, I stopped taking on new cases because I could no longer ensure that communications with my clients and others were confidential. I also felt like I was putting the attorneys who practiced in the same physical location as me at risk. As much as possible, I stopped discussing confidential issues on the telephone or in emails and, for a time, I tried to maintain as many communications as I could through written materials. However I could not stop all international calls and emails because such drastic measures would make my practice a nullity.

19.    Several clients and attorneys, who knew I was representing Guantanamo detainees, asked me point blank if I thought our communications were confidential based on public knowledge of government surveillance. I could only answer honestly and tell those individuals that I had no idea whether or not I was being surveilled.  I do not know if individuals ceased communicating with me, or limited the quantity or substance of their communications, because of fear that the federal government might be eavesdropping on our communications. There were many jokes and innuendo and there were fewer referrals.

20.    I eventually decided not to renew my lease at my office. I ultimately

decided to seek an appointment at the International Court because I was

concerned about upholding my ethical and fiduciary duties to clients

when their confidential communications might be intercepted. I was also

concerned about negatively affecting other lawyers with whom I shared

space.

21.    I became a plaintiff in this action because I need to know as an attorney

whether or not my communications with clients and others in my practice

are in fact confidential. If my communications are not confidential then I

cannot practice law until I can figure out a way to make those

communications confidential. It really is as simple as that.

22.    I have practiced law for twenty-five years. I am from a family of attorneys

and I am proud to be an attorney.  The system of law that I have proudly

been a part of honors those principles that include the right to

communicate with our clients in a confidential manner. When I call a

client or a witness or other individual related to a case on the telephone I

need for them to know that they can talk to me openly and freely. When I

send an email, I need to know that the email is a private communication

and my work product is protected.  I need to know that individuals can

trust me and trust that what they say to me will go no farther than our

personal exchange. I no longer have that trust; I no longer even have the

ability to earn that trust. I have not stopped representing my Guantanamo

clients but at the same time I could not subject unwitting individuals to the possible surveillance of the US government, so I stopped taking other cases in 2007. I sought and received my current position with the International Court to give myself some distance from what I deem to be illegal practices of the US government. I am attempting to figure out how I can honor my ethical obligations as an attorney at a time when I am uncertain about whether or not my communications are being surveilled. It is a very troubling situation.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 5th day of May 2008

H. Candace Gorman
Law office of H. Candace Gorman

**8**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS B. WILNER, et al.,

    Plaintiffs,

        v.

NATIONAL SECURITY AGENCY and
DEPARTMENT OF JUSTICE,

    Defendants.

Civil Action No. 07-CIV-3883
(DLC)

DECLARATION OF RICHARD A. GRIGG

I, Richard Grigg, declare as follows:

1.     I am an attorney with the law firm of Spivey & Grigg. I primarily do personal injury trial work and am board certified in Personal Injury Trial and Civil Trial. I have been licensed since 1973. I have been president of the International Academy of Trial Lawyers, am presently president of the Texas Chapter of the American Board of Trial Lawyers, and am on the Board of Directors of the Texas Trial Lawyers Association. I am a United States citizen.

2.     I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ) on January 18, 2006, seeking information regarding the NSA warrantless surveillance program, including whether the federal government is intercepting communications involving me or my law office. I am now a Plaintiff in *Wilner et al. v. NSA et al.*

1

3.  It is my understanding that in response to my FOIA request, the NSA and DOJ have refused to confirm or deny whether they have records related to whether the NSA is monitoring my electronic communications.

4.  I am concerned that I may be subject to surveillance under the warrantless surveillance program because, since May of 2005, I have represented three detainees at Guantanamo Naval Base. Because of public statements by members of the Bush administration, I am concerned the NSA is monitoring or has monitored my communications without a warrant. I have reason to believe that, on the basis of my representation of former Guantánamo detainees, Mohammad Akhtiar and Naseer, and my current representation of detainee Obaydullah, the NSA may have targeted me for surveillance and engaged in warrantless surveillance of my electronic communications.

5.  I believe the surveillance might include my law office, my cellular telephone, my laptop computer, and my home phone. Monitoring communications to and from my office may also result in monitoring the communications of other lawyers in my firm and lawyers in other firms who use my phone number and fax number.

6.  My current and former detainee clients – Mohammad Akhtiar, Naseer, and Obaydullah – are all Afghan citizens. I represented Mohammad Akhtiar in a habeas corpus case challenging the legality of his detention; I represented Naseer in a habeas case and a petition filed pursuant to the Detainee Treatment Act; and I presently represent Obaydullah in a petition filed pursuant to the Detainee Treatment Act. Mr. Obaydullah is still detained at Guantánamo and my other two clients were detained for years at the naval base.

2

7.   My three clients are considered enemy combatants by the government. By labeling them enemy combatants, the government is asserting that it essentially considers my clients terrorists. Despite having never been charged or tried, all three of my clients are alleged to be members of the Taliban or other organizations that the government has classified as terrorist organizations.

8.   I received a Secret level security clearance from the FBI in order to visit my clients in Guantánamo.

9.   In my representation of my detainee clients, I have used emails, faxes, and the telephone. I have communicated with clients, their families, with national and international human rights groups, and with other counsel representing detainees.

10.  My work requires me to communicate internationally with clients, clients' families, foreign lawyers, and human rights groups in Afghanistan. I have communicated on matters concerning my clients with the media in England and Poland, as well as media in the United States.

11.  I have had communications with non-citizens overseas concerning the factual basis upon which the government relies in detaining my clients. I have discussed legal strategy and confidential client matters. These communications have been in furtherance of my representation of my clients detained at Guantánamo. These communications began in 2005 and continue to the present.

12.  I also communicate internationally for personal matters and for other non-related clients. It is essential for me to be able communicate confidentially with my clients and others in order to effectively represent my clients.

3

13.  I need to be able to communicate by telephone or e-mail in order to have a two way conversation that includes questions and answers and discussion in order to obtain information, pursue investigation, and develop the case and my litigation strategy. Email and telephone are the most efficient, and sometimes the only way for me to communicate with people in other countries. Postal mail is slow and does not permit a back and forth conversation or multiple participants. Meeting in person is time consuming, significantly more expensive, often simply not possible.

14.  I am concerned that the possible interception and monitoring of my international communications is interfering with my ability to properly and effectively represent my clients as well as to comply with my ethical duties to maintain my clients' confidences and preserve the sanctity of my work product. The interception and monitoring of my communications also would compromise the privacy interests of all of my clients, as well as violate the privacy interests of potential witnesses and others with whom I need to communicate as part of my practice.

15.  My clients and their families have been and are concerned that the federal government might be eavesdropping on the communications. Furthermore, other attorneys in my office have expressed concerns that their communications may be monitored.

16.  The NSA's refusal to confirm or deny whether it has intercepted and monitored my communications compromises my ability to zealously represent my clients and harms my law practice.

4

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 2ND day of May 2008.

Richard A. Grigg
Bar # 08487500
SPIVEY & GRIGG, L.L.P.
48 East Avenue
Austin, Texas 78701
Tel: (512) 474-6061
Fax: (512) 474-1605

5