# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS B. WILNER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. 07-CIV-3883 (DLC) |
| | ) |
| NATIONAL SECURITY AGENCY and | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### APPENDIX TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT REGARDING THE *GLOMAR* RESPONSE

Kathryn A. Sabbeth (KS 9014)
David C. Vladeck (DV 4836)
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Avenue, NW, Suite 312
Washington, D.C. 20001
(202) 662-9546

*Of Counsel**

Shayana Kadidal (SK-1278)
Emilou MacLean
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6438
Email: skadidal@ccrjustice.org

James R. Rubin
Julie P. Shelton
Karen Borg
Mark A. Schwartz
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street
Suite 1800
Chicago, IL 60602
(312) 242-4112
Email: jshelton@butlerrubin.com

*Attorneys for Plaintiffs*

Dated: May 6, 2008
New York, New York

---

* Counsel gratefully acknowledge the significant contributions of Louise McGauley Betts, a third-year law student at Georgetown University Law Center.

# APPENDIX

**Tab No.**

Declaration of Scott Barker ........................................................................................................1

Declaration of Charles H. Carpenter.........................................................................................2

Declaration of John A. Chandler ...............................................................................................3

Declaration of Joshua Colangelo-Bryan ...................................................................................4

Declaration of J. Wells Dixon....................................................................................................5

Declaration of Tina Monshipour Foster.....................................................................................6

Declaration of H. Candace Gorman ...........................................................................................7

Declaration of Richard A. Grigg................................................................................................8

Declaration of Gitanjali S. Gutierrez ........................................................................................9

Declaration of Jonathan Hafetz................................................................................................10

Declaration of David J. Luban.................................................................................................11

Declaration of Joseph Margulies .............................................................................................12

Declaration of George Brent Mickum IV ................................................................................12

Declaration of Brian J. Neff....................................................................................................14

Declaration of Clive A. Stafford Smith ...................................................................................15

Declaration of Michael J. Sternhell .........................................................................................16

Declaration of Stephen M. Truitt ............................................................................................17

Declaration of Thomas B. Wilner............................................................................................18

W0067343v1

**9**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THOMAS B. WILNER, et al.,        ) | |
| )| |
| Plaintiffs,           ) | |
| )| |
| v.                ) | Civil Action No. 07-CIV-3883 (DLC) |
| )| |
| NATIONAL SECURITY AGENCY and   ) | |
| DEPARTMENT OF JUSTICE,       ) | |
| )| |
| Defendants.          ) | |

**DECLARATION OF GITANJALI S. GUTIERREZ**

I, Gitanjali S. Gutierrez, declare as follows:

1. I am a citizen of the United States and an attorney at the Center for Constitutional Rights (CCR), 666 Broadway, New York, NY, 10012. Upon graduating magna cum laude from Cornell Law School, I clerked for the Honorable Guido Calabresi of the United States Court of Appeals for the Second Circuit and then taught international human rights law at Cornell University Law School. I have been engaged in constitutional, human rights and civil rights practice since 2003, first in my capacity as a Gibbons Fellow in Public Interest and Constitutional Law and now as an attorney at CCR.

2. CCR was founded in 1966 by civil rights attorneys, and has grown as a reputable non-profit legal and educational organization that works to protect people's constitutional and human rights. Over the last four decades, CCR has been involved in virtually every popular social movement in the United States, and has brought over one hundred major human rights and civil liberties cases into United States courts.

1

3.  Over the years, CCR has been recognized for its progressive use of law. It has received honorary awards from the City University of New York Public Interest Law Association (1999), the New York University Public Interest Law Foundation (1996 and 2004), the National Lawyers Guild (1999), the International Law Section of the District of Colombia Bar (2004), the Benjamin N. Cardozo School of Law (2004) and the City University of New York University School of Law (2007).

4.  Since 9/11, CCR has been at the forefront of work to defend victims of abuses committed in the name of the "war on terror." For these efforts CCR has received various honors and awards. CCR received the *Lennon Ono Grant For Peace* in 2006, particularly for its 2004 Supreme Court victory in *Rasul v. Bush*, which established that detainees held at Guantánamo Bay were entitled to the right of habeas corpus. In 2006, CCR was awarded the *Raphael Lemkin Human Rights Award* by the Rabbis for Human Rights, as well as Global Exchange's *Domestic Human Rights Award* in recognition of CCR's central position in the movement to hold the United States government legally accountable for torture and human rights violations post-9/11 in Guantánamo and elsewhere. Also in 2006, the Institute for Policy Studies awarded CCR with the *Letelier-Moffitt Human Rights Award*, honoring CCR for our work in *Arar v. Ashcroft,* in which CCR demanded justice for a victim of the U.S. policy known as "extraordinary rendition." In 2007, the Southern Center for Human Rights presented CCR with the *Frederick Douglass Human Rights Award,* for CCR's outstanding contribution to human rights.

5.  CCR serves as co-counsel in habeas or Detainee Treatment Act (DTA) petitions on behalf of several hundred men who are detained or who have been detained at Guantanamo.

6.  I am listed as counsel for many of these cases. I have been directly involved with client meetings for over forty men from over ten different countries. In addition, I have assisted with obtaining next friend authorizations and with maintaining family communications with foreign citizens in numerous additional cases.

7.  After the United States Supreme Court's decision in *Rasul v. Bush*, in June 2004, I was the first habeas attorney to conduct an attorney client meeting at Guantanamo. I have been involved with the direct representation of Guantanamo detainees beginning in July 2004 when I filed a habeas petition on behalf of U.K. citizens Feroz Abassi and Moazzam Begg.

8.  I continue to represent citizens from Saudi Arabia, Libya, Pakistan, Qatar, Syria, and Somalia currently detained at Guantanamo in their habeas and/or DTA petitions in the United States District Court for the District of Columbia, the United States Court of Appeals for the District of Columbia and the United States Supreme Court. My colleagues and I also represent one of the seventeen men who were transferred to Guantanamo from CIA secret detention, Majid Khan, who is a Baltimore area resident, U.S. asylum-holder and citizen of Pakistan.

9.  I have made over twenty trips to Guantanamo for client meetings, with each trip lasting an average of two weeks.

10. On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government is engaged in warrantless electronic surveillance of communications involving me or my law office, CCR. Alongside 23 other attorneys

3

who represent current or former Guantánamo detainees, I am now a Plaintiff in *Wilner et al. v. NSA et al.*

11.  Despite the detailed information that I provided in my FOIA request concerning the obstacles to my representation created by the NSA's potential monitoring of my communications, the NSA and DOJ provided a "Glomar" response and refuse to confirm or deny whether they have records related to whether the NSA is monitoring my electronic communications.

12.  Under the President's warrantless surveillance program, the Executive asserts that the federal government may target for surveillance not only suspected terrorists but also any person in the United States communicating with any person outside the United States if the government believes that one party to the communication is affiliated with a terrorist organization.  I understand that, under this program, government agencies have been engaged in, and may in the future engage in, surveillance through listening to telephone calls, reading e-mails and faxes, and otherwise monitoring and recording electronic communications.

13.  While I understood that the federal government was engaged in the surveillance of some international communications prior to the initiation of the warrantless surveillance program, I also knew that there were important limitations to the extent of that communication that I believe would have likely prevented the government from monitoring my communications.  Safeguards – including judicial review and judicially-supervised minimization requirements preventing the monitoring and recording of privileged communications – protected against the interception of privileged attorney-

client communications in surveillance governed by the Foreign Intelligence Surveillance Act (FISA).

14. It is my understanding that similar restrictions do not, have not and will not govern the surveillance of my international communications with clients, family members, and other litigation participants in the course of my litigation under the warrantless surveillance program. Indeed, the Executive has made official assertions that attorney-client communications are not categorically excluded from the scope of the program. See *Responses to Joint Questions from House Judiciary Committee Minority Members* (Mar. 24, 2006) at 15, ¶45, *available at* http://judiciary.house.gov/media/pdfs/responses032 406.pdf. As an attorney, I find this shocking.

