# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS B. WILNER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )      Civil Action No. 07-CIV-3883 (DLC) |
| | ) |
| NATIONAL SECURITY AGENCY and | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## APPENDIX TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT REGARDING THE *GLOMAR* RESPONSE

Kathryn A. Sabbeth (KS 9014)
David C. Vladeck (DV 4836)
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Avenue, NW, Suite 312
Washington, D.C. 20001
(202) 662-9546

*Of Counsel*[*]

Shayana Kadidal (SK-1278)
Emilou MacLean
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6438
Email:  skadidal@ccrjustice.org

James R. Rubin
Julie P. Shelton
Karen Borg
Mark A. Schwartz
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street
Suite 1800
Chicago, IL 60602
(312) 242-4112
Email:  jshelton@butlerrubin.com

*Attorneys for Plaintiffs*

Dated:  May 6, 2008
New York, New York

---

[*] Counsel gratefully acknowledge the significant contributions of Louise McGauley Betts, a third-year law student at Georgetown University Law Center.

## APPENDIX

**Tab No.**

Declaration of Scott Barker ...................................................................................................1

Declaration of Charles H. Carpenter.........................................................................................2

Declaration of John A. Chandler ..............................................................................................3

Declaration of Joshua Colangelo-Bryan ...................................................................................4

Declaration of J. Wells Dixon...................................................................................................5

Declaration of Tina Monshipour Foster.....................................................................................6

Declaration of H. Candace Gorman ..........................................................................................7

Declaration of Richard A. Grigg...............................................................................................8

Declaration of Gitanjali S. Gutierrez ........................................................................................9

Declaration of Jonathan Hafetz...............................................................................................10

Declaration of David J. Luban ................................................................................................11

Declaration of Joseph Margulies .............................................................................................12

Declaration of George Brent Mickum IV .................................................................................12

Declaration of Brian J. Neff....................................................................................................14

Declaration of Clive A. Stafford Smith ....................................................................................15

Declaration of Michael J. Sternhell ..........................................................................................16

Declaration of Stephen M. Truitt.............................................................................................17

Declaration of Thomas B. Wilner.............................................................................................18

W0067343v1

**14**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS B. WILNER, et al., )
)
Plaintiffs, )
)
v. )  Civil Action No. 07-CIV-3883 (DLC)
)
NATIONAL SECURITY AGENCY and )
DEPARTMENT OF JUSTICE, )
)
Defendants. )
)

## DECLARATION OF BRIAN J. NEFF

I, Brian J. Neff, declare as follows:

1. I am a United States citizen. Since 1994, I have worked as an attorney. I am currently admitted in New York, New Jersey and Massachusetts. I am also a member of the Bar of the United States Supreme Court, the United States Court of Appeals for the Third Circuit, and the United States District Courts for the Southern and Eastern Districts for New York, and for the District of New Jersey. My work as an attorney has been in the areas of civil and criminal litigation. I am currently Counsel with Schiff Hardin, LLP, 900 Third Avenue, New York, N.Y. 10022. I am a plaintiff in this action.

### Background

2. A December 2005 report in The New York Times revealed that President Bush had authorized the creation of a warrantless surveillance program (hereinafter "the Program). James Risen & Eric Lichtblau, *Bush Lets US Spy on Callers Without Courts*, N.Y. Times, Dec. 16, 2005. "). According to the report, the Program was instituted for the purpose of detecting terrorist activities, and it included the secret surveillance of electronic

communications between Americans and persons outside the United States. The report indicated that the number of people within the United States who were monitored "may have reached into the thousands since the program began." *Id.*

3.     Since late 2005, I have been representing a number of men imprisoned without charge at the Guantánamo Naval Base in Cuba. This representation has been provided on a *pro bono* basis. According to the government, my Guantánamo clients have been involved in terrorist activity by virtue their alleged association with al Qaeda or the Taliban.

4.     On January 18, 2006, I and a number of other attorneys representing Guantánamo prisoners filed Freedom of Information Act (FOIA) requests with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the Program. The requests sought information regarding whether, and to what extent, the federal government is conducting surveillance of my electronic communications pursuant to the Program.

5.     The NSA and DOJ failed to adequately respond to the FOIA requests. In particular, the NSA and DOJ refused to confirm or deny that they have records relating to electronic monitoring of my communications pursuant to the Program. The NSA and DOJ subsequently denied administrative appeals from their responses to the FOIA requests.

6.     In May 2007, this action was filed on behalf of me and a number of other attorneys who represent current or former Guantánamo detainees.

## Knowledge of the Warrantless Surveillance Program

7.     My understanding is that the Program involves governmental monitoring of electronic communications, including telephone calls, faxes and emails.

2

8.   The government has asserted that, under the Program, it may target for surveillance not only suspected terrorists but also any person in the United States communicating with any person outside the United States, if the government believes that one party to the communication is "a member of al Qaeda, affiliated with al Qaeda, a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." Attorney General Alberto Gonzales, Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence (December 19, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html (last visited April 25, 2008).

9.   In addition, according to one report regarding the Program, the NSA "besides actually eavesdropping on specific conversations, have combed through large volumes of phone and Internet traffic in search of patterns that might point to terrorism suspects." Eric Lichtblau & James Risen, *Spy Agency Mined Vast Data Trove, Officials Report*, N.Y. Times, Dec. 24, 2005.   This "pattern analysis" includes assessment of "the origins and destination of phone calls and e-mail messages." *Id.*

10.  I understand that there have been official assertions that attorney-client communications are not categorically excluded from the scope of the Program. See *Responses to Joint Questions from House Judiciary Committee Minority Members* (Mar. 24, 2006) at 15, ¶45, *available at* http://judiciary.house.gov/media/pdfs/responses032406.pdf (last visited April 25, 2008).