15. After learning that the NSA was engaged in monitoring of international communications involving U.S. citizens and reviewing the official description of the program's targets, I became concerned about the possibility of the NSA monitoring or having monitored my communications without a warrant because of my communications with my clients' families and potential foreign witnesses, experts or sources.

16. I believe that, based on the description of the program and the untried assertions that U.S. officials have made about my clients, there is a great likelihood that some of my communications for the purpose of litigation may have been, or may in the future be, monitored without judicial review. High-ranking officials in the U.S. government have repeatedly asserted that the men imprisoned at Guantánamo are "enemy combatants" or "terrorists." Government officials have insisted publicly that many detained there are affiliated with Al Qaeda, or organizations affiliated with Al Qaeda. Though only a very small minority has been charged, and little evidence has been released to substantiate

these assertions, the U.S. government has alleged that the majority of the men detained at Guantánamo in 2004 were affiliated with Al Qaeda and/or the Taliban. Mark Denbeaux & Joshua Denbeaux, *Report on Guantanamo Detainees: A Profile of 517 Detainees through Analysis of Department of Defense Data*, Seton Hall Public Law Research Paper No. 46, February 2006.

17.    More specifically, the President and various Department of Defense personnel have made official statements to the media claiming that some of my clients are affiliated with or supportive of al Qaeda, despite the fact that none of my clients at Guantanamo has been tried by the United States for any crime.

18.    I have reason to believe that, on the basis of my representation of individuals such as British citizen Feroz Abassi, Uzbek citizen Zakirjan Hassam, Saudi citizen Mohammed al Qahtani, Pakistani citizen – and former CIA "ghost" detainee – Majid Khan, Libyan citizen Abdul Ra'ouf Ammar Mohammad Abu Al Qassim, and other Guantanamo detainees, the NSA may have targeted me for surveillance and engaged in warrantless surveillance of my electronic communications.

19.    Since July 2004, I have been engaged in confidential and privileged international communications with my clients' families and other individuals related to their cases. I continue to engage in international communications for my current clients detained in Guantanamo.

20.    Because my clients' families and other investigative sources and experts are in countries halfway across the globe, I engage in a variety of international communications at all hours, throughout the day or weekend. As a result, in the course of my representation of men currently or formerly detained in Guantanamo, I communicate internationally via my

work and personal emails (including using my Blackberry and home and work laptop computers), work phone, home landline, personal cell phone, including for text messages, and CCR fax machine.

21. I communicate with foreign national clients (primarily family-member next friends in the habeas or Detainee Treatment Act (DTA) petitions); foreign experts or investigators; foreign co-counsel; and foreign witnesses and potential witnesses or other sources of litigation information. Since July 2004, I have had regular international communications on at least a weekly basis with these litigation participants primarily from the United Kingdom, Saudi Arabia, Pakistan, Switzerland, Yemen and Afghanistan. I have also on occasion engaged in international telephonic or email communications with litigation participants in Kuwait, Qatar and Albania.

22. It is critical for me to communicate with foreign nationals in various countries for the purposes of my litigation in order to adequately and vigorously represent my clients. I rely upon these communications to discuss the development of the cases, pursue investigative leads, develop case strategies, learn information that may be of assistance to my client, and keep clients apprised of the legal strategy and case developments, among other things.  The confidentiality of this communication is important in order to effectively represent my clients, and to gain the trust of those with whom I communicate. My clients and clients' families in politically-repressive foreign countries often have a deep-seeded fear of government entities.  I must be able to ensure them that the United States will not use their communications with me, as their attorney, against them or their detained relative.  Absent this assurance, it is extremely difficult to persuade them to disclose fully critical information.

23.  The delay in communication when I am forced to rely on postal mail or in-person meetings can sometimes be damaging to the litigation.  There are other practical limitations to effective representation when I am forced to rely on other forms of communication aside from telephonic and email communication, including the inability to communicate simultaneously with multiple people in different locations.  It is also significantly more expensive – sometimes prohibitively so – to engage in international communications without resort to phone or email because of the cost of courier service and airfare to Pakistan, Yemen, Albania or other countries in the Middle East.  The Saudi government has also repeatedly denied our request for a visa to travel to Saudi Arabia to meet with a client's family and conduct an investigation.  In that case, for example, we must rely exclusively upon international communications to develop our Saudi client's case.

24.  More specifically, for almost a year, we were unable to obtain critical factual information about Majid Khan's detention from his brother in Pakistan – who had first-hand knowledge of Majid Khan's kidnapping and initial detention – because we could not assure ourselves or our client's family of confidential telephonic or email communications.  Ultimately, I had to travel to Pakistan in 2007 to conduct a full witness interview.

25.  In addition, for several clients' families, including Mr. Khan's family, I have only been able to conduct limited interviews via telephone because of my concern that I could not guarantee the potential witnesses confidential communications.  I was required to withhold sensitive questions and send these inquiries via written mail and wait weeks for the responses.  This process precluded my ability to ask clarifying or follow-up questions

8

in a timely manner and was extremely burdensome. This resulted in delays for filings as we waited for the information to arrive via mail.

26. I also had to explain to my clients the risk that our telephonic or email communications might be monitored by the U.S. government. These conversations undermined my ability to investigate my clients' cases and work with litigation participants in foreign countries.

27. In the case of another client, Mr. Mohammed al Qahtani, we are only able to communicate with his family via telephonic or written communications because the Saudi government has refused to grant CCR attorneys visas. It took several months for us to arrange for his family in several different Saudi cities to use CCR's account with an international courier as a means of providing us with confidential information in writing. In addition to the delay while we made these arrangements, this form of communication is slow and burdensome. We are unable to engage in the back and forth conversation critical to developing factual information.

28. The NSA's possible warrantless surveillance of my communications would not only interfere with my representation of Guantanamo detainees, but also such surveillance would compromise the privacy interests of all of my clients. This would also violate the privacy interests of potential witnesses and others with whom I need to communicate as part of my practice. Needless to say, warrantless surveillance of my telephone calls, e-mails, faxes, and text messages would also violate my privacy during personal communications.

29. NSA surveillance of my faxes would also violate the privacy interests of all attorneys in my office and those with whom they communicate. I note that at CCR, we have one fax line that serves the entire office. Any surveillance of this machine would necessarily

include surveillance of all CCR staff's international fax communications. As a human rights organization, the majority of our staff – from development personnel to litigators to communications staff – engage in communications that may include international facsimiles.

30. My business communications are solely for the furtherance of my legitimate representation of my clients, which includes upholding the Constitution of the United States. I have never been charged with criminal activity or sanctioned for professional misconduct.

31. Since the initial detention of my clients in Guantanamo, the government has imposed numerous barriers to my effective and vigorous representation of them. This regular interference makes it clear to me that monitoring the attorney-client communication in connection with this litigation would be consistent with the government's past policies and practices.

32. The U.S. government has interfered with Guantánamo representation in various ways since the litigation began. Although the protective order entered by the district court required the government not to unreasonably interfere with attorney access to clients, the government has routinely attempted to intimidate detainees and persuade them not to work with lawyers. In multiple instances, military personnel have told detainees they should not work with their lawyers because the lawyers were Jewish or homosexual.

33. Early on in the representation, the government invoked national security concerns in an unsuccessful attempt to justify conducting real-time monitoring of attorney-client meetings at Guantanamo.

34. Detainees have routinely been told they are being taken to interrogations when in fact they are being moved for attorney visits; the detainee's resistance to being moved is then conveyed to his lawyer as a refusal of the legal visit.