3

11.  The administration has asserted that the President has the inherent authority to monitor communications pursuant to the Program without obtaining a warrant or otherwise complying with the requirements of the Foreign Intelligence Surveillance Act.

### Representation

12.  As indicated above, for a number of years I have been involved in the litigation relating to the imprisonment of alleged terrorists at Guantánamo Bay, Cuba. Working with a number of other attorneys from my firm, I filed in the United States District Court for the District of Columbia two Petitions for *Habeas Corpus* on behalf of my clients.

13.  My clients are citizens of Saudi Arabia and Yemen. They include both prisoners and family members of prisoners who filed "next friend" petitions on behalf of their imprisoned loved ones.

14.  The Saudi clients I represent in the Guantánamo litigation are: Mohammed Bin Jaied Bin Aladi Al Mohammed Al Subaie; Jaied Bin Hadi Al Mohammed Al Subaie (next friend); Bijad Defalla Oteibi; Sultan Defalla Oteibi (next friend); Alghamdi Abdulrahman Othman A; and Alghamdi Ahmed Othman A (next friend). My Yemeni clients are: Mohamed Al-Zarnouqi; Mashour Abdullah Muqbel Alsabri; and Mohamed Muqbel Ahmed Alsabri (next friend).

15.  My Saudi clients who were imprisoned at Guantánamo were transferred to the custody of the government of Saudi Arabia after years in confinement at Guantánamo. Subsequent to their transfer, they were released from custody without charge. My Yemeni clients Mohamed Al-Zarnouqi and Mashour Abdullah Muqbel Alsabri remain imprisoned at

Guantánamo. They each have been imprisoned there for approximately six years. Neither of them has been charged with any crime.

16. A security clearance is required before an attorney will be permitted to visit a client at Guantánamo. I obtained such a clearance and have made four trips to Guantánamo to meet with my clients. The most recent trip was in early April 2008.

17. The government has asserted that my clients are affiliated with Al Qaeda and the Taliban. These assertions include claims that my clients attended Al Qaeda terrorist training camps in Afghanistan and that they associated with various high-ranking members of Al Qaeda, including Osama Bin Laden.

### Communication

18. In furtherance of my representation of my clients in the Guantánamo litigation, I have had many electronic communications with persons outside the United States. These communications have included telephone calls and email communications with my clients' family members in both Saudi Arabia and Yemen, as well as phone calls and email communications with clients in Saudi Arabia subsequent to their release. I also have communicated with human rights groups and attorneys outside the United States with regard to the Guantánamo litigation and my clients' cases. Furthermore, I have had telephone and email communication with overseas translators, including communications regarding matters protected by the attorney-client privilege and work product doctrine.

19. The foregoing communications have included communications with persons in Saudi Arabia, Yemen, Bahrain, France, Cuba, the United Kingdom, and perhaps Syria.

5

20.   These communications have occurred throughout the past approximately two and a half years.

21.   It is essential that I engage in these types of communications in order to properly represent my clients.

22.   It is likewise essential that the communications remain confidential. Without confidence that the communications are shielded from government scrutiny, the parties to the communication will be inhibited in the free exchange of information and viewpoints.

23.   Communicating by other than electronic means is not a viable alternative. Telephone communication permits a real-time exchange of information, and helps to ensure that there is a proper understanding – which is particularly important when communicating with someone who does not share my culture or language. Communicating via email eliminates the delay attendant to overseas communication by mail, and is less expensive. Physically traveling overseas to engage in each of these communications is not a realistic option.

**Concerns about Surveillance and Interference with Representation**

24.   I understand that, regardless of any current cessation of the Program, the administration has by no means conceded that Congressional authorization of warrantless surveillance conducted pursuant to the Program is required by the Constitution. *See, e.g.*, Bob Egelko, *Bush lawyer tangles with judge over wiretaps*, San Francisco Chronicle, April 23, 2008. Thus, the threat of further warrantless surveillance pursuant to the Program remains.

25.   I filed the FOIA requests because I was concerned about the possibility that the Program was monitoring my communications. As a result of my work in the Guantánamo

litigation, I have had international electronic communications with persons whom the government has characterized as "terrorists." I have also had many international electronic communications with family members of purported terrorists, and communications with others regarding allegations of terrorist activities. Given what has been reported regarding the Program, the likelihood these communications were monitored is substantial.

26.    The loss of confidence in the confidentiality of my international communications makes an already difficult task significantly harder. Due to the restrictions that have been imposed in the Guantánamo *habeas* cases, I am already limited in terms of the information I am allowed to communicate to my client and others. My concern that communications have been monitored has caused me to further restrict the content of those communications so as to avoid the disclosure of client confidences. Furthermore, on occasion, the persons outside the United States with whom I have communicated have expressed some concern that our conversations were monitored, and I believe this has impeded a full exchange of information.

27.    The government's refusal to confirm or deny whether my communications are subject to warrantless surveillance pursuant to the Program is interfering with my ability to represent my clients.

28.    At this point, I am seeking only information regarding the extent to which my communications are, have been, or will in the definite future be subject to warrantless surveillance. Such information is critical to the proper performance of my duties as an

attorney.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 25th day of April 2008

Brian J. Neff
Counsel
Schiff Hardin, LLP

8

# 15

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS B. WILNER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 07-CIV-3883 (DLC) |
| ) | |
| NATIONAL SECURITY AGENCY and ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DECLARATION OF CLIVE A. STAFFORD SMITH

I, CLIVE A. STAFFORD SMITH, declare as follows:

1. I am a citizen of both the United States and the United Kingdom.

2. I am a member of the bars of Georgia, Louisiana and Mississippi, as well as of the United States Supreme Court and various among the lower federal courts.

3. I completed my British education at Radley College, near Oxford. I then went to the United States for my further education, and took a degree in political science from the University of North Carolina at Chapel Hill, where I was a John Motley Morehead Scholar from 1978-81.