35. Detainees have been held in solitary confinement for up to 11 days prior to a legal visit in Camp Echo (where many attorney-client visits took place); one detainee reported that he was told the stay in isolation was "the lawyer's fault" and could have been avoided had no legal visit been scheduled.

36. The government has frequently challenged next-friend authorizations by prisoners, in one case delaying for many months a visit with a detainee who had been cleared for release, and in another case delaying visit approval for eight months, shortly after which the detainee (who had also been cleared for release) died.

37. The government's refusal to allow attorneys to communicate with detainees directly to offer them representation (without the intervention of next friends) has required attorneys to engage in international communications subject to surveillance under the NSA program or to undertake burdensome travel to the detainees' home countries. Twice attorneys have been detained by home country security police during such travel.

38. Communications with detainees have also been interfered with. Written materials that attorneys wish to (and are entitled to) bring into client meetings are routinely read by military officials, going well beyond the rules allowing security personnel to rifle through them for contraband. On some occasions, soon after a legal visit, the military has interrogated detainees about the precise issues that were the subject of privileged conversations with their lawyers, leading us to suspect that our client visits themselves were somehow monitored.

39. Like all counsel who have represented clients at Guantanamo, I was required to complete a security clearance application, provide affidavits concerning the source of my funding for the representation and consent to "counsel access procedures" that the district court later found violated, in part, the detainees' right to confidential and meaningful attorney-client communications.

40. For one of my most recent clients, former CIA ghost detainee Majid Khan, we sought client access for over a year in his habeas petition. Though I began my representation of him in September 2006, it was not until October 2007—over one full year after our representation began—that I was able to meet Mr. Khan for the first time.

41. Even then, I was required to obtain a higher level of clearance – "Top Secret / Sensitive Compartmentalized Information" (TS/SCI) – and sign an even more restrictive Protective Order, the legality of which has not yet been litigated, in order to secure access to him. The justifications advanced by the government for this particularly restrictive access included that there needed to be added protections to prevent the disclosure of the kinds of "enhanced interrogation techniques" to which my client was subjected in CIA detention.

42. All of this is demonstrative of the government's consistently-manifested intent to subvert the attorney-client relationship in these cases.

43. I did not bring this action as a general challenge to the legality of the warrantless surveillance program, nor to obtain information concerning the sources or methods the government uses under the warrantless surveillance program. I seek only to know the extent to which my own communications, especially my communications with clients or potential witnesses, are, have been, or will in the definite future be subject to warrantless

surveillance. My ability to effectively serve my clients as their attorney requires me to seek assurances that my privileged communications are not being monitored and to provide my clients with guarantees that their communications with me and my work in furtherance of their representation are confidential.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ⟶ day of May 2008

GITANJALI S. GUTIERREZ (Bar No. GG0122)
Attorney
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012

13

# 10

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS B. WILNER, et al.,

    Plaintiffs,

        v.

NATIONAL SECURITY AGENCY and
DEPARTMENT OF JUSTICE,

    Defendants.

Civil Action No. 07-CIV-3883 (DLC)

## DECLARATION OF JONATHAN HAFETZ

I, Jonathan Hafetz, declare as follows:

1.    I am currently the Litigation Director for the Liberty and National Security Project of the Brennan Center for Justice at NYU School of Law. I am admitted to practice in New York, and have practiced law for seven years. During that time, I have litigated numerous high-profile cases involving civil liberties in the federal courts, including the U.S. Supreme Court. I have represented individuals detained as "enemy combatants" in the United States, at Guantánamo, and in Iraq. I am a United States citizen.

2.    On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government is engaged in warrantless electronic surveillance of communications involving me or my law office.

3.    I understand that in response to my FOIA request, the NSA and DOJ have refused to confirm or deny whether they have records related to whether the NSA is monitoring my electronic communications. I am a Plaintiff in *Wilner et al. v. NSA et al.*

4.    I represent Jarallah al-Marri who has been detained by the United States government in Guantánamo Bay, Cuba, since January 2002. I have represented Jarallah al-Marri since 2004 when we filed a habeas corpus petition on his behalf in the U.S. District Court for the District of Columbia, which is still pending. I have visited Jarallah al-Marri three times at Guantánamo.

5.    I also represent Ali Saleh Kahlah al-Marri who has been detained by the United States as the U.S. Navy Brig near Charleston, South Carolina since June 2003. I currently represent Ali al-Marri in his habeas corpus action challenging his detention as an "enemy combatant" (which is pending in the U.S. Court of Appeals for the Fourth Circuit) as well as in a separate action challenging his unlawful conditions of confinement and abuse at the Navy brig (which is pending in the U.S. District Court of the District of South Carolina). I have visited Ali al-Marri approximately eight times, and, since the Spring of 2006, have spoken to him approximately once every two weeks by telephone.

6.    In addition, I represent two U.S. citizens, Mohammed Munaf and Shawqi Omar, who are challenging their detention by the United States in Iraq. We filed habeas petitions on their behalf in the U.S. District Court for the District of Columbia, and their cases are now pending in the U.S. Supreme Court. I have not visited either Mr. Munaf or Mr. Omar.

2

7.  In the course of my work, I communicate by telephone and email with my clients' family members, other attorneys, non-government organizations, and potential witnesses located overseas. I also communicate regularly by telephone with a client who is detained as an "enemy combatant" in the mainland United States. Because of official assertions about the confines of the warrantless surveillance program, as well as the nature of my international communications and the identities of those with whom I communicate, I am concerned about the possibility of the NSA monitoring or having monitored my communications without a warrant. I have reason to believe that, on the basis of my representation of Ali Saleh Kahlah al-Marri, Jarallah al-Marri, and Mohammed Munaf and Shawqi Omar, the NSA may have targeted me for surveillance and engaged in warrantless surveillance of my electronic communications.

8.  In the course of my work I communicate through a variety of forms of electronic media, including telephone (both office and cellular), email, and facsimile. Thus, the aforementioned surveillance might include my law office, cellular telephone, laptop computer, home computer, and PDA device.

9.  I use these media with foreign national clients, witnesses or potential witnesses, co-counsel, non-government organizations, investigators, media outlets, and experts. I communicate internationally most frequently by telephone and email. The countries I most frequently communicate with internationally are Qatar, Saudi Arabia, and Iraq.

10. For me to properly represent my clients, I have to communicate with foreign nationals in various countries. These communications are essential to conduct investigations, gather facts, and develop legal strategy. It is imperative that my communications be

3

confidential in order to protect my work product, preserve the attorney client privilege
that belongs to my clients and to gain the trust of the people with whom I speak.

11.  Communicating by telephone and email is crucial because it enables me to ask questions
and receive real-time answers. Unlike letters, telephone and email conversations are two-
way communications that permit me to counsel my clients and as well as pursue vigorous
investigation. Using postal mail causes delay that can be detrimental to my clients and
my ability to represent them properly. It is also significantly more expensive –
sometimes prohibitively so – to communicate internationally without using the telephone
or email because of the cost of courier service and airfare to other countries.

12.  Because of the clients I represent, I fear I am a surveillance target. High-ranking officials
in the U.S. government have repeatedly asserted that my clients are "enemy combatants"
and "terrorists." In particular, the President himself has accused Ali al-Marri of being an
"al Qaeda sleeper agent," and directly ordered his detention as an "enemy combatant,"
without charge or trial. The government has also accused Jarallah al-Marri of affiliation
with al Qaeda and the Taliban and detained him for more than six years as an "enemy
combatant," also without charge or trial. In addition, the government has declared
Mohammed Munaf and Shawqi Omar as security threats and further alleged that Mr.
Omar is an "enemy combatant" and is associated with the terrorist Abu Musab al
Zarqawi.

13.  In connection with my representation of the aforementioned clients, I have communicated
with potential witnesses, with other lawyers and with my clients' family members

4

overseas, including in Qatar, Saudi Arabia, and Iraq. I also have communicated directly with one of those clients (Ali al-Marri) regularly by telephone.