4. I attended Columbia Law School in New York, where I received my *Juris Doctor* in 1984. I was recognized as a Harlan Fiske Stone Merit Scholar all three years I was there. I was a member of the Columbia Human Rights Law Review.

5. My legal career since 1984 has focused on the defense of indigent persons facing the death penalty in the United States, as well as persons alleged to be terrorists. From 1984-1993, I was a staff attorney with the Southern Center for Human Rights (SCHR) in Atlanta, Georgia. At

1

the SCHR I was responsible for the defense of a large number of prisoners who faced the death penalty. I also represented prisoners in litigation involving their conditions of confinement.

6. In 1993, I left the SCHR to establish a law office in New Orleans, the *Louisiana Crisis Assistance Center* (LCAC). I was the director of the LCAC for eleven years. The *LCAC* is a not-for-profit law foundation devoted to providing legal services to indigent persons facing the death penalty in the South.

7. In 2004, I relocated to London, where I had established the legal charity *Reprieve* in 1999. I am now director of that office. Our remit includes both death penalty litigation and the representation of the prisoners in Guantanamo Bay and other US-sponsored secret prisons.

8. Over the years, I have been counsel in many very serious criminal cases (almost all of them capital) at all levels of the process, from trial to the United States Supreme Court. I have tried more than two dozen capital cases to a jury, and been involved in many more cases that did not proceed to trial. I estimate that I have been involved in over 300 capital cases at one level of the process or another.

9. I have been responsible for securing certiorari review in the United States Supreme Court in various cases, including: *Johnson v. Mississippi*, 108 S. Ct. 1981 (1988) (unanimous reversal of death sentence for improper consideration of invalid prior conviction); *Shell v. Mississippi*, 111 S. Ct. 313 (1990) (unanimous *per curiam* reversal of death sentence for invalid consideration of aggravating circumstance); *Minnick v. Mississippi*, 112 L. Ed. 2d 489 (1990) (reversal of conviction for violation of the Fifth Amendment right to counsel); *Lonchar v. Thomas*, 116 S. Ct. 1293 (1996) (certiorari granted moments before petitioner's scheduled execution, resulting in unanimous decision in favor of the death sentenced inmate.)

2

10. Because of the importance of effective counsel in a meaningful judicial system, I have taken a very active role in systematic litigation on behalf of the right to counsel. This has included a class action on the right to counsel in capital post-conviction in Mississippi, and a great deal of litigation on the need for adequate funding and caseload limits in Louisiana.

11. I have been author or co-author of various manuals on the effective representation of indigent persons facing serious criminal or capital charges in Louisiana (1987, 1994 eds.), Mississippi (four editions, most recently in 1991) and Georgia (two editions). More recently, I have been developing a manual for the representation of prisoners in Guantánamo Bay and similar lawless enclaves.

12. I have published a large amount on both the death penalty and Guantánamo Bay. Most significantly, this has included a book published in the UK as *Bad Men: Guantánamo Bay and the Secret Prisons* (Weidenfeld 2007) and in the US as *Eight O'Clock Ferry to the Windward Side: Seeking Justice in Guantánamo Bay* (Nation 2007). I do a monthly column for the London-based political magazine, *The New Statesman*.

13. I have twice been invited to testify before the United States Congress, Sub-Committee on the Judiciary, regarding racial discrimination in capital cases. More recently, I have been invited to testify before the Subcommittee on Foreign Affairs this Spring on issues concerning Guantánamo Bay.

14. I was a member and staff counsel to the Commission on Human Rights Abuses in Mississippi (Jackson, Mississippi, 1993), which focused on abuses of prisoners in jails around the state.

15. For both my capital defense and Guantánamo work, I have received various honors and awards. I was made a Soros Senior Fellow, then an Echoing Green Fellow, and most

3

recently given a "Visionary" award by the Joseph Rowntree Charitable Trust, which extends until 2010.

16. In 2000, I was honored by Her Majesty Queen Elizabeth II with the *Order of the British Empire* (OBE) for "services to humanity". For work for indigent persons who could not afford counsel, I received an Honorary LLM Degree from the University of Wolverhampton in 2001, and am to receive another similar award from Oxford Brookes University in 2008.

17. I have received Lifetime Achievement Awards from *The Lawyer Magazine* (UK April 2003) and *The Law Society* (U.K. Oct. 2003). I was awarded the *2005 Gandhi Peace* award.

18. On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government has intercepted communications involving me or my charitable law office. I am now a Plaintiff in *Wilner et al. v. NSA et al.*

19. I understand that in response to my FOIA request, the NSA and DOJ have refused to confirm or deny whether they have records related to whether the NSA is monitoring my electronic communications.

20. I have been particularly concerned about this surveillance, as I believe I am a particular target of this kind of government for a number of reasons.

21. I have been involved in the work against Guantánamo Bay for as long as any of the lawyers. I was one of those who first filed the litigation against the prison in February 2002.

22. This work has involved both the military commissions and the habeas litigation, and it has been extremely contentious. It has also involved challenging the secrecy that has wrapped

4

Guantánamo and the other secret prisons – work that is antithetical to those who would keep everything secret, or who would gather "intelligence" by monitoring my own communications. For example, in the representation of the habeas clients, the main work has been to (legitimately) challenge every aspect of the secrecy regime possible. From the start, I learned shocking truths from my clients in Guantánamo about their mistreatment, the innocence of many, and the outright incompetence of those running the prison. It was a great struggle to get these truths through the classification / censorship process.

23. The military commissions work has also been very contentious. I have represented Binyam Mohamed, a British prisoner, in these procedures since he was first charged in November 2005. This has involved the highly unpopular challenge to the ethics of the process, which caused a great deal of heated disputation.