14.    The U.S. government has interfered with Guantánamo and related representations in various ways since the litigation began. The government has never agreed that any of my clients have a right of access to counsel, let alone a right of unfettered access to counsel. On the contrary, they initially detained my clients *incommunicado* and denied them access to counsel. In light of my work in various cases involving suspected terrorists held as "enemy combatants," including several high profile cases, I fear that the government is conducting surveillance of my telephone calls and electronic communications.

15.    One incident has given me particular cause for concern. On June 2, 2006, I had a legal telephone call with Ali al-Marri at the Navy brig near Charleston, where he is detained. I had previously had two telephone calls with Mr. al-Marri during the preceding several weeks. The clear understanding was that these attorney-client communications were not subject to any form of monitoring. Yet, during that June 2 telephone call, Mr. al-Marri informed me that, before the call, the head of the shift at the Navy brig had told him that he had to speak English on the call. When Mr. al-Marri asked him why it mattered what language he spoke since this was a legal call, the head of the shift responded that this was what he had been told by general command. Fearing that my attorney-client communications were being monitored, I subsequently contacted the government counsel on the case by letter and explained my concerns. I demanded that the government respond in writing whether any of my attorney-client calls were being monitored or

subject to any other form of surveillance by the government, including by the military or National Security Agency. On my next visit to the Brig to visit Mr. al-Marri, the commanding officer of the Navy brig informed me in person that the Brig was not recording my calls. To date, however, the government has failed to respond to my letter or to otherwise confirm or deny whether or not the National Security Agency or other government entity is monitoring or surveilling my calls. While I continue to speak to Mr. al-Marri by telephone, I do not discuss certain matters because I am concerned the call is being monitored.

16.    NSA surveillance of my communication with my clients and others interferes with my ability to represent my clients properly. NSA's refusal to confirm or deny whether it is engaged in such surveillance makes it impossible for me to ensure the confidentiality of my communications with clients, potential witnesses, and others. As a result, I cannot participate freely in candid conversations with possible witnesses and other knowledgeable persons, or conduct factual research. As noted, it has also chilled the content of my telephone communications with my client Ali al-Marri. By communicating openly, I risk revealing client confidences as well as disclosing my protected attorney work product. Consequently, it is extremely difficult to gather the information I need to advise my clients, communicate about litigation strategy and present a full set of facts to the courts adjudicating my clients' claims. My ability to advocate on my clients' behalf and to maintain their confidences is fundamental to my obligation to represent them zealously. By refusing to confirm or deny whether it is

engaged in warrantless surveillance of my communications, the NSA is interfering with

my ability to represent my clients in compliance with my ethical duties as an attorney.

17.    NSA surveillance would compromise the privacy interests of all of my clients–not only

Guantánamo detainees but also unrelated clients. It would also violate the privacy

interests of others with whom I need to communicate as part of my practice.  NSA

interception of my telephone calls, e-mails, faxes, and text messages would also violate

my privacy during personal communications.

I declare under penalty of perjury that the foregoing is true and correct.


Signed this 5th day of May 2008

Jonathan Hafetz
Litigation Director, Liberty & National Security Project
Brennan Center for Justice at NYU School of Law


7

# 11

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THOMAS B. WILNER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-CIV-3883 |
| | ) | (DLC) |
| | ) | |
| NATIONAL SECURITY AGENCY and | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF DAVID J. LUBAN

I, David J. Luban, declare as follows:

1.    I am a professor of law at Georgetown University Law Center. My scholarly
interests include both legal ethics and, in recent years, various issues connected
with the global war on terrorism. I have written extensively on issues of ethics
and professional responsibility, including the books *Lawyers and Justice: An
Ethical Study* (Princeton University Press, 1988); *Legal Ethics and Human
Dignity* (Cambridge University Press, 2007); the casebook *Legal Ethics* (co-
author Deborah L. Rhode, Foundation Press, now going into its fifth edition);
several edited collections; and numerous articles. I have served as Chair of the
Association of American Law Schools Section on Professional Responsibility,
and have won awards including the New York State Bar Association's Sanford D.
Levy Prize for ethics scholarship and the American Bar Foundation's Keck
Award for distinguished scholarship on legal ethics and professional

responsibility. For the past four years, I have served as a member of the D.C. Bar's ethics committee.

2.    I have recently authored an article entitled "Lawfare and Legal Ethics in Guantanamo," which is being published in the *Stanford Law Review*.[1] In researching the article, I interviewed several lawyers representing Guantanamo detainees. These included civilian habeas lawyers, military (JAG Corps) lawyers detailed to represent detainees before military commissions, and one civilian lawyer representing a detainee before a military commission. I believe that some of my interview subjects are attaching their own declarations. I have attempted in this declaration to summarize the most salient points of my article.

3.    My research has indicated a persistent pattern of conduct on the part of government officials and interrogators that interferes with the attorney-client relationships between Guantanamo detainees and their counsel. This includes efforts to impede access of lawyers to their clients and to sow mistrust between lawyers and clients. Several of my interview subjects described these as efforts to drive a wedge between clients and their lawyers.

4.    One example of official hostility to lawyers representing detainees in habeas matters is a well-known matter of public record: a radio interview of then-Deputy Assistant Secretary of Defense for Detainee Affairs Charles "Cully" Stimson, given on Federal News Radio on January 11, 2007. Mr. Stimson stated:

> As a result of a FOIA request through a major news organization, somebody asked, "Who are the lawyers around this country representing detainees down

---

[1] *Lawfare and Legal Ethics in Guantánamo*, 60 Stan. L. Rev. 6 (forthcoming), *available at* http://www.law.georgetown.edu/internationalhrcolloquium/documents/Luban-Guantanamopaper.doc.

there?" And you know what, it's shocking. The major law firms in this country--
Pillsbury Winthrop, Jenner & Block, Wilmer Cutler Pickering, Covington &
Burling here in D.C., Sutherland Asbill & Brennan, Paul Weiss Rifkin, Mayer
Brown, Weil Gottshal, Pepper Hamilton, Venable, Alston & Bird, Perkins Coie,
Hunton & Williams, Fulbright Jaworski, all the rest of them--are out there
representing detainees, and I think, quite honestly, when corporate CEOs see that
those firms are representing the very terrorists who hit their bottom line back in
2001, those CEOs are going to make those law firms choose between representing
terrorists or representing reputable firms, and I think that is going to have major
play in the next few weeks. It's going to be fun to watch that play out.[1]

Although Mr. Stimson's comments were quickly disavowed by the Department of

Defense, his position Deputy Assistant Secretary of Defense for Detainee Affairs

is indicative of government dislike of the presence of pro bono habeas lawyers

representing detainees.

5.    Methods of undercutting access of lawyers to their clients reported to me include

guards telling detainees that they have a "reservation" (a term for interrogation) at

the time of their scheduled interview with their lawyer.  When the detainee

expresses a desire not to go to his reservation, his lawyer is told that the client

does not wish to meet with the lawyer.  Although these situations can get

straightened out eventually, scarce interview time is lost.

6.    In addition, attorneys reported that their clients have been punished or threatened

for meeting with their lawyers.  Attorney J. Wells Dixon reports that a client with

---

[1] Interview by Jane Norris with Charles Stimson, in Washington, D.C. (Jan. 11, 2007),
available at http://www.federalnewsradio.com/index.php?sid=1029698&nid=250. A
transcript of the relevant portions of the interview may be found on the internet.
Transcript of interview by Amy Goodman with Stephen Oleskey, Partner at WilmerHale,
and Emily Spieler, Dean of Northeastern University School of Law (Jan. 17, 2007),
*available at*
http://www.democracynow.org/2007/1/17/top_pentagon_official_calls_for_boycott.

whom he had a 9 a.m. appointment was brought to the cell where the meeting was to take place at 3 a.m., and left shackled in a chair, unable to go to the bathroom, for the intervening six hours. Clients have been left in isolation in the cell where the meeting took place for days after. Attorney Thomas Wilner has reported (in a written declaration in the *Al Odah* case[2]) that his client was told that if he met with his lawyer he would never get out of Guantanamo.