24. Along with the other lawyers at *Reprieve*, I have probably represented more of the prisoners than anyone else. At one stage or another, we have provided direct assistance to well over 50 of the prisoners held in Guantánamo Bay. We have also helped, or attempted to help, a large number of other prisoners.

25. Our clients have included some very high profile cases. For example:

- Sami al Haj, the al Jazeera journalist whose plight in Guantánamo Bay is carried daily on television to millions around the world.

- Binyam Mohamed, the British resident who was rendered to Morocco and tortured there for 18 months, before additional torture in the Dark Prison in Kabul (we have also tried to ensure legal assistance to the other nine prisoners carried to Guantánamo on the so-called "Rendition Flight" in September 19-20, 2004).

5

- All the British prisoners including Moazzam Begg, who the US continues to
  believe to be a significant terrorist despite his repatriation to the UK in 2005.
- Ahmed Errachidi, the Moroccan national who was supposed to have been
  "The General", the leader of the Al Qaida Military Wing in Guantánamo Bay.

26. I have also been intimately involved in trying to secure access to the so-called "High
Value Detainees" ("HVDs"), or "ghost" detainees, being held in Guantánamo Bay.

27. In the early days of the process, I was the one who did most of the international
travel to try to locate family members of the prisoners (who would act as "next friends" for
them). Starting in 2003, this travel took me to countries such as Bahrain, Jordan (twice),
Mauritania, Morocco (twice), Qatar (three times), Sudan, and Yemen (three times), as well as
various European countries. My colleagues at Reprieve have visited various additional
countries, including Chad, Kenya, Israel, Pakistan, Russia, and Tunisia.

28. The very purpose of these trips have been to meet with family members of current
prisoners (both in Guantánamo and in other secret prisons), former prisoners (likewise of both
Guantánamo and other secret prisons), as well as members of governments and political
opposition groups. Given that every person held by the US in these prisons is presumably
considered a potential terrorist by US intelligence, this travel enhances the probability that my
work has been the target of surveillance.

29. Our work has gone well beyond the disputes in Guantánamo Bay. At *Reprieve*, we
have been trying to trace "ghost" prisoners and "secret prisons" across the globe, and we have
had a focus on the "ghost" prisoners who are now in Guantánamo Bay long before they were
transferred there (as well as a number of "ghost" prisoners who have still not been transferred

6

there).  We have been working intently on the renditions program to expose the illegalities of the Bush Administration.

30. This has involved investigation in some hot spots around the world, including the Horn of Africa, where our work exposed very early on the new rendition program that had been instituted by the US there.

31. At *Reprieve*, we have issued a number of reports on the "secret" US rendition programs insofar as they have implicated such European countries as Ireland, Germany, Poland, Portugal, Spain, and, most notably, the UK (including Scotland and, most contentious of all, UK territory in Diego Garcia).  We have also done investigation in Italy.  I – and others at Reprieve – have made highly publicized visits to various of these countries.

32. I have personally been ordered in for interrogation by the Jordanian intelligence authorities (which I reported to the US intelligence authorities soon after, when interviewed for my security clearance).  Other members of the *Reprieve* staff have been questioned by law enforcement in other countries.

33. I would be quite surprised if my confidential meetings with clients have not been monitored while I have been in Guantánamo itself.  Certainly none of my clients believe the meetings are confidential.  Some clients tell me directly that they believe that I am an unwitting tool of US intelligence, because it is logical to the clients that if I come in, establish trust with the client, and then ask them for details of their alleged activities, then the US intelligence personnel would want to listen in to our conversations (effectively as an alternative source of interrogation).

34. This is not merely a matter of a client's concerns.  Indeed, the first time I visited the base, an issue arose with another lawyer whose meeting seemed to have been monitored – the

7

client complained that he was questioned about the contents of their discussions soon after the lawyer left the meeting. For myself, my own clients tell me that they have been vigorously questioned by the interrogators at the prison about their discussions with me.

35. I have been threatened by the authorities in Guantánamo Bay on more than one occasion. The most relevant took place on August 5, 2005. I arrived at Camp Echo at 08:05 and was confronted by two officers of the Joint Task Force (JTF-GTMO). We spoke for about twenty minutes. One of the officers made various allegations. He said that they somehow knew that I was going to discuss with my clients the London Bombings that had taken place the month before. He also said that they had information that I was the one who had "planned" the hunger strike going on in Guantánamo at the time. (Parenthetically, their allegations were wrong on both counts, but the issue here is how they developed it, and whether this would raise the probability that US intelligence would focus on me in particular.)

36. Of course, there is one instance when I know that my communications with my clients have been seized by US intelligence. This came on or around June 11-12, 2006, when my clients' legal materials were seized by the JTF-GTMO authorities, supposedly as part of their investigation into the deaths in custody in Guantánamo Bay. We are still involved in litigation to try to get these privileged and confidential materials back.

37. The U.S. government has interfered with Guantánamo representation in various ways since the litigation began. For example, many people are familiar with the case of Charles Stimson, then-Deputy Assistant Secretary of Defense for Detainee Affairs. Stimson threatened attorneys representing Guantánamo detainees, when he stated publicly, "when corporate CEOs see that those [major law] firms are representing the very terrorists who hit their bottom line back in 2001, those CEOs are going to make those law firms choose between representing terrorists or

8

representing reputable firms . . . ." *See* Democracy Now!, Jan. 17, 2007, *available at*

http://www.democracynow.org/2007/1/17/top_official_calls_for_boycott (last visited March 31,

2008).

38. I use all forms of communication – verbal, telephone, mobile phone, e-mail, and

letter.  Because I reside in the UK, and travel a great deal, a large number of my communications

are international.  Indeed, I am based in Dorset, in the UK, and the *Reprieve* headquarters is in

London, so many communications with the office are by e-mail or telephone.  When I travel,

whether to Guantánamo or elsewhere, I am constantly sending communications back to London.