7.    Efforts to sow mistrust between lawyers and clients include restrictions on what lawyers are allowed to say to their clients and comfort items they are entitled to bring to clients to build rapport. Air Force LTC Yvonne Bradley, detailed defense counsel to Binyam Mohamed, stated: "There was no cultural reason why Binyam didn't trust me. He's lived in the West. But I had a harder time getting him to trust me than I ever had with other clients, including inmates on death row. Even the death row inmates can check you out to see who you are. But at Guantánamo, he has no resources to check anything out. The detainees are completely sealed off from information sources in the outside world."

8.    Because interrogators have posed as attorneys, it is difficult for counsel to persuade their clients that they are truly independent of the government. Two habeas lawyers reported that their clients believe (or at least suspect) that they are either CIA or FBI agents.

9.    Interrogators have also attempted to drive attorneys and clients apart by telling detainees that their lawyers are Jews or, in one case reported to me, that the lawyer is homosexual (which happened to be untrue). Such comments are clearly meant to disparage the attorneys in the eyes of conservative Muslim clients. This

---

[2] *Al Odah v. United States*, 346 F. Supp. 2d 1, 8-9 (D.D.C. 2004).

4

tactic was reported by two lawyers, Thomas Wilner (in his *Al Odah* declaration) and Clive Stafford-Smith (in his interview with me as well as in his book *Eight O'Clock Ferry to the Windward Side*). Mr. Wilner reported that interrogators told his client, "Your lawyers are Jews. How could you trust Jews? Throughout history, Jews have betrayed Muslims. Don't you think your lawyers, who are Jews, will betray you?" as well as other equally inflammatory remarks about Jews.

10.    Interrogators also told his client that Mr. Wilner's law firm, Shearman & Sterling, represents the State of Israel. The firm had in fact represented the State of Israel once, in a minor trade matter, fifteen years earlier. Because information about Shearman & Sterling's past client list is not readily available on the internet, it seems likely that this information was conveyed from outside Guantanamo, and thus that the tactic of "disparaging" lawyers in their clients' eyes was not simply an improvisation by interrogators.

11.    In addition to conduct designed to impede lawyers' access to their clients and to sow mistrust between lawyers and clients, on at least two occasions Guantanamo defense lawyers have been placed in ethical difficulties by their adversaries' conduct.

12.    The first occurred when LTC Bradley concluded that the Office of Military Counsel-Defense (OMC-D) was structured in a way that placed her in a disabling conflict of interest. Lawyers in OMC-D represented several detainees with conflicting interests. Specifically, these detainees had identified other detainees as terrorists, or in cahoots with terrorists; but they also alleged that they had been

abusively interrogated (in some cases by foreign police forces that used torture).
Each had an interest in discrediting others' accusations as the product of coercion;
but each had an interest in preserving the credibility of his own statements, which
might lead to a favorable plea bargain or immunity agreement. OMC-D required
defense counsel to share office space, a budget, and a single commanding officer
who was in privilege with all defense counsel.

13.   LTC Bradley complained that it was impossible to avoid overhearing confidential
information from clients with adverse interests in this setting. While military
ethics rules do not impute conflicts of interest to all lawyers in a single defenders'
office, the military ethics rules do not permit lawyers to represent clients where
the representation is afflicted with an actual (rather than merely potential) conflict
of interest.

14.   At an initial hearing for her client Binyam Mohamed, LTC Bradley (then a major)
stated that she could not proceed with the representation of Mr. Mohamed
because of the conflict of interest. She was given a direct order by the military
judge (a colonel) to proceed. Caught between the rock of disobeying a direct
order from a superior officer and the hard place of violating her licensing
jurisdictions' professional responsibility rules, LTC Bradley felt herself
compelled to take the Fifth Amendment. Because the Supreme Court's *Hamdan*
decision temporarily halted the military commissions, the issue was never
resolved.

15.   A second incident of military defenders being placed in an ethical dilemma by
government actions concerned Marine Maj. Michael Mori, detailed defense

6

counsel for David Hicks. In the course of investigating the Hicks case in Australia (David Hicks' home country), Maj. Mori gave several speeches harshly criticizing the fairness of the military commissions. Highly publicized statements by senior U.S. government officials opining that Guantanamo detainees are dangerous, vicious killers, along with public statements by the prosecution, made it imperative that prejudicial views of their client be counteracted, and both civilian and military professional responsibility rules permit lawyers to make public statements defending against prejudicial public statements against their clients.

16.    Col. Morris Davis, then the head prosecutor of the military commissions, suggested publicly that Maj. Mori might be court-martialed for making disrespectful comments about the civilian leadership of the United States, in violation of UCMJ Article 88. Col. Davis's threat would have created a conflict of interest for Maj. Mori, and indeed for any military lawyer in his situation. Lawyers may not engage in a representation in which their own personal interests interfere with the zealous pursuit of their clients' interests. In this case, his personal interest in avoiding prosecution would pressure him to refrain from statements that any civilian attorney would have been free to make in the course of representing Mr. Hicks. (The Hicks case ended in a plea bargain before this issue could be resolved.)

17.    LTC Bradley reported to me that other military counsel she has spoken with stated that Col. Davis's threat has had a chilling effect on their own dealings with the press.

7

18.    Professor Jack Goldsmith, formerly the head of the Justice Department's Office of

Legal Counsel, has written in his memoir *The Terror Presidency* that many

government officials (including himself) believe in the so-called "lawfare" theory,

according to which litigation tactics on behalf of detainees are really a way to use

law as a weapon against the United States.[3]  In the words of the 2005 National

Defense Strategy of the United States, "Our strength as a nation state will

continue to be challenged by those who employ a strategy of the weak using

international fora, judicial processes, and terrorism" – equating the use of judicial

processes with terrorism as a "strategy of the weak."  To officials who believe in

the lawfare theory, efforts to hamper adversary lawyers in representing their

detainee clients might appear to be justified.  In particular, creating ethical

quandaries for defense lawyers might well seem like a legitimate tactic to those

who equate litigation with lawfare.

19.    It is a well-known matter of public record that the government has engaged in a

warrantless electronic surveillance program and that attorneys may have been or

may in the future be subject to surveillance under the program.  According to *The

New York Times*, "The Justice Department does not deny that the government has

monitored phone calls and e-mail exchanges between lawyers and their clients . . .

."[4]  I understand that in this case the government has refused to confirm or deny

conducting such surveillance of the plaintiffs' communications.

---

[3]  Jack Goldsmith, THE TERROR PRESIDENCY:  LAW AND JUDGMENT INSIDE THE BUSH
ADMINISTRATION 58-63 (2007).
[4]  Philip Shenon, *Lawyers Fear Monitoring in Cases on Terrorism*, N.Y. TIMES, Apr. 28,
2008, at A14.