I am also often in the United States and make international communications from the US when I

travel there.

39. I also send a large number of communications internationally to other members of the

legal teams working on the multitude of cases in which *Reprieve* is involved.  Many of these

teams are in the US, but others are scattered across the globe, in the many countries touched by

our clients' cases.

40. I should note that the rest of my legal practice is exclusively in the realm of

international human rights.  Most cases are international death penalty cases where again we

have significant international communications.  Some involve efforts on the part of the US to

extradite people to face trial in the US.

41. From the very start, I have made the assumption that all of my communications are

monitored.  It is the prudent thing to do.  I do not commit crimes, so it is not a matter of being

afraid that I might say something illegal.  Indeed, I have never been convicted of any crime.  I

have never been sanctioned by any bar of which I am a member.

42. Rather, the precautions that I take are founded on my fear that improper interceptions of my communications might betray a confidence of a client. This does not reduce the privacy concerns that I have in terms of being monitored, if that is indeed taking place, because I discuss many very personal things in my communications. Also there are privileged matters that I do discuss (mainly in terms of legal strategy). I just don't talk about things my clients have said that I know they would want to keep confidential. Of course, it also makes it difficult to represent a client as effectively as I would wish.

43. Because of official assertions about the confines of the warrantless surveillance program, as well as the nature of my international communications and the identities of those with whom I communicate, I am obviously concerned about the possibility of the NSA monitoring or having monitored my communications without a warrant.

44. I am very concerned at this, because of the government's unduly broad interpretation of who would be clearly subject to this kind of surveillance. For example, under the government's illegally broad and varying definitions of "enemy combatant" I think I could qualify. I have certainly rendered assistance to those designated by the President as terrorists or enemy combatants. Those to whom I have given legal assistance or advice include people on the lists of people designated by the Treasury and other bodies. They also include those specifically designated by the President as "enemy combatants." While I think it is wholly improper for them to do so, I can see how this could be seen by the intelligence agencies as a justification for viewing me (and others) as subject to surveillance.

45. I am concerned that NSA interception of my communication with clients, potential witnesses and others is compromising my ability to effectively represent my clients. Because of NSA's possible surveillance and its refusal to confirm or deny whether it is engaged in such

10

surveillance, I cannot ensure the confidentiality of my communications or the sanctity of my

work product.. This substantially interferes with my ability to conduct factual investigation,

explore legal theories, and otherwise represent my clients' interests . As a result, I am

handicapped in my ability to gather all information necessary to advise my clients, to advocate

zealously on their behalf, and to make the full and best presentations to the courts hearing their

claims. It is my duty as a lawyer to advocate zealously on behalf of my clients, maintain my

clients' confidences and shield my work product from the opposition. By refusing to confirm or

deny whether it is intercepting my communications, the NSA is preventing me from representing

my clients in accordance with my ethical and fiduciary obligations to them.

46. Government surveillance of my communications would compromise the privacy

interests of all of my clients, Guantánamo detainees as well as other clients unrelated to

Guantánamo. It would also violate the privacy interests of potential witnesses and others with

whom I communicate as part of my practice. Warrantless surveillance of my telephone calls, e-

mails, faxes, and text messages would also violate my privacy during personal communications.

47. I have often lectured in Britain and elsewhere on the finer aspects of the US system,

aspects that these other countries should emulate. Perhaps the most important example is the

Constitution, and all the principles that flow from the Bill of Rights. One is clearly freedom of

information, and the notion that the Government should have to reveal to its citizens efforts the

Government has been making to investigate those citizens. It troubles me greatly to think that

this may have happened to me.