20.   As lawyers, the plaintiffs are reasonable to be concerned that, if they discuss

confidential or privileged information in their electronic communications, they

may be divulging privileged and confidential information to the government. To

reveal client confidences to the adversary in this manner would clearly violate an

attorney's professional duties. Prudent and ethical lawyers who suspect that

confidential conversations with their clients are being monitored by their

adversaries would take great care to steer away from sensitive subjects. In this

way, attorneys' fear of surveillance significantly hampers their ability to gather

evidence and explore legal theories. By leaving open the possibility of

warrantless surveillance of the plaintiffs' communications, the government forces

them into an ethical quandary pitting competence and zealous advocacy against

confidentiality. This chills their ability to serve their function as advocates in

accordance with the most basic principles of the profession.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _3rd_ day of May 2008

David J. Luban

**12**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS B. WILNER, et al., ) ) Plaintiffs, ) ) v. ) ) NATIONAL SECURITY AGENCY and ) DEPARTMENT OF JUSTICE, ) ) Defendants. ) ) | Civil Action No. 07-CIV-3883 (DLC) |

## DECLARATION OF JOSEPH MARGULIES

I, Joseph Margulies, declare as follows:

1.    I am an attorney with the Roderick MacArthur Justice Center and an Associate Clinical

Professor at Northwestern University Law School in Chicago.  I received my J.D., *cum*

*laude*, from Northwestern in 1988.  I previously worked with the Texas Capital Resource

Center and engaged in the private practice of law, specializing in civil rights and capital

defense.  In 2002, I was the Distinguished Practitioner in Residence at Cornell University

Law School, and in 2004 joined the MacArthur Center.  I am a U.S. citizen.

2.    I was Counsel of Record in *Rasul v. Bush* (U.S. 2004), involving detentions at the

Guantánamo Bay Naval Station (consolidated with *Al Odah v. United States*), and in

*Geren v. Omar & Munaf v. Geren* (U.S. 2008), involving detentions at Camp Cropper in

Iraq.  I continue to be involved in coordinating the litigation nationwide challenging

various aspects of the Bush Administration's post-9/11 detention policy.  In June 2005, at

the invitation of Pennsylvania Republican Senator Arlen Specter, I testified at the first

Senate Judiciary Committee hearing on detainee issues.  I am the author of *Guantánamo*

*and the Abuse of Presidential Power* (Simon and Schuster 2006), named one of the best books of 2006 by *The Economist* magazine; recipient of the Silver Gavel Award of 2007, given annually by the American Bar Association to the book that best promotes "the American public's understanding of the law and the legal system"; and recipient of the Scribes Book Award of 2007, given annually by the American Society of Legal Writers to honor "the best work of legal scholarship published during the previous year." My commentaries on civil liberties in the wake of September 11 have appeared in numerous publications, including the *Washington Post*, the *Los Angeles Times*, the *Chicago Tribune*, the *Miami Herald*, the *Virginia Quarterly Review*, and the *Legal Times*.

3. I am a Plaintiff in *Wilner et al. v. NSA et al.*, after having filed, through counsel, a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government is or has engaged in warrantless electronic surveillance of my communications.

4. Because of official assertions about the confines of the warrantless surveillance program, as well as the nature of my international communications and the identities of those with whom I communicate, I am concerned about the possibility that my communications have been or will be monitored by the NSA without a warrant. I have reason to believe that, on the basis of my current and past representation of men detained by the U.S. government at Guantánamo, in secret CIA prisons, and at a U.S. military base in Iraq, the NSA may have targeted, or may in the future target, me for surveillance without judicial review.

5.    I understand that, under the NSA's warrantless surveillance program, government agencies have been engaged in, and may in the future engage in, several types of surveillance.

6.    In my practice, I have international communications by electronic mail, telephone and facsimile.  I also receive text messages from at least one of my overseas non-citizen clients, a former Guantánamo prisoner.  My international communications are through either the university at which I am employed or my home.  My business communications are solely for the legitimate representation of my clients.

7.    I communicate overseas with foreign national clients, witnesses or potential witnesses, co-counsel, investigators, media outlets, experts, and others relevant to my practice.  For the purposes of litigation, I have engaged in communications with individuals around the world, including in Australia, Iraq, and the United Kingdom.  At present and in the future, I expect I will engage in further international communications for the purposes of litigation, including potentially to individuals in the countries listed above, as well as in Morocco, Pakistan, the Palestinian Occupied Territories, Saudi Arabia, Poland, Afghanistan, and Thailand.

8.    My representation requires that I communicate with foreign nationals overseas.  These communications are necessary, *inter alia*, to discuss the progress of the litigation, pursue investigative leads, develop a legal strategy, learn information that may be of assistance to my client, and keep my clients apprised of the legal strategy.  It is often essential that these communications be confidential.  Confidentiality is both integral to effective

representation, and a necessary precondition to gaining the trust of those with whom I communicate.

9.    I need to be able to communicate by telephone or e-mail in order to ask questions and receive real-time responses. This allows me to obtain information that is or may be helpful to my cases and ensures mutual understanding of the communication. Unlike letters, telephone and email allow the ready back-and-forth inherent in an attorney-client relationship as well as the inquiry fundamental to thorough investigation. The delay in communication caused by relying on postal mail or in-person meetings is detrimental to the litigation. There are other practical limitations to using communication other than the telephone and email, including the inability to communicate simultaneously with multiple people in different locations and use a real-time translator. It is also significantly more expensive – sometimes prohibitively so – to communicate internationally without resort to phone or email because of the cost of courier services and airfare to certain countries. And of course, travel to some of these countries is invariably expensive, and often fraught with personal risk.

10.   I represent or have represented certain clients who I believe may have been or could be targeted for surveillance under the NSA warrantless surveillance program. Among others, I have represented former Guantánamo prisoner Mamdouh Habib; former CIA "ghost" prisoner Abu Zubaydah; and U.S. citizen prisoners, Shawqi Omar and Mohammad Munaf, who are detained at a U.S. military base in Iraq.

11.   Since May 2002, I have represented Mamdouh Habib, an Australian who was imprisoned at Guantánamo Bay between June 2002 and January 28, 2005. Mr. Habib was one of the

4
4

first prisoners at Guantánamo to have legal representation.  At the request of his wife, Maha Habib, I was authorized to represent Mr. Habib and filed a *habeas corpus* petition challenging the legality of his detention June 10, 2002.[1]

12.    I applied for and was granted a Secret Level security clearance in 2004 prior to my first meeting with Mr. Habib at Guantánamo in November 2004.  For the purposes of my representation of Mr. Habib, I traveled to Guantánamo Bay, Cuba and Australia and used electronic mail, telephone and facsimile to communicate with foreign national litigation participants, including family members, foreign counsel, and members of the media regarding various aspects of my representation of Mr. Habib including, *inter alia*, the circumstances of his arrest in Pakistan, the identity of the agents who arrested and rendered him to Egypt, and his treatment in U.S., Pakistani, and Egyptian custody.  Since Mr. Habib's release from Guantánamo, I continue to communicate with him by electronic mail, telephone, facsimile and text messaging.

13.    I currently represent Zayn al-Abidin Muhammad Husayn, or Abu Zubaydah, imprisoned at Guantánamo Bay, Cuba since on or about September 6, 2006 when he was publicly reported to have been transferred from a secret CIA prison outside of the United States.[2] Publicly available information indicates that Abu Zubaydah is a Saudi of Palestinian descent.  Abu Zubaydah has been imprisoned in U.S. custody for more than six years without charge or trial.  He was reportedly captured on March 28, 2002 in Pakistan and transferred to the network of secret CIA prisons, including allegedly in Thailand and

---

[1] Petition for Writ of Habeas Corpus and Request for Adequate Process, *Habib v. Bush, later consolidated as Rasul v. Bush,* 542 U.S. 466 (2004) (No. 02-01130).

[2] Everything included in this declaration regarding Abu Zubaydah is publicly available information.

Morocco. On February 5, 2008, CIA Director Michael Hayden acknowledged that Abu Zubaydah was subjected to aggressive interrogation techniques including, *inter alia*, controlled drowning, sometimes called waterboarding, while in CIA custody.[3]

14.    I began my representation of Abu Zubaydah late last year. I have filed a petition under the Detainee Treatment Act (DTA) challenging Abu Zubaydah's "enemy combatant" designation and the legality of his continued detention.[4] Prior to meeting Abu Zubaydah, I was required to obtain the highest level of security clearance – Top Secret / Sensitive Compartmented Information (TS/SCI) – which I obtained earlier this year. I have now met with him at Guantánamo Bay, Cuba for several days, with the first meeting taking place in February 2008. For the purposes of my representation of Abu Zubaydah, I have begun to have communications with non-citizens outside of the United States and anticipate that these communications will accelerate as the case proceeds.