11

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _22_ day of April 2008

CLIVE A. STAFFORD SMITH
DIRECTOR
REPRIEVE

**16**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
——————————————————————————  x
THOMAS B. WILNER, et al.              :
                                      :
                    Plaintiffs,       :
                                      :
        v.                            :   C.A. No. 07-cv-3883 (DLC)
                                      :
NATIONAL SECURITY AGENCY and          :
DEPARTMENT OF JUSTICE                 :
                                      :
                    Defendants.       :
——————————————————————————  x
```

## DECLARATION OF MICHAEL J. STERNHELL

I, MICHAEL J. STERNHELL, declare as follows:

1.      I am a citizen of the United States of America and an attorney associated with

Kramer Levin Naftalis & Frankel LLP ("Kramer Levin"), 1177 Avenue of the Americas, New

York, New York 10036.

2.      I am a member in good standing of the bars of the following courts: New York

State, Appellate Division, Second Department; District of Columbia; United States Supreme

Court; United States Court of Appeals for District of Columbia Circuit; United States Court of

Appeals for the Second Circuit; United States District Court for the Southern District of New

York; and United States District Court for the Eastern District of New York. I am also a member

of the American Bar Association, the New York State Bar Association and the International

Human Rights Committee of the Association of the Bar of the City of New York.

3.      I have been engaged in the practice of law since 2002. My practice is primarily

focused on civil and criminal securities litigation, representing clients in Securities and Exchange

Commission enforcement actions and other administrative agency proceedings and conducting

corporate internal investigations. I also devote a substantial portion of my practice to

representing clients *pro bono* in the areas of asylum law and human rights litigation. Since September 2005, I have represented seven Chinese citizens who are ethnic Uighurs and who are now, or were previously, detained by the Department of Defense at the United States Naval Station at Guantánamo Bay, Cuba ("Guantánamo").

4.    Since September 2005, I have represented Ayub Hajimemet, Ahmed Adil and Akhdar Qasem Basit, all of whom are Chinese citizens who were held in extrajudicial detention in Guantánamo between 2002 and May 2006. They were petitioners in *Mamet v. Bush*, No. 1:05-cv-01886 (EGS) (D.D.C. filed Sept. 22, 2005), a petition for a writ of habeas corpus that was voluntarily dismissed following their release from Guantánamo and transfer to Albania.

5.    Since December 2005, I have represented Abdul Razakah and Ahmad Tourson, both of whom are Chinese citizens who have been held in extrajudicial detention in Guantánamo since 2002. They are petitioners in *Razakah v. Bush*, No. 05-cv-2370 (EGS) (D.D.C. filed Dec. 12, 2005), a petition for a writ of habeas corpus that has been stayed since March 17, 2006. Mr. Razakah is also a petitioner in *Razakah v. Gates*, No. 07-1350 (D.C. Cir. filed Aug. 30, 2007), a petition for relief under the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, 119 Stat. 2680. Mr. Tourson is also a petitioner in *Tourson v. Gates*, No. 08-1033 (D.C. Cir. filed Jan. 25, 2008), a petition for relief under the DTA.

6.    Since December 2005, I have represented Adel Noori and Abdul Ghappar Abdul Rahman, both of whom are Chinese citizens who have been held in extrajudicial detention in Guantánamo since 2002. They are petitioners in *Mohammon v. Bush*, No. 05-cv-2386 (RBW) (D.D.C. filed Dec. 21, 2005), a petition for a writ of habeas corpus. Mr. Noori is also a petitioner in *Noori v. Gates*, No. 08-1033 (D.C. Cir. filed Mar. 20, 2008), a petition for relief under the DTA. Mr. Abdul Rahman is also a petitioner in *Abdughappar Abdurahman v. Gates*,

No. 07-cv-1303 (D.C. Cir. filed Aug. 2, 2007), a petition for relief under the DTA.

7.      On January 18, 2006, I filed a Freedom of Information Act ("FOIA") request with the National Security Agency ("NSA") and the Department of Justice ("DOJ"), seeking information regarding the NSA warrantless surveillance program, including whether, and to what extent, the federal government is engaged in warrantless electronic surveillance of communications involving me or my law office. I am a plaintiff in *Wilner et al. v. NSA et al.*

8.      In connection with my representation of current and former prisoners at Guantánamo, I have frequently had occasion to communicate by telephone and email with individuals outside of the United States. Since May 2006, when three of my clients were released from Guantánamo and transferred to a refugee center in Tirana, Albania, I have also been in regular contact by telephone and email with these men, who have been granted asylum by the Albanian government. The representations made by the NSA and DOJ about the scope of the warrantless surveillance program lead me to believe that the NSA may be monitoring or has previously monitored my international communications without a warrant. In particular, I believe that my communications with my clients in Albania may have been monitored.

9.      In connection with my representation of current and former prisoners at Guantánamo, I have communicated with individuals located outside of the United States via telephone using my office telephone, my mobile telephone and my home telephone. I have also communicated with individuals located outside of the United States via email using my office computer, my home computer and my BlackBerry.

10.     The parties to these communications have included my clients, their families, representatives of foreign governments, UN agencies, nongovernmental organizations and foreign journalists. I have communicated by telephone and email with individuals in Albania,

-3-

Canada, China, Italy, Germany, Spain, Sweden and the United Kingdom. My clients who remain incarcerated in Guantánamo have all been cleared for release, but they cannot return to China because they will be detained, tortured and possibly executed by the Chinese government for their political and religious beliefs. My international communications have therefore been critical to my ongoing efforts to locate countries that might offer my clients asylum.

11.     Telephone and email are the only practical means by which I can undertake these international communications, and the delays associated with sending letters would seriously prejudice my clients. My attorney-client communications would be far more cumbersome and expensive if they occurred via letter because of the costs of translation and of time. In contrast, when communicating with my clients via telephone, I am able to have a translator on the line to translate the conversation in real time.

12.     Although only a very small minority of prisoners at Guantánamo has been charged, and little evidence has been released to substantiate these assertions, the U.S. government has alleged that the majority of the men detained at Guantánamo in 2004 were affiliated with Al Qaeda and/or the Taliban. Mark Denbeaux & Joshua Denbeaux, *Report on Guantanamo Detainees: A Profile of 517 Detainees through Analysis of Department of Defense Data*, Seton Hall Public Law Research Paper No. 46, February 2006. My clients have all been cleared for release from Guantánamo since 2003. Nevertheless, when they appeared before their Combatant Status Review Tribunals ("CSRTs") in Guantánamo, they were all accused of being members of the East Turkistan Islamic Movement ("ETIM"), an organization that the Executive claimed was affiliated with the Taliban and al Qaeda. On that basis, Messrs. Razakah, Tourson, Noori and Ghappar Abdul Rahman were found to be enemy combatants by the CSRTs.

13.     In addition to my representation of current and former Guantánamo prisoners, I

also engage in other litigation, including the representation of witnesses, subjects and targets of regulatory and criminal investigations. The other parts of my practice often require me to engage in communications with clients residing outside the United States. I am therefore concerned that certain of these communications may have been monitored in connection with the NSA's warrantless surveillance program.