15.    In the course of my representation of Abu Zubaydah, I expect it is likely that I will communicate with people who could be targeted by the NSA warrantless surveillance program, placing my privileged international communications at risk of surveillance without judicial review. Indeed, in order to represent my client zealously, as required by my ethical obligations as a member of the Bar, there are countless people with whom I

---

[3] The New York Times reported that videotapes were created of Abu Zubaydah's interrogation and subsequently destroyed. *See* Mark Mazzetti, *C.I.A. Destroyed Tapes of Interrogations*, New York Times, Dec. 6, 2007, *at* http://www.nytimes.com/2007/12/06/washington/06cnd-intel.html?_r=1&ref=washington&oref=slogin. During the trial of Zacarias Moussaoui, Judge Leonie Brinkema explicitly asked about the existence of videotapes of Abu Zubaydah's interrogation and was told that there was no information about the existence of these videotapes. The Department of Justice provided conflicting information, acknowledging the existence of taped interrogations of CIA "ghost" prisoners, only after the conviction and sentencing of Mr. Moussaoui. *See* Letter from Chuck Rosenberg, U.S. Attorney, to the Honorable Karen J. Williams and the Honorable Leonie Brinkema, (Oct. 25, 2007), *at* http://graphics8.nytimes.com/packages/pdf/world/20071207_intel_letter.pdf.

[4] Petition for Review Case, *Husayn v. Gates,* (D.C. Cir. Dec. 17, 2007) (No. 07-1520).

would want or need to communicate, many of whom are foreign nationals living abroad. Based on the descriptions of the NSA warrantless surveillance program, and the government's untried allegations against my client, I take it for granted that many of these communications have a likelihood of being monitored under the program.

16.    I represent Shawqi Omar and Mohammad Munaf, U.S. citizens detained by the United States at the U.S. military base at Camp Cropper in Baghdad for approximately three years each. Mr. Omar was seized in October 2004 in Iraq and has been held since then in various U.S. detention facilities in Iraq, including Abu Ghraib. Mr. Munaf was arrested in May 2005 in Iraq and has been held since then at Camp Cropper.

17.    My representation of Mr. Omar and Mr. Munaf has in the past and is likely in the future to entail international communications with non-citizens, some of whom may fit within the ambit of those purportedly targeted by the NSA's warrantless surveillance program.

18.    The past and potential future existence of the warrantless surveillance program; the likelihood that my communications have been, are being, or could in the future be monitored; and the unwillingness of the U.S. government to confirm or deny whether my own communications, or more generally the communications between U.S. citizen attorneys and their clients or other litigation participants, are subject to surveillance without judicial review, diminishes my capacity to represent my clients. It makes it more difficult for me to investigate the allegations against my clients. For some communications, I expect that those with whom I am speaking would be brought to the attention of the U.S. government merely through their communication with me – an unwanted and illegitimate intrusion merely because they communicated with me their

knowledge of my clients. In some cases, I may be forced to state early in my communications that there is a risk or likelihood that the U.S. is monitoring our communication, which may chill the free exchange of information and make it more likely that the other person will either refuse to communicate with me at all, or refuse to be open with me about the information that they know that might be critical to my representation. I might also need to delay communication to avoid certain telephonic and electronic mail communications in favor of in-person communications even though that is exponentially more costly in terms of time and money, and sometimes may be impossible because of access difficulties.

19.    I did not bring this action as a general challenge to the legality of the warrantless surveillance program, nor to obtain information concerning the sources or methods the government uses under the warrantless surveillance program. At this juncture, I seek only to know the extent to which my own communications, especially my communications with clients or potential witnesses, are, have been, or will in the definite future be subject to warrantless surveillance.


I declare under penalty of perjury that the foregoing is true and correct.


Signed this 5th day of May 2008

Joseph Margulies

8
8

**13**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS B. WILNER, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>NATIONAL SECURITY AGENCY and )<br>DEPARTMENT OF JUSTICE, )<br><br>Defendants. ) | Civil Action No. 07-CIV-3883 (DLC) |

**DECLARATION OF GEORGE BRENT MICKUM IV**

I, George Brent Mickum IV, declare as follows:

1.      I am a citizen of the United States of America and a partner in the law firm of Spriggs &

Hollingsworth, LLP, 1350 I Street, N.W., Washington D.C.  I am licensed to practice law

in the District of Columbia and the Commonwealth of Virginia.  I have been a litigator

for approximately twenty-five years.  I severed as Master in the Federal American Inn of

Court (1998 to 2007).  I have lectured at Carnegie-Mellon University and the University

of Wisconsin at Madison.  I have conducted seminars at Catholic University, George

Washington Law School, and Seton Hall University School of Law.  I have served as an

instructor in the National Institute of Trial Advocacy's Trial Advocacy and Deposition

Training Programs from 1998 to the present.  I have provided testimony before the

British Parliament's All-Party Parliamentary Group, London, England, March 28, 2006;

the International Commission of Jurists, American University, Washington, D.C., July 2,

2006; and the European Parliament, London England, October 4, 2006.  I am a recipient

of the National Legal Aid & Defender Association's 2007 Beacon of Justice Award and The Southern Center for Human Rights' 2007 Frederick Douglass Human Rights Award.

2.  On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government is engaged in warrantless electronic surveillance of communications involving me or my law office. I am a plaintiff in *Wilner et al. v. NSA et al.*

3.  Based upon official assertions about the parameters of the warrantless surveillance program, as well as the nature of my international communications and the identities of those with whom I communicate, I am concerned that the NSA is monitoring or has monitored my communications without a warrant. I have reason to believe that, on the basis of my representation of Bisher al-Rawi, Jamil el-Banna, and Martin Mubanga, all of whom are former Guantánamo detainees who were released without charge and living in the United Kingdom, the NSA likely targeted me for surveillance and engaged in warrantless surveillance of my electronic communications. Because I also represent Zayn al-Abidin Muhammad Husayn, who is more commonly known in this country as "abu Zubaydah," I believe that I am targeted by NSA for surveillance and that NSA has engaged in warrantless surveillance of my electronic communications.

4.  Based on the information available to me I believe the NSA's surveillance includes my law office telephone, home telephone, cellular telephone, laptop computer, and Blackberry.

5.    In my work I use e-mail, faxes, and telephone to contact foreign governmental officials, foreign nationals, NGOs, witnesses or potential witnesses, co-counsel, investigators, media outlets, and potential experts. I also communicate internationally for personal matters. I primarily use e-mail and the telephone to conduct these communications.

6.    During my representation of my previous clients, it was essential for me to communicate with foreign nationals in various countries to represent my clients. Those communications were necessary to develop defenses to the government's charges, pursue investigative leads, develop legal strategies, obtain information that would be of assistance to my client, and keep my clients apprised of the legal strategy and case developments, among other things.

7.    During my representation of my present client, abu Zubaydah, it will be even more important for me to be able to communicate with foreign nationals in various countries for the purposes of my litigation to adequately and vigorously represent my client who was, according to numerous public sources, tortured extensively by the CIA. These communications are necessary to develop defenses to the government's false charges, pursue investigative leads, develop legal strategies, obtain information that would be of assistance to my client, identify witnesses and keep my client advised of the legal strategy and case developments, among other things. The confidentiality of these communications is vital to my ability to represent my client effectively, and to maintain the trust of those with whom I communicate.