14.     The U.S. government has interfered with the representation of Guantánamo prisoners in various ways since prisoners first began to assert their rights in the courts of the United States with the assistance of counsel. At the outset of each of the habeas corpus proceedings referenced *supra* at ¶¶ 13-15, the government contested my authority to represent the petitioners therein. The government refused repeatedly to permit my clients access to their counsel and only relented under court order.

15.     I am concerned that the government's possible surveillance of my communication with my clients or others may interfere with my ability to represent my clients effectively as well as comply with my ethical obligations as their counsel. NSA's possible surveillance of my communications, and its refusal to confirm or deny whether it is engaged in such surveillance, makes it impossible for me to ensure my communications with clients, potential witnesses and others are confidential. As a result, I cannot engage in candid conversations with witnesses, potential witnesses, conduct factual research, or explore legal theories. The risk of revealing client confidences and my own work product inhibits my ability to gather information, advise my clients and fully develop the complete spectrum of factual and legal options to present to the courts adjudicating their claims. By refusing to confirm or deny whether it is engaged in warrantless surveillance of my communications, the NSA is interfering with my ability to represent my clients in accordance with the most basic ethical duties of the legal profession.

-5-

16.    I consider it an honor and privilege to represent innocent men who have been

denied due process and the opportunity to prove their innocence before a court of law.  And I

consider it my duty as a lawyer to contest my government's efforts to violate the Constitution,

both in its extralegal detention of my clients and other prisoners at Guantánamo and in its

warrantless surveillance of those who choose to represent them.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this 25th day of April, 2008
New York, New York

Michael J. Sternhell

**17**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS B. WILNER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 07-CIV-3883 (DLC) |
| ) | |
| NATIONAL SECURITY AGENCY and ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF STEPHEN M. TRUITT

I, Stephen M. Truitt declare as follows:

1.      I have been a sole practitioner for the last two years. Before that I was a partner and of

counsel at Pepper Hamilton LLP, Randolph & Truitt, and Wald, Harkrader & Ross.

Before that I was at the Civil Division, General Litigation Section of the Department of

Justice commencing in 1966. My entire career has been in the general area of civil

litigation based in the District of Columbia. I have represented Indian tribes, partnerships,

unions, people, municipalities, corporations, and foreign sovereigns. I am a member of

the District of Columbia Bar, the Supreme Court, various Circuit Courts and the Tax and

Federal Claims Courts here in the District of Columbia.  I am a United States citizen and

served in the United States Marine Corps.

2.      On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with the

National Security Agency (NSA) and the Department of Justice (DOJ), seeking to

determine if the federal government has or is engaged in warrantless electronic

surveillance of communications of my law office or me.  Alongside 23 other attorneys

who represent current or former Guantánamo detainees, I am now a Plaintiff in the above captioned action.

3.   In response to my FOIA request, the NSA and DOJ have refused to confirm or deny whether they have records related to whether the NSA is monitoring my electronic communications.

4.   This is a simple case with a simple goal, namely to determine the facts of whether the warrantless surveillance program has been used to intercept the privileged communications between attorneys and litigation participants. At the most basic level, it asks, "has my phone, fax, or internet communication been intercepted without the authority of a warrant?"

5.   I have represented in domestic US litigation the National Iranian Oil Company (NIOC), various Kuwaiti trading companies, and other non-sovereign foreign entities. I have a number of correspondents in Iran, Kuwait, Yemen and other places that might pique the curiosity of our "intelligence" apparatus. Some of these correspondents have risen to high places: Iran's Oil Minister when I acted for NIOC in 1989 is now the vice president of Iran and the head of the Atomic Energy Organization of Iran. I spoke with him in securing his authority to compromise NIOC's claim against Ashland Oil for $325,000,000 in 1989 and have electronically communicated with him since September 11, 2001. Adding the fact that I now represent two prisoners at Guantanamo, the basis of my curiosity about government surveillance comes into focus.

6.   In light of the foregoing and because of official assertions about the confines of the warrantless surveillance program, as well as the nature of my international

communications and the identities of those with whom I communicate, I am concerned

about the possibility of the NSA monitoring or having monitored my communications

without a warrant.

7.     I am advised and believe that the Executive instituted a warrantless eavesdropping

program. The federal government takes the position that under the program it may target

for surveillance not only suspected terrorists but also any person in the United States

communicating with any person outside the United States, if the government believes that

one party to the communication is "a member of al Qaeda, affiliated with al Qaeda, a

member of an organization affiliated with al Qaeda, or working in support of al Qaeda."

Attorney General Alberto Gonzales, Press Briefing by Attorney General Alberto

Gonzales and General Michael Hayden, Principal Deputy Director for National

Intelligence (December 19, 2005), *available at* http:

//www.whitehouse,gov/news/releases/2005/12/20051219-1.html (last visited March 31,

2008). I understand that, under this program, government agencies have been engaged

in, and may in the future engage in, surveillance through listening to telephone calls,

reading e-mails and faxes, and otherwise monitoring and recording electronic

communications.

8.     While I understood that the federal government was engaged in the surveillance of some

international communications prior to the initiation of the warrantless surveillance

program, I also believe that there were important limitations to the extent of that

communication that I believe would have likely prevented the government from

intercepting my communications. I doubt that there are, have been or will be similar

restrictions governing the surveillance of my international communications with clients, family members, and other litigation participants in the course of my litigation under the warrantless surveillance program.

9.    I regularly use email, telephone, fax as well as letters in communicating with friends and clients abroad. Very little of the communication is via hard copy letter and even letters are usually sent by electronic means as well as by hard copy.  Such communication deals with legal advice, witness preparation and other confidential legal matters.

10.    In particular, I have acted for Kuwaiti trading companies in domestic US litigation and in international arbitration. These matters have largely been discussed and prepared for via electronic transmission.