8.    By and large, in representing my clients, it generally is most productive and efficient for me to communicate by telephone or e-mail because I can ask questions, receive responses

3

and follow up with more questions. If necessary, a translator can participate in a telephone or email exchange. Having a dialogue in real time helps to develop the attorney-client relationship and a level of familiarity that promotes trust, whether with a client or a witness. Using postal mail is too slow and one-sided. It is not possible to meet face-to-face for every communication. It also is significantly more expensive to communicate internationally without using the telephone or email because of the cost of courier service and airfare to Great Britain, Spain, Afghanistan, Saudi Arabia, Pakistan, Morocco, and Thailand. For countries like Saudi Arabia, Afghanistan, and Pakistan, the political climate may make it impossible to travel to interview clients.

9.     As part of my representation of my clients, I routinely communicate with other attorneys in this office and at other law firms. In my previous representation, I was required to work closely with many firms, including, but not limited to the law firm of Shearman & Sterling. I expect to be working with other law firms on this case. Accordingly, monitoring my electronic messages did involve and continues to involve other attorneys and law firms.

10.    I have never been charged with criminal activity or sanctioned for professional misconduct. My business communications are solely for the furtherance of the legitimate representation of my clients.

11.    I represent abu Zubaydah, a Palestinian, who is presently incarcerated by the United States government in Guantánamo Bay, Cuba. He has been in U.S. custody since March 28, 2002. Much of that time was spent in the custody of the CIA in secret detention, or "black sites" around the world. Beginning in 2004, I represented Bisher al- Rawi, an

4

Iraqi, Jamil el-Banna, a Palestinian, and Martin Mubanga, a British resident. Each was detained in 2002. Mubanga was released in February of 2005; al-Rawi was released in March 2007; el-Banna was released in December 2007. I have represented al-Rawi, el-Banna, and Mubanga before the United States District Court for the District of Columbia, the United States Court of Appeals for the D.C. Circuit, and the Supreme Court of the United States. Presently, I represent abu Zubaydah before the D.C. Circuit in a petition pursuant to the Detainee Treatment Act. To represent my clients, I was required to submit to security clearance procedures that included an extensive background check. My present security clearance is Top Secret-Sensitive Compartmented Information (TS-SCI), the highest level of security clearance and that which is required for my representation of former CIA "ghost" detainee abu Zubaydah.

12.   I was the second habeas attorney allowed to travel to the naval base at Guantanamo Bay in August 2004 following the Supreme Court's opinion in *Rasul v. U.S*, 542 U.S. 466 (2004). I have traveled there frequently over the years, most recently from April 3 through April 8, 2008.

13.   Given the U.S. government's position and the apparent extent of its warrantless surveillance, I believe that Guantánamo lawyers, in general, have been and will continue to be targets of government surveillance under the program because of their representation of clients who are purportedly considered to be affiliated with al Qaeda or organizations affiliated with al Qaeda.

14.   Beginning in 2004 and continuing through December 2007, I began collecting evidence in my cases. Among other things, my clients were accused of associating with known al

5

Qaeda operatives, receiving terrorist training in Bosnia and Afghanistan, keeping

explosives in the basements of their homes, and surveilling Jewish organizations in New

York for possible terrorist attacks. My work required me to make frequent international

calls and send e-mails to collect information about my clients and to prepare defenses

against the charges. As part of my representation I spoke frequently with information

sources in the United Kingdom, Spain, and elsewhere. I also spoke with British attorneys

who represented alleged al Qaeda operatives abroad. Based on these conversations and

the subject matter of those conversations, I believe I was a target of surveillance under

the program because of my involvement in the Guantánamo litigation.

15.    In December 2007, I began my representation of abu Zubaydah whom the government

falsely alleges was a very highly placed member of al Qaeda. The government also

falsely alleges that my client was responsible for providing information under torture that

resulted in the capture of the alleged mastermind of the 9/11 tragedy, Khalid Sheikh

Mohammad. No charges have been levied against my client to date. To defend my

client, it will be necessary to talk with witnesses around the world in locations like

Afghanistan, Pakistan, Saudi Arabia, Morocco, Thailand, Jordan, the United Kingdom,

Belgium, and Switzerland. It will be necessary to speak with government officials,

attorneys, and individuals whom the government may contend are associated with

terrorist groups in order to defend against charges placed against my client. It also may

be necessary to talk with attorneys, investigators, and witnesses regarding other prisoners

at Guantanamo whom my client is alleged to have implicated under torture. It will be

necessary to talk to the family members and relatives of abu Zubaydah, and with non-

governmental and quasi governmental organizations around the world. All these communications are at risk of being targeted under the warrantless surveillance program.

16.    In addition to my representation of my Guantánamo clients, I also engage in other litigation, including in product liability litigation. That work requires me to engage in international communication with the United Kingdom, Switzerland, Belgium, and Canada.

17.    The U.S. government has interfered with my Guantánamo representations in various ways since the litigation began. The government has seized material from my clients that was protected by the attorney-client privilege and the work product doctrine. The government has systematically tortured all of my clients in derogation of U.S. and international laws and treaties. The federal government has taken the position that Guantánamo detainees are not entitled to access to counsel, and has taken steps to interfere with detainees' communications with counsel. In connection with my representation of abu Zubaydah, the CIA tortured my client extensively and has publicly admitted to this, including by admitting that he was subjected to controlled drowning, sometimes called "waterboarding." The government has refused to deliver my mail to my client in a timely fashion and has refused to provide my client's mail to me in a timely fashion. The FBI conducted interviews with my client without counsel present. The CIA has attempted to intimidate me for revealing publicly available information that refutes the government's false allegations about my client and threatened other attorneys representing former CIA "ghost" detainees, intimating that those attorneys had disclosed information to me in violation of the protective order. Because of the high profile nature

7

of my client, and the fact that the government tortured him and admitted to destroying

videotaped evidence of his torture, I have a firmly held belief that the government already

has or may have targeted me for surveillance.

18.    I am concerned that the possible past or future interception of my communication with

my clients or others with whom I communicate in furtherance of my representation of

abu Zubaydah may interfere with my legal representation. NSA's possible surveillance

of my communications, and its refusal to confirm or deny whether it is engaged in such

surveillance, makes it impossible for me to protect the confidentiality of my

communications with clients, potential witnesses, and others. This significantly limits

my ability to participate in candid conversations, engage in factual research, explore legal

theories, and to otherwise represent my clients' interests. I am particularly concerned

that my conversations with other attorneys who represent high value detainees will be

intercepted by the government. I also believe that some witnesses who possess

information that is relevant to my client's defense are reluctant to speak with me for fear

that the communication may be intercepted. Because engaging in such communications

necessarily risks revealing client confidences and my own legal theories and strategies, I

cannot freely gather all the information I need to advise my clients, or advocate zealously

on their behalf, or present all the facts and legal options to the courts adjudicating their

claims. My ethical and fiduciary obligations include zealous advocacy, maintenance of

client confidences, and protection of my work product. By refusing to confirm or deny

whether it is engaged in warrantless surveillance of my communications, the NSA is

making it difficult if not impossible for me to represent my clients in accordance with the most basic ethical duties of the legal profession.

19.    Government surveillance of my communications without a warrant would compromise the privacy interests of all of my clients–including corporate and other clients wholly unrelated to Guantánamo or the warrantless surveillance program.  This would also violate the privacy interests of potential witnesses and others with whom I communicate as part of my practice unrelated to Guantanamo. As part of my representation of past and present clients, witnesses and other officials have been reluctant to speak with me over the telephone or by e-mail for fear of improper surveillance.

20.     Warrantless surveillance of my telephone calls, e-mails, faxes, and text messages would also violate my privacy during personal communications.

21.    It is important that I be allowed to represent my client and talk freely with witnesses around the world.  Government surveillance of my communications impedes my ability to represent a client who is falsely accused and wrongfully tortured.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 29th day of April 2008

_____
George Brent Mickum IV
Partner
Spriggs & Hollingsworth LLP

9