11.    As I mentioned I represent two prisoners at Guantanamo, Maher El Falesteny, a Palestinian (ISN519) and Hani Abdullah, a Yemeni (ISN 841) Both have been held for several years at Guantanamo and I have visited them some eleven times commencing in 2005 after my security clearance was granted. In both cases I have filed *habeas* actions and review proceedings in the D.C. Circuit under the combined provisions of the Detention Treatment Act and Military Commissions Act. In connection with El Falesteny, I have had extensive electronic communications with an asylum lawyer in Serbia who has assisted in filing an asylum application there, a considerable undertaking requiring extensive coordination and communication, all via phone, fax, or email.  In connection with El Falesteny's Circuit petition I have made one submission under seal to the because of the sensitive nature of these communications revealed in the filing.  In the case of Abdullah, I have visited a conference on Guantanamo prisoners in Yemen in

January 2008 where I met his family, various government officials, and members of the press. I have communicated electronically with such persons since that time including on matters of a confidential nature.

12. I believe that no proper warrant or other authority could be issued to allow interception of my communications described above. Nonetheless, in light of the President's statements and those of others in high office to the effect that in times of war the executive has supervening power displacing the restraints of the Bill of Rights, and given the context of my representation of Guantanamo detainees, I believe that such interception has taken place and further that the interceptors believe, erroneously, that such is allowable under our law. Unless I can determine the facts of the matter in the present suit any such abuse will go unchallenged. As a direct result of my belief that such surveillance has and is taking place, I cannot and do not discuss electronically with my clients and others sensitive matters which, absent fears of such surveillance, I unhesitatingly would discuss.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of April 2008

Stephen M. Truitt

5

**18**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THOMAS B. WILNER, et al., )<br><br>Plaintiffs, )<br><br>v.                                                       )<br><br>NATIONAL SECURITY AGENCY and )<br>DEPARTMENT OF JUSTICE,          )<br><br>Defendants.                              ) | Civil Action No. 07-CIV-3883 (DLC) |

## DECLARATION OF THOMAS B. WILNER

I, Thomas B. Wilner declare as follows:

1.      I am a citizen of the United States of America.  I have practiced law for more than 35 years, and am a member of the Bars of the District of Columbia, the State of New York, the Commonwealth of Pennsylvania and the Supreme Court of the United States.  I am a partner of Shearman & Sterling LLP in Washington, D.C., where I am managing partner of the firm's international trade litigation and government relations practice.

2.      On May 1, 2002, I filed suit in the United States District Court for the District of Columbia on behalf of 12 Kuwaiti citizens detained by the United States at the Guantanamo Bay Naval Base seeking basic due process rights for those detainees and, most importantly, a fair hearing before an impartial tribunal to determine whether there is sufficient cause to detain them. *Al-Odah v. United States*, Cir. No. 02-828 (D.D.C.) (CKK).  I was counsel of record for Guantanamo detainees in the cases decided in their favor by the United States Supreme Court in June, 2004, *Rasul v. Bush, Al-Odah v. United States*, 542 U.S. 466 (2004), and am counsel of record for Guantanamo detainees in the cases now pending before the United States Supreme Court, *Boumediene v. Bush, Al-Odah v. United States,* Nos. 06-1195 and 06-1196.

3.      On January 18, 2006, I filed a Freedom of Information Act (FOIA) request with
the National Security Agency (NSA) and the Department of Justice (DOJ), seeking information
regarding the NSA warrantless surveillance program, including whether, and to what extent, the
federal government is engaged in warrantless electronic surveillance of communications
involving me or my law office.  I am now a Plaintiff in *Wilner et al. v. NSA et al.*

4.      I understand that, in response to my FOIA request, the NSA and DOJ have
refused to confirm or deny whether they have records relating to whether the NSA has or is
monitoring my electronic communications.

5.      Based on the official descriptions of the scope of the government's  warrantless
surveillance program, and my representation of Guantanamo detainees and my communications
with their families in order to represent them, I have reason to believe that the NSA may have
targeted me for surveillance and engaged in warrantless surveillance of my electronic
communications.  Indeed, I have been informed on two occasions by government officials, on
the condition that I not disclose their names, that I am probably the subject of government
surveillance and should be careful in my electronic communications with others.

6.      The government previously asserted the right, and the need in order to protect
United States national security, to monitor and eavesdrop on my conversations with at least
certain of my clients at Guantanamo Bay.  Although the U.S. district court rejected the
government's right to do so, *Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C 2004), I believe
certain government officials continue to believe it would further national security to monitor my
communications and that, in the absence of court supervision preventing it, they would do so.

7.      I am engaged primarily in an international legal practice, representing for the
most part non-U.S. individuals, governments and entities in connection with transactions,

litigations and other matters in which they are involved in the United States. Because most of my clients are located outside the United States, we cannot depend on in-person meetings to communicate. It is essential that I be able to communicate with them by telephone, fax and e-mail to provide and receive timely information, discuss issues and provide advice in order to be able to fulfill my obligations to adequately and vigorously represent their interests. It is also essential that those communications be private and confidential. Effective representation depends on the ability of attorney and client to be able to communicate freely and privately without fear of disclosure. See *Al-Odah v. United States*, 346 F. Supp. 2d 1, supra, and cases cited therein.

      8.     The belief that my conversations and other electronic communications with my foreign national clients are being monitored has made it far more difficult for me to carry out my obligations as a lawyer. This is so not only in the Guantanamo litigations, but in my normal international practice as well. At the very least, the government's refusal to confirm or deny whether it is engaging in such surveillance of my communications deprives me and my clients of the ability to ensure the confidentiality of our communications and, by itself, substantially interferes with our ability to communicate candidly and freely. It has hampered me in my ability to communicate information freely, to identify legal and strategic options that should be considered on the clients' behalf, and to advise the clients of those options. No one in good conscience can freely identify or discuss possible plans for a case while the other side may be listening in. Because of the possibility that the government is monitoring my communications, I regularly refrain from discussing in my phone calls and e-mails with my foreign clients key issues that should be discussed to protect their interests. The possibility that the government is

3

monitoring my communications has therefore significantly compromised my ability to represent my clients effectively.

9.    In that connection, I did not bring this action as a facial challenge to the legality of the government's warrantless surveillance program or to inquire into the general methodology the government uses under its program. At this juncture, to be able to conduct my practice and represent my clients effectively, I seek only to know whether my communications have been, are or will in the future be, subject to warrantless surveillance and, if so, the extent of that surveillance. That basic information is important to enable me to conduct my practice and represent my clients effectively.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _/st_ day of May 2008

Thomas B. Wilner

W0066654v1

4